UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY BOIKE,

    Plaintiff,

v.

AKAL SECURITY, INC.,

    Defendant.
_____/

Case no. _____

U.S. District Judge _____

**COMPLAINT AND JURY DEMAND**

Plaintiff Gary Boike, for his complaint, alleges as follows:

## Introduction

1.    Plaintiff Gary Boike ("Boike") is a career law enforcement officer who has a hereditary color vision deficiency. Notwithstanding that condition, he successfully worked as a federal court security officer in the United States Marshals Service's Court Security Program. Before that, Boike worked twenty-five years as a police officer with the Hamtramck, Michigan police department. Boike's vision was examined before he was accepted as a court security officer and tested periodically.

2. Defendant Akal Security, Inc. ("Akal") was Boike's employer for approximately fifteen years when Boike worked as a court security officer at the federal courthouse for the United States District Court, Eastern District of Michigan. Akal was aware of Boike's color vision deficiency when it hired Boike. Although Boike capably performed all of the duties of his position, Akal fired him because of his color vision deficiency after the Marshals Service directed that he be removed from the Court Security Program due to his disability.

3. This is an action against Akal to redress its unlawful discharge of Gary Boike in violation of the Americans with Disabilities Act, as amended, ("ADA"), 42 U.S.C. §12101, *et seq.* and the Michigan's Persons with Disabilities Civil Rights Act, MCL 37.11101, *et seq*.

### Jurisdiction and Venue

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331.

5. Venue in this Court is proper under 28 U.S.C. §1391 and 42 U.S.C. §2000e-5(f)(3) because Boike was terminated from employment in this judicial district and thus a substantial part of the events giving rise to the claim occurred in this judicial district; the unlawful employment practice occurred in this district; and Boike would have continued to work as a court security officer in this judicial district but for Akal's unlawful employment practice.

## The Parties

6. Akal is a New Mexico corporation with its principal offices in Espanola, New Mexico. Akal is in the business of contracting to provide court security services to the United States Marshals Service ("Marshals Service" or "USMS") as part of the Marshals Service's Court Security Program.

7. Boike was employed by Akal as a Court Security Officer and Lead Court Security Officer (collectively, "CSO") in the Marshals Service's Court Security Program for approximately fifteen years. He worked at the United States District Court in Detroit, Michigan. As a CSO, Boike provided security to the federal court system and its judicial officers. At all relevant times, including at the time of Boike's discharge, Akal was under contract with USMS to provide court security services in the Sixth Federal Judicial Circuit.

## Facts

**The Marshals Service's Court Security Program**

8. To fulfill its statutory obligation to provide for the security of the federal judiciary, the Marshals Service administers the Court Security Program. CSOs are employed by private contractors subject to approval by USMS. Once accepted into the Court Security Program, the Marshals Service deputizes CSOs so that they function as law enforcement officers with powers of arrest while on duty. Among other things, the Marshals Service has established and at different times revised medical standards which CSOs must meet to be eligible to work under a

3

court security contract and to remain employed under such a contract as part of the Court Security Program.

9. USMS requires applicants to the Court Security Program to submit to a physical examination, the results of which are reviewed by the Marshals Service before a decision is made to accept a candidate into the Court Security Program. CSOs are also required to have annual physical examinations, the results of which are also reviewed by the Marshals Service.

10. USMS retains sole discretion under its contract with Akal to remove an individual's authorization to work under the contract and in the Court Security Program. Once an individual's authority to work in the Court Security Program has been revoked by USMS for medical reasons or otherwise, that individual may no longer work as a CSO.

**The Marshals Service's Vision Requirements**

11. At all relevant times, USMS and Akal were parties to a contract for the Sixth Federal Judicial Circuit.

12. USMS, in Section C-14(e)(1) of that contract, required that: "Corrected distant visual acuity must be 20/30, or better, as measured with both eyes viewing (binocular). Complete loss of vision in one eye is disqualifying. Corrected distant visual acuity must be 20/125, or better, in the worst eye. Ability

to distinguish basic colors, as well as shades of color, is required. Normal peripheral vision is required."

**Plaintiff's Color Vision Disability**

13.  Since birth, Boike has had color vision deficiency, an inherited condition. This condition causes Boike to be unable to distinguish certain colors as measured by enhanced color vision testing, such as the Farnsworth D-15 or the Ishihara color vision tests.

14.  Boike's color vision deficiency has never affected his ability to perform his essential duties as a CSO, and at all times he performed to the satisfaction of Akal, USMS and the judges he was assigned to protect. Boike adequately performed all of the essential functions of the CSO position for approximately fifteen years in the Court Security Program before Akal terminated his employment.

15.  Nor did Boike's color vision deficiency ever affect his ability to perform his essential duties in other law enforcement positions. Boike worked for twenty-five years as a police officer with the Hamtramck, Michigan police department, from 1974 to 1999. For twelve of those years, from 1985 to 1997, he was assigned to the Drug Enforcement Administration as a Task Force Agent pursuant to a joint program between the Hamtramck police department and the DEA.

**USMS Testing of Color Vision**

16.     When Boike applied to the Court Security Program in 1998, the Marshals Service required him to submit to a physical examination as part of the application process. That examination included a color vision test. Upon information and belief, Boike failed the color vision portion of the exam.

17.     Notwithstanding his color vision deficiency, USMS accepted Boike into the Court Security Program and hired Boike in about 1999.

18.     After the Marshals Service accepted Boike into the Court Security Program, it required him to take a physical examination annually. Each year that Boike took a physical examination it included a color vision test. Boike submitted the results of the physical examination to the contractor (Akal, and before that, a predecessor company), which then transmitted the results to the Marshals Service. After USMS awarded Akal the Sixth Federal Judicial Circuit contract in about 1999, Boike submitted the results of his annual physical examinations to Akal, which transmitted the results to the Marshals Service.

19.     Upon information and belief, USMS has maintained the same color vision requirements since about 2000, and Boike failed the color vision portion of the exam each year. Until 2014, the Marshals Service never required him to submit to follow-up color vision testing following an annual physical or concluded

that, based on the results of the exam, he was not medically qualified to work in its Court Security Program.

**USMS Demands Additional Color Vision Testing**

20.     In December 2013, Boike underwent an annual physical exam and correctly identified four out of fourteen plates on the Ishihara color vision test. He submitted the results to Akal, which provided them to the Marshals Service.

21.     In February 2014, the Marshals Service issued a Medical Review Form ("MRF") to Akal stating that it had identified a "color vision deficit" based on Boike's failure to correctly identify more than four of the fourteen plates. USMS directed Boike to take the Farnsworth D-15 color vision test, and specified that he take the test without the aid of color vision corrective lenses.

22.     Upon information and belief, the Marshals Service and Akal permit nearsighted CSOs to take initial, annual and any follow-up physical examinations with the assistance of corrective lenses. As set out above, the medical standards for nearsightedness reference corrected vision. The Marshals Service and Akal also permit nearsighted CSOs to wear corrective lenses on the job.

23.     In April 2014, Boike took the Farnsworth D-15 color vision test. The physician who administered the test wrote, alongside the test results, "Mr. Boike has a deutan defect (mild). He has been able to perform his job for the last 15

7

years and should still be able to." Boike submitted the test results, along with the physician's note, to Akal, which gave them to the Marshals Service.

24. In June 2014 or thereabouts, the Marshals Service issued an MRF to Akal stating that Boike had "a significant color vision deficit" and that his condition "impair[ed] the ability to recognize basic colors and d[id] not meet the required color vision standard for the job."

**Akal's Termination of Plaintiff**

25. By letter dated July 9, 2014, Akal discharged Boike. The letter from Akal stated that Boike had been medically disqualified from the position of CSO, and enclosed a communication from the Marshals Service stating that Boike did not meet the CSO medical standards required by the contract. Akal advised Boike that its contract with the government required it to "comply with the directives issued under the terms of that contract by removing [him] from the position of Court Security Officer."

26. Akal's termination violated federal law, 42 U.S.C. §12112(b)(2), which provides that it is illegal to "participat[e] in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by [the ADA]."

27. Akal discharged Boike despite the fact that it knew that Boike's color vision deficiency had never affected his ability to safely and efficiently perform the responsibilities of the CSO position, and despite the fact that it knew he could have passed the test with the aid of color vision corrective lenses.

28. Akal discharged Boike because he is disabled or because it regarded Boike as disabled.

29. Akal knew that its discharge of Boike was unlawful, because the Equal Employment Opportunity Commission ("EEOC") has issued a cause determination in at least one other case where Akal discharged a qualified CSO with a disability because of its contract with USMS.

**Plaintiff Has Exhausted His Administrative Remedies**

30. Boike timely filed a disability discrimination charge against Akal with the EEOC. By letter dated June 30, 2016, the EEOC informed Boike that it had found reasonable cause to believe that Akal violated the ADA in connection with his discharge. The EEOC proposed a Conciliation Agreement requiring, among other things, Akal to pay Boike backpay in the amount of $75,000 (including interest, less legal deductions), compensatory damages in the amount of $50,000 and punitive damages in the amount of $100,000.

31. Following Akal's rejection of the proposed Conciliation Agreement, by letter dated October 18, 2016, the EEOC issued Boike a Notice of Right to Sue (Conciliation Failure) on his discharge claim against Akal and a Notice of Right to Sue on his reasonable accommodation claim against Akal. Both notices stated that Boike had the right to bring suit against Akal within ninety (90) days of his receipt of the notices. This complaint was timely filed within that 90-day period.

32. Boike also filed a formal complaint with the Marshals Service's Equal Employment Opportunity Office challenging his removal from the contract by the Marshals Service. The Marshals Service and Boike entered into an agreement resolving that complaint.

## COUNT I—DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

33. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if stated herein.

34. In enforcing color vision standards and in requiring color vision examinations that are not job-related and consistent with business necessity, Akal violated the ADA.

35. In denying Boike a reasonable accommodation in the form of color vision corrective lenses, Akal violated the ADA.

36. In discharging Boike, who was fully qualified to carry out the duties of CSO, because he is disabled or because it regarded him as disabled, Akal violated the ADA.

37. Akal's unlawful acts were intentional and have caused Boike emotional distress and harm.

### COUNT II—DISABILITY DISCRIMINATION IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

38. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if stated herein.

39. In enforcing color vision standards and in requiring color vision examinations that are unrelated to Boike's ability to perform the duties of the CSO position, Akal violated the Michigan Persons With Disabilities Civil Rights Act.

40. In discharging Boike, who was fully qualified to carry out the duties of CSO, because he is disabled or because it regarded him as disabled, Akal violated the Michigan Persons With Disabilities Civil Rights Act.

41. In discharging Boike when an adaptive device aid in the form of color vision corrective lenses would have enabled him to "pass" the color vision portion of his annual and follow-up physical exams, Akal violated the Michigan Persons With Disabilities Civil Rights Act.

42. Akal's unlawful acts were intentional and have caused Boike emotional distress and harm.

## **Relief Requested**

Plaintiff requests that the Court enter a judgment and order:

A. declaring that Akal violated the ADA;

B. declaring that Akal violated the Michigan Persons With Disabilities Civil Rights Act;

C. granting Plaintiff equitable relief, including back pay;

D. awarding Plaintiff punitive damages, in an amount that a jury may award Plaintiff as a result of Akal's intentional discrimination;

E. awarding Plaintiff compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and such other non-pecuniary damages that he suffered, all in an amount that a jury may award Plaintiff as a result of Akal's intentional discrimination;

F. awarding Plaintiff prejudgment and postjudgment interest;

G. granting Plaintiff his attorney's fees and costs in bringing this action; and

H. granting Plaintiff such other and further relief as this Court deems to be just and proper.

          Thomas N. Ciantra
          Joshua J. Ellison
          Kate M. Swearengen
          Cohen, Weiss and Simon LLP
          330 West 42nd Street
          New York, NY 10036
          (212) 563-4100
          tciantra@cwsny.com
          jellison@cwsny.com
          kswearengen@cwsny.com

          s/John G. Adam
          John G. Adam (P37205)
          Legghio & Israel, P.C.
          306 S. Washington, Suite 600
          Royal Oak, MI 48067
          (248) 398-5900
          jga@legghioisrael.com

January 12, 2017          Attorneys for plaintiff

## JURY DEMAND

Plaintiff demands a trial before a jury on all issues triable to a jury.

                                        Thomas N. Ciantra
                                        Joshua J. Ellison
                                        Kate M. Swearengen
                                        Cohen, Weiss and Simon LLP
                                        330 West 42nd Street
                                        New York, NY 10036
                                        (212) 563-4100
                                        tciantra@cwsny.com
                                        jellison@cwsny.com
                                        kswearengen@cwsny.com

                                        s/John G. Adam
                                        John G. Adam (P37205)
                                        Legghio & Israel, P.C.
                                        306 S. Washington, Suite 600
                                        Royal Oak, MI 48067
                                        (248) 398-5900
                                        jga@legghioisrael.com

January 12, 2017                         Attorneys for plaintiff