# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
#### COLUMBUS DIVISION

WILBUR ALLMOND )
)
    Plaintiff. )      Civil Action No. 4:05-CV-00096(HL)
)
    v. )
)
AKAL SECURITY, INC. and )
ALBERTO GONZALES, Attorney )
General of the United States )
)
    Defendants )
)

## DECLARATION OF RICHARD J. MILLER, M.D.

I, Richard J. Miller, declare as follows:

### Background

1.    I am a Medical Consultant for Federal Occupational Health (FOH), a component of the U.S. Public Health Service.   From 1995 through June 30, 2004, I was Director for Law Enforcement Medical Programs for FOH.  A copy of my curriculum vitae is attached to this declaration as Exhibit A.

2.    Law Enforcement Medical Programs (LEMP), a component of FOH, provides medical consultation and services to federal law enforcement agencies.  These consultations and services include validation of medical standards, medical exams and medical qualification determinations for applicants and incumbents, medical surveillance (for example, hearing and lead testing for firearms instructors), and fitness for duty determinations for incumbents.

AKAL001108

Services in FOH/LEMP are provided by occupational medicine physicians who work exclusively with weapons-carrying occupations within the federal government.

3.   As the Director for FOH/LEMP, I oversaw the delivery of medical services to our federal law enforcement agency customers, supervising a staff of about 40 physicians, nurses, and administrative personnel in Atlanta, Georgia. My administrative responsibilities ranged from the development of the interagency agreement between FOH and the receiving agency to ensuring that the medical review process was consistent, complete and up to current standards of care. In addition, I directly oversaw the delivery of medical services at our health units at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia and Artesia, New Mexico, and at the U.S. Secret Service Headquarters in Washington, D.C. I also functioned as the Primary Reviewing Physician for the U.S. Secret Service.

4.   Currently, as a medical consultant to FOH/LEMP, I continue as the Primary Reviewing Physician for the U.S. Secret Service, with a new assignment in assisting in the development of a medical program for the Secret Service. In addition, I provide medical consultation to federal, state, and local law enforcement agencies and FOH/LEMP staff, on request. One of these consultation functions is to review all proposed medical disqualification recommendations for the Court Security Officer medical review program. I no longer have administrative responsibilities within FOH/LEMP.

5.   My role with respect to the Court Security Officer (CSO) medical review program has evolved during the program's four-year existence. As described in more detail below, in

-2-

AKAL001109

Case 2:17-cv-10109-JMH-REW ECF No. 25-6 filed 03/15/18 PageID.421 Page 4 of 126
06/29/06 10:42 FAX 2024065972 USSS AOD SAFETY & HEALTH PAGE 04/18
06/29/2006 10:52 202-307-9455 US MARSHALS
Case 4:05-cv-00096-HL Document 78-7 Filed 07/03/06 Page 4 of 15

1999, I conducted a study for the U.S. Judicial Conference and the U.S. Marshals Service to identify the essential functions of the CSO position and recommend any changes in the medical standards then in place. After that study was completed and the basic standards approved, the USMS hired FOH (through an inter-agency agreement) to conduct the medical reviews. As Director for FOH/LEMP, I was primarily responsible for implementation of the CSO medical review program. In addition, during the first year or so of the program (until late 2001 or the first part of 2002), I was the primary reviewing physician. Dr. John Barson and Dr. Louis Chelton took over those responsibilities in later years, and Dr. Chelton remains the primary reviewing physician today. Since 2003, I have reviewed (first as the Director, now as the Medical Consultant) all disqualification recommendations regarding CSOs for which there is no subject matter expert reviewing the recommended disqualification.

### Development of the CSO Medical Standards

6.   On or about July 26, 1999, the United States Marshals Service and the Committee on Security and Facilities of the Judicial Conference of the United States (hereinafter, the "Committee" or the "Judicial Conference") jointly requested that FOH/LEMP conduct a job task analysis of the CSO position. The purpose of the study was to identify the essential job functions of the CSO position and advise the Judicial Conference on the medical standards needed to assess whether CSOs were able to perform those functions.

7    My understanding was that judges on the Committee were concerned that some CSOs were not physically capable of safeguarding the federal courts, particularly in the heightened security environment after the bombing of the federal building in Oklahoma City. The

-3-

AKAL001110

06/29/06 10:52 FAX 2024065972 USSS AOD SAFETY & HEALTH PAGE 05/19
06/29/2006 10:52 202-307-9456 US MARSHALS
Case 4:05-cv-00096-HL Document 78-7 Filed 07/03/06 Page 5 of 15

concern, as expressed to me, was that CSOs be able to perform not only routine duties, but to respond adequately in emergency situations.

Five federal court districts were chosen for the functional job analysis. An effort was made to select districts of various sizes and attributes. The five districts, and dates visited, were:

| | |
|---|---|
| Northern Georgia District (Atlanta) | 9/29-30/99 |
| Delaware District (Wilmington) | 10/13-14/99 |
| Colorado District (Denver) | 10/20-21/99 |
| Maryland District (Baltimore) | 10/27-28/99 |
| Oregon District (Portland) | 11/3-4/99 |

In each court, I (with the assistance of colleagues from FOH/LEMP) conducted focus groups consisting of five CSOs of varying seniority. The goal, through group discussion, was to identify the frequency and importance of various job functions. Each focus group discussed and then agreed upon (by consensus or vote) the essential job functions of the CSO position. They also provided narrative comments on how they perform their jobs and the nature of their work environment. In addition to these focus groups, my FOH/LEMP colleagues and I collected information through interviews with federal judges, U.S. Marshals, Deputy U.S. Marshals, and other CSOs. We also spent time observing CSOs on the job to gain greater insight into their work functions and environments.

9.   In 2000, I provided the Committee with a final report describing the results of the job task analysis and recommending a number of changes to the CSO medical standards. A copy of the final report is attached hereto as Exhibit B. It is dated February 4, 2000, but I believe it was completed a few months after that. Due to a typographical error, the date was not changed from a prior draft.

Received Jun-29-2006 11:36 From-2024065972 To-FOH ATLANTA FEDERAL Page 005

AKAL001111

10. Sometime after I presented the report, the Committee indicated that they were interested in having FOH/LEMP implement the recommendations of the report and establish the CSO medical review program. We formalized that agreement through another inter-agency agreement with the USMS.

11. I did not intend for the job task analysis report to describe every detail of the testing procedures and protocols that would be used to determine whether CSOs were qualified. Rather, my understanding was that any specific procedures and protocols would be developed by the organization conducting the medical reviews and would be refined as needed based on experience. That is, in fact, how we proceeded once FOH/LEMP was selected to carry out the program. We periodically consult with the USMS and the Committee regarding the medical review program and discuss any major issues that arise, but do not seek approval for every change in the testing procedures or protocols.

12. The job task analysis study was conducted, and the medical standards developed, specifically for the CSO position. Our objective was to identify the essential job functions of the CSO position and recommend medical standards based on those functions. The medical standards were not meant to assess whether CSOs are medically qualified to perform other jobs or whether they are substantially limited in any major life activities. In the field in which I specialize (law enforcement occupational medicine), law enforcement agencies have a wide range of medical requirements, depending on their specific mission, job duties, and risk factors presented. The reviewing physicians at FOH/LEMP make individualized assessments

-5-

AKAL001112

of medical qualification based on their knowledge of the medical standards that apply to the specific position at issue and the essential functions of that position.

### Medical Review Process

13.    FOH/LEMP reviewing physicians examine all pertinent medical information available in order to make a medical qualification recommendation to the agency as to whether an individual is or is not capable of safe and effective job performance. They have been trained to understand a wide range of medical conditions that are likely to impact on the job performance of weapons-carrying positions and are very familiar with essential job functions and the work environment of the particular position at issue. Given the variety of medical conditions that may be present and may affect job performance, the reviewing physician is unlikely to be a specialist in the treatment of the medical condition at issue in a particular case. He or she is, however, in a unique position to understand the medical qualifications for a weapons-carrying position and the impact of a medical condition on the ability to carry out the essential functions of the particular job at issue.

14.    FOH/LEMP uses a two-tiered approach for reviewing the medical qualifications of CSOs. The applicant or incumbent is first examined by a qualified examining physician in or near the district in which the CSO works. The contractor is responsible for finding physicians in each area. FOH/LEMP assists the USMS by checking each physician to make sure he or she is properly licensed and reviewing his or her malpractice history. Upon reviewing the work of the examining physicians, FOH/LEMP provides the USMS with feedback on their clinical quality with an assessment of their clinical skills and consistency.

–6–

AKAL001113

06/29/2006  10:52    202-307-9455           US MARSHALS                    PAGE  09/19

15.    The examining physician reviews and compiles a complete medical history, commenting on all positive and significant negative historical findings, conducts a complete physical examination, interprets test results, identifies any concerns, and provides patient education and recommendations. He or she documents the result of the exam on USMS Form 229 and attaches related test results and other medical information. All of that material is then given to the contractor, which forwards it to the USMS, which reviews it for completeness and then forwards it to FOH/LEMP.

16.    The second phase consists of the medical review performed by the reviewing physician at FOH/LEMP. In order to make recommendations to the USMS regarding the medical qualifications of CSOs, it is important to have an extensive knowledge of the essential job functions and work environment of the CSO position. In developing the CSO medical review process, I concluded that it was unreasonable to expect the examining physician to have the required job knowledge needed to make the individualized medical qualification recommendation. An examining physician may only see a few applicants or incumbent CSOs, whereas the reviewing physician performs thousands of reviews each year. This allows the reviewing physician to develop greater familiarity with the position and greater knowledge of the specific medical requirements for the position. Therefore, although FOH/LEMP considers recommendations made by examining physicians and relies on the objective results of their examinations, the ultimate responsibility for making a recommendation to the USMS rests with the reviewing physician. This provides a more consistent review process, particularly when the individuals who are the subject of the

–7–

AKAL001114

medical reviews are spread across the country. With the documentation of a proper and complete medical history and physical examination, lab work, hearing and vision testing results, and any additional tests or reports, the reviewing physician should have all the necessary medical information to make an informed individualized medical qualification recommendation.

17. Except in the most unusual cases (where immediate action is needed), the reviewing physician never recommends disqualification based solely on the results of the annual medical examination. Instead, the reviewing physician will either state that the CSO is medically qualified or will request additional information. In many cases, that additional information will come from the individual's personal treating physician (for example, if he or she is under care for diabetes or a heart condition). In other cases (such as those involving hearing or vision), the CSO may be asked to visit a specialist to have additional tests done.

18. FOH/LEMP recommends medical disqualification of CSOs in two circumstances. First, if the CSO fails to provide the requested information, we may recommend medical disqualification on that basis. In many cases, CSOs are given two or even three opportunities to provide additional information before we make that recommendation. Second, we may recommend disqualification if the CSO provides the additional information requested and that information demonstrates to the reviewing physician that the CSO does not meet the relevant medical standard. As noted above, although I am no longer the primary reviewing physician for the CSO program, since 2003, I have reviewed all CSO disqualification

–8–

AKAL001115

recommendations for which there is no subject matter expert reviewing the recommended
disqualification.

### Hearing Standards

19.   One of the issues we examined in the job task analysis was the importance of hearing to the
CSO position. Based on the focus groups and interviews with CSOs, USMS personnel, and
judges, and our observations of the job, it was clear that CSOs must possess and maintain
adequate hearing in order to carry out their assigned duties in a safe and effective manner.
The safety of the federal judiciary, court personnel, and the public depends on CSOs' ability
to hear, localize, discriminate, recognize, and/or understand a variety of environmental and
speech sounds. Our job task analysis identified six hearing-related essential job-functions for
the CSO position:

   a.   Comprehend speech during face-to face conversations
   b.   Comprehend speech during telephone conversations
   c.   Comprehend speech during radio transmissions
   d.   Comprehend speech when you can see another CSO
   e.   Hear sounds that require investigation; and
   f.   Determine the location of sound.

20.   The environment in which the CSO operates is a very dynamic and evolving one. In most
work environments, the potential hazard and threat incidents that can occur can often be
predicted with regards to their frequency of occurrence, the cause of the incident, the course
the incident will run, and what is required to deal with incident.  While the ability to hear is
important in these environments, analysis of the potential threats and hazards can allow the
development of plans and procedures to deal with the incident in a predictable way.  In the
environment of the CSO, potential threats and hazards involve the human element

–9–

06/29/06  10:44 FAX 2024065972          USSS AUD SAFETY & HEALTH                    PAGE  11/18
06/29/2006   18:52    202-307-9455              US MARSHALS

(individual or group), which is actively attempting to disrupt the normal state of the environment (e.g., court room, hallway, area surrounding the court house) for their own purposes (e.g., escape, disruption of court, assassination). The risk for those who depend on CSOs for their safety is great if the CSO is unable to perform their essential hearing job functions.

21.   Our job task analysis also indicated that communication is critical to informing the responding officers about an emergency situation and rapidly developing responses to security breaches. CSOs must, therefore, be able to clearly understand directions in times of crisis. They must be able to hear communication at a level of sound that does not inform persons causing an incident of the CSOs' response plans. They also must be able to discern the direction of a disturbance or detect an approaching threat (sound localization).

22.   Based on our conclusions regarding the importance of hearing to the CSO position, FOH/LEMP recommended, and then implemented, a two-tiered system for detecting and assessing CSOs' hearing ability.

a.   **Pure-tone Screening.** The first phase consists of an unaided pure tone audiogram, performed by a licensed and/or certified audiologist, or a technician certified by the Council for Accreditation in Occupational Hearing Conservation, or the equivalent. The purpose of this screening test is to identify and assess the degree of any hearing loss at various frequencies.

i.   The number of frequencies tested depended, at least during the early life of the program, on the judicial circuit in which the CSO worked. My

—10—

AKAL001117

understanding is that, as contracts were renewed by the USMS, additional frequencies were added for CSOs working under those contracts. The basic criteria was no loss greater than 30 decibels (dB) in either ear at the test frequencies of 500 Hertz (Hz), 1000 Hz, and 2000 Hz. As of October 1, 2001, we used a more extensive range of test frequencies (allowing hearing loss up to 40 dB at 3000 Hz and 50 dB at 4000 Hz) for CSOs in the 3rd, 5th, and 12th circuits. As of October 1, 2002, CSOs in the 1st, 2nd, 4th, and 6th circuits also were tested at those higher frequencies. Other circuits may have been added since that time.

ii.    In addition to this phasing-in of some of the pure tone frequencies, FOH/LEMP also allowed for slightly greater hearing loss for incumbent CSOs, as compared to applicants. This was an attempt to account for the fact that the incumbents were familiar with the job and in a better position to compensate for hearing loss that slightly exceeded our requirements.

iii.   The hearing standards established for CSOs allow for mild to moderate hearing loss. These standards do not require perfect or even "normal" hearing (generally defined in the field to include hearing loss up to 25 dB at 500, 1000, 2000, and 3000 Hz). We attempted, in the CSO hearing standards, to strike a balance by allowing some hearing loss, but requiring a level of unaided hearing ability necessary to safely and efficiently perform the job.

–11–

AKAL001118

iv.   Testing for unaided sound field speech recognition in noise. This tests the CSO's ability to hear and distinguish a spoken list of words in a noisy environment. At least 50% of the words must be identified correctly.

iii.   If the CSO meets the above requirements unaided, but wears hearing aids, we also require him or her to take the functional tests aided (i.e., with the hearing aids in place). We compare the results to the unaided testing to make sure that the hearing aid is functioning and does not in fact worsen the individual's hearing abilities (which can occur in some cases). We originally instructed CSOs who wore hearing aids to take both sets of tests (unaided and aided) during the same visit to the audiologist. This was meant to save time and expense, because it eliminated the need to return for additional testing after the reviewing physician determined that the unaided portion had been passed. However, that procedure seemed to cause confusion, in that some CSOs thought they could qualify solely on the basis of the aided testing (which was never the case). Therefore, we now limit our initial request to unaided testing and only request the aided testing after determining that an individual meets the unaided requirements, but wears hearing aids on the job.

23.   In developing and implementing hearing standards and testing procedures for all of our client agencies, FOH/LEMP periodically consults with Lynn Cook, Au.D., an Occupational Audiologist for the U.S. Naval Medical Center who specializes in law enforcement occupational audiology. Dr. Cook did not create the CSO standards, but the standards reflect

–13–

AKAL001119

    iv.   If the CSO or CSO applicant meets the unaided screening criteria and does not wear hearing aids, adequate auditory function is inferred and no further testing is necessary.

b.   **Functional Testing.** Those who fail to meet the unaided pure tone screening criteria, or meet those criteria but wear hearing aids, are referred for a more in-depth second phase evaluation to determine auditory function, particularly for speech recognition. A licensed and/or certified audiologist must perform this evaluation. The second phase evaluation includes:

    i.   Additional, unaided audiogram testing to verify the results of the initial screening audiogram and identify any significant (greater than 25 dB) disparities between the ears (which would indicate a compromised ability to localize sound).

    ii.   Testing for unaided speech reception thresholds (SRT) for each ear under headphones. These results should not exceed 30 dB in each ear.

    iii.   Testing for unaided speech recognition in quiet for each ear, performed at +30 dB SL (30 dB over the SRT level determined in ii), but not to exceed 75 dB, under headphones. This tests the ability of the CSO to hear and distinguish a spoken list of words in a quiet environment. At least 90% of the words must be identified correctly.

—12—

AKAL001120

input we received from her regarding the hearing demands of this type of position and the problems associated with hearing aids (as described below). Since the CSO standards were first implemented in late 2000 or early 2001, FOH/LEMP has adjusted them periodically as we have learned more about currently available technologies and research on hearing loss. In making these adjustments, we again consulted periodically with Dr. Cook.

24.   One requirement that has remained unchanged since the program began is that CSOs pass both the pure tone audiogram and the functional tests unaided -- i.e., without the use of a hearing aid. I initially recommended to the Judicial Conference that the use of hearing aids by CSOs be prohibited entirely. However, the Judicial Conference expressed concern that such a prohibition would disqualify too large a percentage of the CSO workforce. Accordingly, we agreed to an approach in which CSOs are required to pass the relevant tests unaided, but if they do so are allowed to wear hearing aids on the job.

25.   Our concerns regarding the use of hearing aids were based on knowledge acquired in FOH/LEMP's work for various weapons-carrying positions and consultations with Dr. Cook and other experts in the field. Unlike eyeglasses in those with visual impairment, hearing aids do not restore those with permanent hearing loss to normal hearing. Hearing aids come with a legal disclaimer stating this fact. A certain level of distortion is inherent in all sensorineural hearing losses and hearing aids improve hearing ability the least under the most difficult listening situations (increased background noise) where hearing impaired individuals need the greatest enhancement and where CSOs face the most critical and safety-sensitive situations. With a significant hearing difference between the two ears, the ability to localize

--14--

AKAL001121

sound (determine its direction) is generally lost. In addition, hearing aids are mechanical devices and as such are subject to loss, malfunction, and breakage. Batteries die and hearing aids may be dislodged in physical confrontations. For all of these reasons, we determined that allowing CSOs to meet the requirements using hearing aids was not compatible with the extremely demanding hearing critical job functions of the CSO.

26.     The primary, overall job responsibility of CSOs is to protect the judiciary and public in federal courthouses. As part of this duty, CSOs must be able to hear threats made and instructions issued, including in emergency situations. Failure to hear threats made or instructions issued could potentially result in bodily harm and even death.

27.     Those CSOs who can not pass the hearing test unaided generally have hearing which, without their hearing aids, is not as good as those who can pass the test unaided. The inability to pass the hearing test unaided indicates some degree of hearing impairment. When a hearing aid is not working for the wearer, his ability to hear may be less than it would be if his hearing aid was functioning. If a CSO's hearing aid failed while on the job, the CSO would necessarily have to rely on his/her residual hearing. Such residual hearing may not be adequate to hear threats made or instructions issued. If a CSO passed the hearing test unaided and wore a hearing aid on the job, but his hearing aid failed while on the job, his hearing impairment would generally not be as great as the CSO who could not pass the hearing test unaided and whose hearing aid failed on the job. For the preceding reasons, among others, it is fully reasonable to require that CSO's pass the hearing test unaided.

−15−

AKAL001122

28.    FOH/LEMP is not responsible for drafting the contracts between the USMS and the companies that employ the CSOs. My understanding, however, is that until 2002, those contracts did not spell out the hearing requirements and testing procedures in much detail. Toward the later part of 2002, USMS indicated that they were interested in modifying the contracts to include more information regarding the hearing requirements and the hearing evaluation procedures, and they sought my input regarding the language of that modification. Attached to this declaration as Exhibit C is the 11th Circuit version of that modification. The functional tests and requirements described in that document are the same ones FOH/LEMP was using prior to the contract modification. In other words, the contract modification reflected practices that were already being followed and had been in place since shortly the new CSO medical review program began in 2001.

### My Work as Primary Reviewing Physician

29.    As noted above, I was the primary reviewing physician during approximately the first year to eighteen months of the new CSO medical review program. During that time, I reviewed the medical examinations and medical records of thousands of incumbent CSOs. Of these, I would estimate that hundreds had diabetes or hearing impairments. Although I don't have exact numbers, I know that I recommended medical disqualification for only a small percentage of individuals with those conditions. As described above, diabetes, psychiatric disorders, and hearing impairments are not automatic disqualifiers under the standards. Rather, the reviewing physician evaluates each personal individually to assess whether he or she is medically qualified to perform the essential functions of the CSO position.

–16–

AKAL001123

06/29/2006   10:52   882-397-8456          US MARSHALS                    PAGE   15/18

I declare, under penalty of perjury, that the above information is true and correct.

6-29-06
_____
Date

Richard J. Miller, M.D.

Firmwide:81242176.1 051010.1007

—17—

AKAL001124

# ALLMOND v.  ALBERTO GONZALES

## 4:05-CV-00096 (HL)

## EXHIBIT A

## To Declaration of Richard, J. Miller

AKAL001125

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.437   Page 20 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 5 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 18 of 27

# CURRICULUM VITAE

## Richard J. Miller, M.D.

U.S. PUBLIC HEALTH SERVICE
Federal Occupational Health
Atlanta Federal Center
100 Alabama Street, Room 3R10

**Voice** (404) 562-7950  ext 107 (office)
(home)
**Fax** (404) 562-3415 (office)
(home)
**Email** rmiller@psc.gov (office)

October 20, 2004

AKAL001126

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.438   Page 21 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 6 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 19 of 27

## EDUCATION

| | |
|---|---|
| 6/72 | BA; Emory University; Atlanta, Georgia |
| 6/76 | MD; Medical College of Georgia; Augusta, Georgia |
| 6/77 | Charleston Area Medical Center (West Virginia); 1977 Flexible Residency |

## PROFESSIONAL LICENSE(S)--Physician

| State | Number | Expiration Date |
|---|---|---|
| California | G56466 | 7/31/05 |
| Georgia | 018709 | 12/31/05 |

## WORK EXPERIENCE

1/95-Present
**Primary Reviewing Physician, U.S. Secret Service**
Responsible for the medical qualification determinations and the medical surveillance of all U.S. Secret Service weapons-carrying applicants and employees. Make about 4500 medical qualification determinations yearly by the review of pre-placement and periodic employee medical examinations and employee fitness-for-duty evaluations.

10/94-6/30/04
**Director, Federal Law Enforcement Medical Programs/Federal Occupational Health**
Commissioned Officer, US Public Health Service. Rank O-6 (Equivalent to Navy Captain or Army Colonel).

Developed and managed Federal Occupational Health (FOH) Federal Law Enforcement Medical Programs. Recognizing that firearms-carrying positions are unique in occupational medicine, this program develops and manages medical programs for Federal law enforcement agencies. To date, this program provides medical services and consultation to over 35 federal law enforcement agencies. Federal agencies receiving services from this program include U.S. Secret Service, Immigration and Naturalization Service, IRS--Criminal Investigative Service, U.S. Customs Service, U.S. Marshals Service, National Park Service, Fish & Wildlife Service, Park Police, EPA—Criminal Investigation, Drug Enforcement Agency, Defense Criminal Investigative Service, US Court Security Officers/Judicial Security Division, and the Administrative Office of the US Courts.

Currently, not including the law enforcement health centers providing direct service, Dr. Miller manages a consultative staff that includes 65 professional and data management staff. To date,

AKAL001127

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.439   Page 22 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 20 of 27

Dr. Miller has performed formal job task analyses and made
medical standards recommendations for 25 federal law enforcement
occupations.

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.440    Page 23 of 126

Case 4:05-cv-00096-HL    Document 78-8    Filed 07/03/06    Page 8 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 21 of 27

Services provided by FOH Federal Law Enforcement Medical Programs
include:

- Pre-placement and Periodic medical exams
- Medical review of medical exams to determine whether applicants and/or incumbents satisfy functional requirements of position
- Review and validation of current medical standards or development of new medical standards
- Fitness-for-duty medical evaluations
- Medical consultation on workers compensation, return-to-work, and reasonable accommodation issues
- Medical review for drug deterrence
- Medical surveillance for hearing preservation and lead exposures
- Training for physical fitness coordinators in physical fitness, testing and training technique, risk assessment, sports injuries, and nutrition
- Medical information/data management for law enforcement agencies.

The FOH Federal Law Enforcement Medical Programs has developed a unique data management system--MERITS (Medical Evaluation and Reports Information Tracking System). MERITS was developed to facilitate the law enforcement medical review process, allow longitudinal (year-to-year) evaluations of an individual's medical trends, provide quality assurance, and develop customized reports for law enforcement customer agencies. This is a state-of-the-art data management system that is most attractive to Federal law enforcement agencies needing to enhance/control their management of medical information. MERITS reporting capabilities are customized for each law enforcement agency to meet their specific needs.


9/92-10/95
**Regional Director, Division of Federal Occupational Health (DFOH), Southeast Region, Atlanta.**
Responsible for managing the delivery of comprehensive occupational health services, on a reimbursable basis, to Federal employees in North and South Carolina, Georgia, Florida, Kentucky, Tennessee, Alabama, Mississippi. These services include medical surveillance, environmental health (industrial hygiene), health promotion, employee counseling, disability management, and physical fitness to over 50,000 Federal employees through over 25 service provision sites.

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.441   Page 24 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 9 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 22 of 27

5/89–9/95
**Principal Investigator, Federal Center Fitness Facility Research Project, Kansas City and Atlanta.**
Initiated in 1989 and funded by the U.S. Office of Personnel Management (OPM) and the U.S. Army, investigation of the long-term benefits (productivity, health risks, health care expenditures) of participation in a comprehensive health promotion program. Evaluated four (4) years of the participation of 2500 Federal employees in a comprehensive health promotion program. Final report delivered to OPM on 9/30/95.

10/88-9/94
**Founder and Chair, National Federal Occupational Health Wellness/Fitness Task Force**
Developed and recommended national standards and policy for Federal Occupational Health wellness/fitness programs for Federal employees.

10/86-8/92
**Regional Director, Division of Federal Occupational Health (DFOH), Region VII, Kansas City, Missouri**
Responsible for providing comprehensive occupational health services, on a reimbursable basis, including medical surveillance, environmental health (industrial hygiene), health promotion, employee counseling, disability management, and physical fitness to over 30,000 Federal employees in Kansas, Missouri, Nebraska, and Iowa through 16 service provision sites.

6/86-8/92
**Associate Regional Health Administrator for Clinical Affairs, U.S. Public Health Service, Region VII, Kansas City, Missouri.**
Clinical representative of the Regional Health Administrator (RHA), Region VII. Liaison between RHA and State and Local Health Directors in Kansas, Missouri, Nebraska, and Iowa.

3/85-6/86
**Regional Clinical Coordinator, U.S. Public Health Service, Region IX, San Francisco.**
Responsible for quality assurance and clinical coordination of U.S. Public Health Service-funded primary care health centers and National Health Service Corps-supported health professionals in California, Arizona, Nevada, Hawaii, and the Pacific Islands.

Continued development of "Clinical Management Outline," (see below), including the development of the "Perinatal Checklist," instrument to determine effectiveness of perinatal services in primary care health centers. Developed process by which Region IX primary care grantees used "Clinical Management Outline" in the grant application and for clinical management. Developed support system for Region IX primary care center Clinical Directors by the facilitation of clinical leadership and management conferences.

AKAL001130

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.442   Page 25 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 10 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 23 of 27

10/84-3/85
**Acting Primary Care Branch Chief, U.S. Public Health Service, Region VII, Kansas City, Missouri.**
Responsible for grant application review, financial allocation, and clinical quality care processes for U. S. Public Health Service primary care health center grantees in Kansas, Missouri, Nebraska, and Iowa.

5/83-3/85
**National Health Service Corps Clinical Activities Coordinator, U.S. Public Health Service, Region VII, Kansas City, Missouri.**
Responsible for quality assurance and clinical coordination of U.S. Public Health Service-funded primary care health centers and National Health Service Corps-supported health professionals in Kansas, Missouri, Nebraska, and Iowa.

Developed the "Clinical Management Outline" for primary care health center grantees and health professionals, and USPHS primary care project officers--a guide to clinical management in the primary health care setting using the community-oriented primary care model and incorporating the following:

        Health Care Needs/Demand Assessment  Health Care Plan
        Clinical Practice Policies
        Quality Assurance Program/Performance and Procedural Review

7/80-5/83
**General Medical Officer, National Health Service Corps, Albina Community Health Center, Portland, Oregon.**
Provided and supervised primary care health services to adult urban indigent population at county multi-service center. Developed, supervised, and provided client orientation to and case management system for county pre-paid health plan. Developed clinical management systems: triage, appointment, no-show, etc.

7/77-7/80
**General Medical Officer, National Health Service Corps, Banks County, Georgia.**
Primary care physician in rural county of 7500 (only physician in county). Developed comprehensive health practice.

AKAL001131

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.443   Page 26 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 11 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 24 of 27

## PROFESSIONAL ASSOCIATIONS

| | |
|---|---|
| 2003-current | Permanent member, American College of Occupational and Environmental Medicine Task Force on National Medical Guidelines for Law Enforcement Officers |
| 2000-current | Associate member, International Association of Chiefs of Police (IACP) Chair, Police Physicians Section, International Assoc of Chiefs of Police |
| 1987-current | Member, American College of Occupational and Environmental Medicine |
| 1992-1995 | Member, Residency Advisory Committee, Environmental and Occupational Medicine Residency Program, Emory University School of Public Health, Atlanta |
| 1993 | Member, Review Panel, Agency for Toxic Substances and Disease Registry Clinical Fellowship Program in Environmental Medicine |
| 1983-1993 | Member, American Public Health Association |
| 1986-1992 | Member, Greater Kansas City Federal Executive Board |
| 1987-1992 | Active Staff, Department of Occupational Medicine, Research Medical Center, Kansas City, Missouri |
| 1991-1992 | President, Great Plains Chapter, American College of Occupational Medicine |
| 1991-1992 | Member, House of Delegates, American College of Occupational Medicine |
| 1990-1993 | Adjunct Assistant Professor, School of Medicine, Department of Preventive Medicine, University of Kansas Medical Center, Kansas City, Kansas |
| 1987-1989 | Chairperson, Health and Accident Prevention Subcommittee, Greater Kansas City Federal Executive Board |

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.444   Page 27 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 12 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 25 of 27

## AWARDS

U.S. Public Health Service

| | |
|---|---|
| 2004 | Federal Occupational Health Director's Award for Dedication to the Principles of Outstanding Service |
| 2002 | Federal Occupational Health Director's Award for Dedication to the Principles of Customer Service |
| 1997 | Outstanding Unit Citation, U.S. Public Health Service |
| 1989 | Unit Commendation, U.S. Public Health Service |
| 1988 | Commendation Medal, U.S. Public Health Service |
| 1985 | Regional Health Administrator's Special Recognition Award, USPHS, Region VII (Kansas City, Missouri) |
| 1985 | Achievement Medal, U.S. Public Health Service |
| 1984 | Regular Corps Ribbon, U.S. Public Health Service |
| 1982 | U.S. Public Health Service Citation |

Outside the U.S. Public Health Service

| | |
|---|---|
| 1995 | Letter of appreciation from the Director, U.S. Secret Service, Eljay Bowron, on the medical consultation services provided to that agency |
| 1990 | Certificate of Appreciation, U.S. Department of Health and Human Services, for contribution to National Breast Cancer Awareness Activities |
| 1986 | Certificate of Appreciation, U.S. Bureau of Prisons, Department of Justice, as participant on review team for the Medical Center for Federal Prisoners, Springfield, Missouri |
| 1986 | Certificate of Appreciation, Uniformed Services University of the Health Sciences, for contribution as West Coast interviewer of medical school applicants |
| 1983 | Certificate of Appreciation, Multnomah County, Oregon, Department of Human Services |

AKAL001133

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.445   Page 28 of 126

Case 4:05-cv-00096-HL   Document 78-8   Filed 07/03/06   Page 13 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 26 of 27

## PRESENTATIONS

| | |
|---|---|
| 10/24/03 | "Developing National Guidelines for Police Officers," International Association of Chiefs of Police Conference, Philadelphia. |
| 10/22/03 | "Weapons of Mass Destruction:Police as First Responders," International Association of Chiefs of Police Conference, Philadelphia. |
| 5/4/03 | "Developing National Guidelines for Police Officers," American College of Occupational and Environmental Medicine, Public Safety Section. American Occupational Health Conference, Atlanta. |
| 10/6/02 | "Developing National Guidelines for Police Officers," International Association of Chiefs of Police Conference, Minneapolis. |
| 4/16/02 | "Medical Standards for Law Enforcement," American College of Occupational and Environmental Medicine, Public Safety Section. American Occupational Health Conference, Chicago. |
| 6/30/99 | "Health Issues Affecting Women in Law Enforcement," Interagency Committee on Women in Federal Law Enforcement conference, Washington, DC. |

AKAL001134

Case 2:17-cv-10109-JMH-REW  ECF No. 25-6  filed 03/15/18  PageID.446  Page 29 of 126

Case 4:05-cv-00096-HL  Document 78-8  Filed 07/03/06  Page 14 of 15
Case 2:03-cv-04344-HB  Document 168  Filed 12/21/2005  Page 27 of 27

**PUBLICATIONS**

8/03          Co-Editor with Stephen Hessl, MD, <u>Clinics in Occupational and Environmental Medicine: Law Enforcement Worker Health</u>, Elsevier, Inc., August 2003.

8/03         "Medical employability determinations for law enforcement officers," in <u>Clinics in Occupational and Environmental Medicine: Law Enforcement Worker Health</u>, Elsevier, Inc., August 2003, pages 385-398.

8/03         Martin Allen, MD, Neil Hibler, PhD, and Richard Miller, MD, "Evaluating the mental health of law enforcement officers," in <u>Clinics in Occupational and Environmental Medicine: Law Enforcement Worker Health</u>, Elsevier, Inc., August 2003, pages 605-623.

2000         Martin Allen, MD, Neil Hibler, PhD, and Richard Miller, MD, "Fitness-for-Duty Evaluations of Law Enforcement Officers in Accordance with Federal Occupational Health Procedures", in <u>Domestic Violence by Police Officers</u>, Behavioral Science Unit, FBI Academy, 2000, pages 27-38.

AKAL001135

# ALLMOND v. ALBERTO GONZALES

## 4:05-CV-00096 (HL)

## EXHIBIT B

## To Declaration of Richard, J. Miller

AKAL001136

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.448    Page 31 of 126

Case 4:05-cv-00096-HL    Document 78-9    Filed 07/03/06    Page 1 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 2 of 23

# FINAL REPORT

## MEDICAL REQUIREMENTS
## FOR
## COURT SECURITY OFFICERS

### PREPARED FOR THE
### U.S. MARSHALS SERVICE

### JUDICIAL FACILITY SECURITY PROGRAM

### PREPARED BY
### FEDERAL OCCUPATIONAL HEALTH
### LAW ENFORCEMENT MEDICAL PROGRAMS

February 4, 2000

1

AKAL001137

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.449   Page 32 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 2 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 3 of 23

# TABLE OF CONTENTS

| | |
|---|---|
| Overview | Page 4 |
| Functional Job Analysis | Page 5 |
| Development of Medical Requirements | Page 6 |
| Results of the Functional Job Analysis | Page 8 |
|     Job Task Frequency | Page 8 |
|     CSO Risk Profile | Page 9 |
|     Job Task Importance | Page 10 |
|     Essential Job Functions | Page 11 |
| CSO Medical Requirements | Page 13 |
|     Cardiovascular | Page 14 |
|     Dermatology | Page 16 |
|     Endocrine and Metabolic | Page 17 |
|     Gastrointestinal | Page 18 |
|     Genitourinary | Page 19 |
|     Head, Nose, Throat, and Neck | Page 20 |
|     Hearing | Page 21 |
|     Hematology | Page 22 |
|     Medications | Page 23 |
|     Musculoskeletal | Page 24 |
|     Neurological | Page 26 |
|     Organ Transplantation and Prosthetic Devices | Page 28 |
|     Psychiatric | Page 29 |
|     Respiratory | Page 30 |
|     Vision | Page 32 |

AKAL001138

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.450   Page 33 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 3 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 4 of 23

## APPENDICES

Appendix A     Federal Law Enforcement Work Functions Inventory and
Directions for Use, Revised (US Marshals Service—Judicial
Security Division) 7/28/99

Appendix B     Focus Group Determination of Job Task Frequency, by Site

                 Northern Georgia District (Atlanta),
Delaware District (Wilmington),
Colorado District (Denver),
Maryland District (Baltimore),
Oregon District (Portland)

Appendix C     Focus Group Determination of Job Task Importance, by Site

Appendix D     Focus Group Narrative Comments and Critical Incidents, by Site

Appendix E     Focus Group Determination of Essential Job Functions, by Site,
with Consensus Essential Job Functions Determination

Appendix F     Interviews and Observations

AKAL001139

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.451    Page 34 of 126

Case 4:05-cv-00096-HL    Document 78-9    Filed 07/03/06    Page 4 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 5 of 23

## I. Overview

On July 26, 1999, Federal Occupational Health, Law Enforcement Medical Programs, was requested to review and validate the medical requirements for Court Security Officers. This request was made jointly by the Sub-Committee on Security, Committee on Security and Facilities, U.S. Judicial Conference; the Judicial Facility Security Program, U.S. Marshals Service, and the Office of Court Security, Administrative Office of the U.S. Courts.

Court Security Officers, a contract workforce, supplement the mission of the U.S. Marshals Service by providing security for U.S. federal courthouses, their property and employees. In providing these vital services, the Court Security Officers are a major component of the Judicial Facility Security Program, which is administered by the U.S. Marshals Service.

Recent years have seen increased security threats to U.S. federal buildings, U.S. courthouses, and federal judiciary. The federal judicial system of the U.S. is the foundation of American freedom, and security threats to the federal courthouse or the federal judiciary are a threat to our national security. Therefore, these threats must be taken extremely seriously. Security threats to the sanctity of the federal court range from threats to the safety of the federal judge to distractions in the courtroom during trial that can cause misconduct or mistrial.

The U.S. Marshals Service is deployed to meet threats to the sanctity of the federal court. Assisting them in this mission are the Court Security Officers (CSO), who must be capable of providing both a deterrence to potential threats, and a timely and appropriate response to actual threats. The primary functions of the CSO include physical security for the federal courthouse and perimeter, checkpoint security for the courthouse and courtroom entry points, courtroom monitoring, and a rapid response to emergencies and alarms within the courthouse.

AKAL001140

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.452   Page 35 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 5 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 6 of 23

## II. Functional Job Analysis--Development of CSO Medical Requirements

Federal Occupational Health, Law Enforcement Medical Programs (FOH/LEMP) is a major provider of medical occupational consultation to the management of federal law enforcement agencies. FOH/LEMP provides medical occupational consultation to over 35 federal law enforcement agencies and has performed functional job analyses on over 20 federal law enforcement occupations.

The goal of a functional job analysis is to determine the occupational requirements of a job or occupation. The functional job analysis must be performed using scientific methods so that occupational data is collected in a fair, consistent, objective manner. A properly performed analysis will become the foundation for the development of an occupation's medical requirements and will be capable of withstanding the most vehement medico-legal challenges.

The functional job analysis performed by FOH/LEMP included the following:

1. Interviews with federal judges, U.S. Marshals, Deputy U.S. Marshals, and CSOs regarding their view on the functions and work environments of the CSO;
2. Direct observations of CSO work functions and environments; and
3. Incumbent CSO focus groups scoring the "Federal Law Enforcement Work Functions Inventory," a tool developed by FOH/LEMP, to define both the occupational requirements and risk profile for the CSO.

Five federal court districts were chosen by the Judicial Facility Security Program, U.S. Marshals Service in which to perform the functional job analysis. These districts were chosen for their unique and diverse contribution to the CSO workforce. The five districts, and dates visited, were:

| | |
|---|---|
| Northern Georgia District (Atlanta), | 9/29-30/99 |
| Delaware District (Wilmington), | 10/13-14/99 |
| Colorado District (Denver), | 10/20-21/99 |
| Maryland District (Baltimore), | 10/27-28/99 |
| Oregon District (Portland) | 11/3-4/99 |

In each federal court district, interviews and observations were made (see Appendix G, "Interviews and Observations"). In each district, five CSOs with varying experience in the CSO job worked as participants in the focus group process using the "Federal Law Enforcement Work Functions Inventory" (see Appendix A, "Federal Law Enforcement Work Functions Inventory and Directions for Use, Revised (US Marshals Service—Judicial Security Division) 7/28/99."

5

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.453   Page 36 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 6 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 7 of 23

## III. Development of Medical Requirements

Recommendations for the medical requirements of the CSO position are based on the analysis of collected data obtained during the functional job analysis. This data includes the occupational requirements of the CSO position; the risk profile; narrative information collected from focus group participants, judges, U.S. Marshals, Deputy U.S. Marshals, and CSOs; and an intimate understanding of law enforcement occupational medicine, using reference manuals and expert consultants.

1. **Occupational requirements** or essential job functions for the CSO position were determined by incumbent CSOs within the focus group. (See Appendix A, for the focus group directions, goals, Inventory of questions, and key to scoring scales.) In turn, the occupational requirements determine whether a medical requirement is needed to ensure that individuals hired to perform their job safely and efficiently. The focus groups were asked to evaluate the job tasks listed in the "Federal Law Enforcement Work Functions Inventory" and determine the following:

   a. Job task frequency,
   b. Job task importance, and
   c. Define essential job functions (occupational requirements).

   Responses from each of the five focus groups were merged to develop an overall score. The overall CSO job task frequency score is an average of all five focus group scores for job task frequency. Within a single focus group, a job task is essential if at least three of the five focus group members agree that the job task is essential. For a job task to be determined an essential job function for CSOs, at least four of the five focus groups must agree that the job task is essential.

2. The **Risk profile** identifies the unique job requirements and working environments of the CSO position and describes their potential and actual physical and safety risks. The risk profile is derived from the focus group determination of job task frequency (Appendix B). After a medical requirement becomes necessary, as determined by the occupational requirements, the risk profile determines the level of the medical requirement.

3. **Narrative information** obtained from participants during the focus group provides significant information that describes the work environments typically encountered by the CSOs. Such narrative information will include critical incidents that highlight unique activities involving CSOs in critical situations that may highlight the need for specific medical requirements. Critical incidents may include incidents that involve shootings, fighting with suspicious individuals, identifying contraband items, or performing rescues.

5

AKAL001142

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.454   Page 37 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 8 of 23

4.   **Interviews and observations.**   Information concerning CSO occupational requirements was collected through interviews with federal judges, U.S. Marshals, Deputy U.S. Marshals, and CSOs.   Direct observations of CSO work functions and environments provided further insight into their occupational requirements.

5.   **Medical documents** from law enforcement and occupational medicine specialists are referenced to support the need for medical requirements.   A major reference used in the development of law enforcement medical standards is the Medical Screening Manual for California Law Enforcement developed by the Commission on Peace Officer Standards and Training of the State of California, 1996 (California POST).

6.   **Subject matter experts** in the field of law enforcement occupational medicine have provided their opinions concerning medical requirements in law enforcement occupations.   Assisting in the development of the vision section was Greg Good, OD, Ph.D., Professor of Optometry, College of Optometry, Ohio State University, Columbus, Ohio.   Assisting in the development of the hearing section was Lynn Cook, M.Ed., CCC-A, FAAA, Occupational Audiologist, National Naval Medical Center, Bethesda, Maryland.   Providing overall assistance in the development of this document was J.C. Philip Spottswood, Esq., M.P.H., U.S. Office of Personnel Management.

7

AKAL001143

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.455   Page 38 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 8 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 9 of 23

## IV.  Results of the Functional Job Analysis

### A.  Job Task Frequency

Job task frequency is determined by focus group members who score the Inventory job tasks as to how often each task is performed in an average year.  The most important usage of the job task frequency results is to develop a risk profile for the CSO occupation.  For results of the CSO job task frequency determinations, see Appendix B.

### Risk Profile

The CSO risk profile in this functional job analysis examines the average performance frequency of certain high-risk or aggressive law enforcement functions determined by focus group participants.  The job tasks used in the risk profile (see below) are closely related to the probability that the law enforcement employee will or will not engage in physical confrontation, use of weapons, or face high-risk individuals with a propensity to violence.  The risk profile category determination was made by comparing the CSO risk profile with the risk profile of other law enforcement occupations that have participated in this functional job analysis.

In addition to the supportive information listed above for justification of medical requirements, the risk profile for a law enforcement agency further identifies the unique job requirements and working environment of a law enforcement agency and therefore is vital in justifying medical requirements. The risk profile reviews the potential physical and safety risks to the occupation when performing essential job functions. After a medical requirement becomes necessary, as determined by the occupational requirements, the risk profile determines the level of the medical requirement.

A high-risk profile law enforcement occupation demands a high level of medical requirements (vision, hearing, cardiopulmonary, metabolic, etc.) in order to minimize the safety threat to the incumbent.  Similarly, a low risk profile law enforcement occupation presents a lower safety threat by the fact that aggressive law enforcement functions (listed below) are infrequent.

8

AKAL001144

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.456    Page 39 of 126

Case 4:05-cv-00096-HL    Document 78-9    Filed 07/03/06    Page 9 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 10 of 23

CSO Risk Profile

For each of the following functions the average frequency was obtained by averaging the group scores for all five CSO focus groups. Frequency scoring scales, unless given as a percentage of time, follow the scoring scale of the "Inventory," in Appendix A.

| Function | | Average Frequency |
|---|---|---|
| I.B.4 | Use of body armor | 0 |
| I.B.6 | High pursuit, emergency, evasive driving | 0 |
| II.B.1 | Perform LE functions under low/poor light | 2.6 |
| I.B.9a | Percent of work time outside of the office | 86% |
| I.B.10 | Work alone while armed out of the office | 5.6 |
| I.B.14 | Conduct vehicular stops | 1.0 |
| I.B.15 | Stop, question, detain individuals | 4.32 |
| I.B.16 | Encounter individual with violent or irrational Temperament | 2.40 |
| I.C.2 | Use of shoulder weapon | 0 |
| I.C.3a | Use of baton | 0 |
| I.C.3b | Use of pepper spray | 0 |
| I.C.4 | Use of handcuffs | 0 |
| I.C.5a | Resisting during handcuffing (% of total) | 0 |
| I.C.7a | Draw handgun while performing LE function | 0 |
| I.C.7b | Draw handgun & make shoot/no-shoot decision | 0 |
| I.C.7c | Fire handgun while performing LE function | 0* |
| III.1 | Engage in physical confrontation | 0.88* |
| III.3 | Pursue fleeing suspect on foot | 0 |
| III.4 | Subdue combative person after running in pursuit | 0 |
| III.9 | Use bodily force to gain entrance | 0 |

* Indicates number of times function used during career as CSO. Otherwise, use frequency scoring scale in appendix A.

Risk profile for CSO's        Low-Medium  (26 points/225 possible)

High-risk characteristics include:

Frequent LE work under low or poor light  (Up to 6 times per year)
Very high percentage of time working outside an office  (86%)
Very high frequency working alone while armed outside the office  (Daily)
Vehicular car stops are made, although infrequent  (1-2 times yearly)
Very high frequency stop or question individuals  (Weekly)
Frequent encounters with violent or irrational persons  (Up to 6 times per year)
Physical confrontations are engaged, although infrequent  (Yearly)

9

AKAL001145

Case 2:17-cv-10109-JMH-REW ECF No. 25-6 filed 03/15/18 PageID.457 Page 40 of 126

Case 4:05-cv-00096-HL Document 78-9 Filed 07/03/06 Page 10 of 15
Case 2:03-cv-04344-HB Document 168 Filed 12/21/2005 Page 11 of 23

## B. Job Task Importance

Job task importance is determined by focus group members who score the Inventory functions as to the importance of the task in the performance of their job. Each task is rated by how important it is to have the ability to perform the task. The most important usage of the job task importance results is to define the essential job functions. For the results of the CSO job task importance determinations, see Appendix C.

## C. Essential Job Functions

Essential job functions are essential to the performance of the CSO job. A CSO who is unable to perform an essential job function is likely to disrupt the flow of required work and directly threaten the health and safety of themselves and others. The essential job functions, as determined by the incumbent CSO in the functional job analysis, become the bona fide occupational requirements for the job. Essential job functions take into consideration both the actual function and the environment in which the function is to be performed.

### Levels of Confidence of Essential Job Functions

As previously discussed, each focus group determines whether a job function is essential by a majority vote. If the majority (at least 3 of 5) of focus groups determine that a job function is essential then that job function is classified as essential. To ensure that a level of confidence is reached in the determination of essential job functions a higher standard is used in determining whether a job function is essential. For this functional job analysis for CSOs, a job function is essential if the following conditions are met:

1. **Consensus essential job function.** All five focus groups agree that the job function is essential.
2. **Near consensus essential job function.** Four of the five focus groups agree that the job function is essential.

10

AKAL001146

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.458   Page 41 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 11 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 12 of 23

## CSO Essential Job Functions

Based on the results of the CSO functional job analysis the following job functions are essential for the CSO position. The consensus essential job functions are marked by an *. for distinction.

### Work Environment

1. Work extended hours
2. Work in adverse weather
3. Work alone while armed*
4. Work under stress*
5. Stop, question or detain individuals*
6. Encounter individuals who display a violent or irrational temperament*
7. Provide armed escort*

### Weapons

8. Use handgun with weak (non-dominant) hand*
9. Use handcuffs*
10. Use handgun*
11. Confiscate weapon from person in pat down*

### Cardiovascular and Musculoskeletal

12. Attempt to physically subdue attacker*
13. Physically control violent or unruly crowds
14. Attempt to subdue after running in pursuit
15. Respond to emergency with unplanned strenuous physical activity
16. Climb stairs in pursuit or in emergency*
17. Sit or stand in one position for at least 2 hours

### Vision

18. Use distant vision to monitor front checkpoint and to monitor courtroom*
19. Use distant vision to monitor garage/vehicles
20. Use distant vision to detect if individual has weapon*
21. Use near vision to read x-ray monitor*
22. Recognize basic colors*
23. Visually detect peripheral movement/ID threat

11

AKAL001147

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.459    Page 42 of 126

Case 4:05-cv-00096-HL    Document 78-9    Filed 07/03/06    Page 12 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 13 of 23

Hearing

24. Comprehend speech during face-to-face conversations*
25. Comprehend speech during telephone conversations
26. Comprehend speech during radio transmissions*
27. Comprehend speech when you can't see another CSO*
28. Hear sounds that require investigation*
29. Determine location of sound*

AKAL001148

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.460    Page 43 of 126

Case 4:05-cv-00096-HL    Document 78-9    Filed 07/03/06    Page 13 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 14 of 23

## V.    CSO Medical Requirements

Based on the results of the functional job analysis and the knowledge of the job requirements for weapons-carrying positions (see Section III, "Development of Medical Requirements") the following recommendations are made for the CSO medical requirements.

These recommendations do not include any requirement to satisfy weight and/or body composition standards. Many research studies and court decisions direct us to examine the ability to perform the functional or essential job functions rather than satisfy a weight and/or body composition requirement. A comprehensive study regarding body composition and physical performance within the U.S. military provided the following findings.

1.  No consistent relationship between bodyfat and physical performance.
2.  If job-related performance standards were in place, a body composition standard would be unnecessary in relation to physical performance.
3.  Appearance of different individuals at the same body weight and fat content can vary considerably depending on other factors. A stronger rationale for appearance criterion and standards that define acceptable and unacceptable appearance must be developed.

(Marriot and Grumstrup-Scott, eds., Body Composition and Physical Performance: Applications for the Military Service, 1992.)

AKAL001149

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.461    Page 44 of 126

Case 4:05-cv-00096-HL    Document 78-9    Filed 07/03/06    Page 14 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 15 of 23

## A. CARDIOVASCULAR SYSTEM REQUIREMENT

The applicant/incumbent must have a cardiovascular system that is sufficient for the individual to safely and efficiently carry out the requirements of the position.

- Blood pressure must be controlled, with or without medication, equal or less than 150 mmHg systolic and 90 mmHg diastolic.
- Confirmation of hypertension will require at least three (3) serial readings of blood pressure. Serial readings must include at least three (3) blood pressure readings taken on different days and should include readings in both arms in a standing, sitting, and recumbent position.
- All medications taken for cardiovascular conditions will be carefully reviewed to ensure that they do not compromise safe and efficient job performance.
- Any history of a cardiovascular condition or newly diagnosed conditions will be evaluated on a case-by-case basis and may require further evaluation.

CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ANGINA PECTORIS

2. AORTIC ANEURYSM

3. CARDIOMYOPATHY

4. CEREBROVASCULAR CONDITIONS such as Cerebrovascular Accident or Transient Ischemic Attacks or Carotid Artery Disease

5. CHRONIC THROMBOPHLEBITIS

6. CHRONIC VENOUS INSUFFICIENCY

7. CONGENITAL ANOMALIES such as Atrial and Ventricular Septal Defect

8. CONGESTIVE HEART FAILURE

9. CORONARY ARTERY DISEASE or HISTORY OF MYOCARDIAL INFARCTION

10. DEEP VEIN THROMBOSIS

11. DYSRHYTHMIAS such as Ventricular Tachycardia or Fibrillation, Wolff-Parkinson-White syndrome, Paroxysmal Atrial Tachycardia with or without block, Atrial Flutter or Fibrillation.

14

AKAL001150

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.462   Page 45 of 126

Case 4:05-cv-00096-HL   Document 78-9   Filed 07/03/06   Page 15 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 16 of 23

12. ELECTROCARDIOGRAM FINDINGS such as
    a.   Left Bundle Branch Block
    b.   Newly acquired Right Bundle Branch Block
    c.   ST segment alterations
    d.   Atrioventricular dissociation
    e.   First Degree A-V Block with PR interval >= 0.3 seconds
    f.   Second and Third Degree A-V Block
    g.   Atrial fibrillation or Flutter
    h.   Bradycardia with heart rate of less than 40 or sinus pauses of 3.0 seconds or longer

13. HYPERTENSION that exceeds a systolic blood pressure of 150 and/or diastolic blood pressure of 90 mm Hg with or without medication.

14. MARFAN'S SYNDROME

15. MYOCARDITIS/ ENDOCARDITIS/ PERICARDITIS

16. OCCLUSIVE PERIPHERAL ARTERIAL DISEASE such as Raynaud's

17. PACEMAKERS or PROSTHETIC VALVES are generally disqualifying. Any other condition or post-surgical management that requires the use of Coumadin or other anti-coagulants is generally disqualifying.

18. PULMONARY EMBOLISM

19. SYNCOPE, history of (Cardiogenic or vasovagal).  This history will require cardiology evaluation and/or tilt table testing for final determination.

20. VALVULAR HEART DISEASE such as mitral valve stenosis or regurgitation, aortic stenosis or regurgitation

AKAL001151

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.463   Page 46 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 1 of 15
Case 2:03-cv-04344-HB     Document 168     Filed 12/21/2005     Page 17 of 23

## B.  DERMATOLOGY REQUIREMENT

The applicant/incumbent must be free of dermatological conditions that may result in restricted function or movement, thereby impairing the safe and efficient performance of essential job functions.  Dermatological conditions may cause the applicant/incumbent to be unduly susceptible to injury or disease as a consequence of environmental exposures, including the sun, as well as other functions.  All dermatological conditions will be reviewed on a case-by-case basis.

### CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. COSMETIC DISFIGUREMENTS such as severe scars or burns, which results in restricted flexibility, grip, movement, etc.

2. PHOTOSENSITIVE SKIN CONDITIONS that limit significantly limit job performance by limiting the work environment.

3. SCLERODERMA

4. SEVERE CHRONIC DERMATITIS such as eczema or psoriasis.

5. SEVERE SKIN INFECTION

16

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.464    Page 47 of 126

Case 4:05-cv-00096-HL    Document 78-10    Filed 07/03/06    Page 2 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 18 of 23

## C. ENDOCRINE AND METABOLIC SYSTEMS REQUIREMENT

The applicant/incumbent must have an endocrine and metabolic system free of conditions that may affect normal hormonal or metabolic functioning and response that is likely to adversely affect safe and efficient job performance. Any excess or deficiency in hormonal production can produce metabolic disturbances affecting weight, stress adaptation, energy production, and a variety of symptoms or pathology such as elevated blood pressure, weakness, fatigue and collapse. All endocrine and metabolic conditions will be reviewed on a case-by-case basis.

### CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ADRENAL DYSFUNCTION (In the form of Addison's Disease or Cushing's Syndrome). These conditions may be acceptable if present without evidence of disease, such as hypertension, diabetes, hypoglycemia, electrolyte imbalance, or musculoskeletal weakness.

2. DIABETES INSIPITUS

3. DIABETES MELLITUS or HYPERGLYCEMIA will require additional medical tests and documentation of treatment to evaluate whether an individual is capable of safe performance of essential job functions.

4. PARATHYROID DISORDERS

5. PITUITARY DYSFUNCTION

6. THYROID DISEASE (Hypothyroidism or Hyperthyroidism) may be acceptable if adequately controlled and stable for at least one year and is without complications (such as significant weight changes, cardiac arrhythmia, tachycardia, poor exercise tolerance, tremors, heat or cold intolerance, significant swelling, or muscle pain). Documentation of control will include a thyroid profile and a medical report from the treating physician.

17

AKAL001153

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.465   Page 48 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 3 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 19 of 23

## D. GASTROINTESTINAL SYSTEM REQUIREMENT

The applicant/incumbent must have a gastrointestinal tract that is sufficient for the individual to safely and efficiently carry out the requirements of the job.

- There should be no evidence by physical examination (including laboratory testing) and medical history of gastrointestinal conditions likely to present a safety risk or to worsen as a result of carrying out the essential functions of the job.
- All new and existing gastrointestinal conditions will be reviewed on a case-by-case basis.
- All medications taken for gastrointestinal conditions will be carefully reviewed to insure that they do not compromise job performance and therefore interfere with safe and efficient job performance.
- Any condition that is recurrent with significant diarrhea and/or pain, that may limit activity, requires pain medication, or that causes anemia, weakness or significant weight loss may be disqualifying.

CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ANAL FISSURES

2. CHOLECYSTITIS, CHOLELITHIASIS, or GALLBLADDER DISEASE

3. CIRRHOSIS OF THE LIVER

4. COLOSTOMIES

5. CROHN'S DISEASE, ULCERATIVE COLITIS, REGIONAL ENTERITIS, ILEITIS, or IRRITABLE BOWEL SYNDROME

6. DIVERTICULITIS

7. DYSPHAGIA

8. HEPATITIS, acute or chronic

9. HERNIA, UNTREATED INGUINAL, INCISIONAL, or VENTRAL

10. INTESTINAL OBSTRUCTION

11. PANCREATITIS

18

AKAL001154

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.466   Page 49 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 4 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 20 of 23

## E.  GENITOURINARY SYSTEM STANDARD

The applicant/incumbent must have a genitourinary system that is sufficient for the individual to safely and efficiently carry out the requirements of the job.  All medications taken for genitourinary conditions will be carefully reviewed to insure that they do not compromise job performance and therefore interfere with safe and efficient job performance.  All genitourinary conditions will be reviewed on a case-by-case basis.

### CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1.   DYSMENORRHEA or ENDOMETRIOSIS that causes chronic and severe pain requiring the frequent use of narcotic medications.

2.   GLOMERULONEPHRITIS or PYELONEPHRITIS

3.   KIDNEY STONES (URINARY CALCULI) that are symptomatic, recurrent, or that causes kidney dysfunction.

4.   NEPHROTIC SYNDROME

5.   NEUROGENIC BLADDER

6.   POLYCYSTIC KIDNEY DISEASE

7.   RENAL FAILURE, acute or chronic

8.   RENAL TOXICITY

9.   RENAL VEIN THROMBOSIS

10.   UROPATHIES, uncorrected obstructive

19

AKAL001155

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.467   Page 50 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 5 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 21 of 23

## F. HEAD, NOSE, MOUTH, THROAT AND NECK STANDARD

The applicant/incumbent must have structures and functions of the head, nose, mouth, throat and neck that are sufficient for the individual to safely and efficiently carry out the requirements of the job. This may be demonstrated by:

- A physical exam of the head, nose, mouth, throat and neck that is within the range of normal variation, including normal flexion, extension and rotation of the neck;
- Open nasal and oral airways;
- Unobstructed Eustachian tubes;
- No structural abnormalities that would prevent the normal use of protective eyewear;
- Normal conversational speech;
- No evidence of a pre-existing or newly diagnosed medical condition of the head, nose, mouth, throat, or neck that could significantly interfere with the individual's ability to successfully perform essential law enforcement functions, such as speech or breathing, or that has the potential to render the person suddenly incapacitated.
- All head, nose, mouth, throat, and neck conditions will be reviewed on a case-by-case basis.

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ARTIFICIAL LARYNX or ESOPHAGEAL SPEECH

2. FACIAL DEFORMITIES that impair breathing or speech

3. MUTISM or APHONIA (inability to speak)

4. NASAL POLYPS that impair breathing or speech

5. NECK MASSES, LYMPHADENOPATHY or TRACHEOSTOMY that impair breathing or speech

6. RESTRICTED RANGE OF MOTION IN THE NECK

7. TEMPOROMANDIBULAR JOINT SYNDROME

20

AKAL001156

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.468   Page 51 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 6 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 22 of 23

## G. HEARING STANDARD

The applicant/incumbent must be able to hear well enough to safely and efficiently carry out the requirements of the job. This requires binaural hearing (to localize sounds) and auditory acuity, which may be demonstrated by:

- A current pure tone, air conduction audiogram, using equipment and a test setting which meet the standards of the American National Standards Institute (see 29 CFR 1910.95);
- Documentation of hearing thresholds as specified below:

1. In the frequency range from 500 - 2000 hertz (Hz), the pure tone audiometric deficit should not exceed 30 decibels in either ear, without the use of hearing aids.
2. At 3000 Hz, the pure tone audiometric deficit should not exceed 40 decibels in either ear, without the use of hearing aids.
3. At 4000 Hz, the pure tone audiometric deficit should not exceed 50 decibels in either ear, without the use of hearing aids.

- Binaural hearing (hearing in both ears) is required. Complete loss of hearing in one ear is disqualifying.
- Functional hearing test, including speech recognition and/or the HINT, will be used to determine the medical qualification of all individuals who fail the pure tone audiometric screening.
- All audiological conditions will be reviewed on a case-by-case basis.

## OTOLOGICAL CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. HEARING AIDS             *Incumbents*
2. ACOUSTIC NEUROMA         *Must pass standard through*
3. MENIERE'S DISEASE          *3000 Hz + (15) incumbents*
4. OTOSCLEROSIS             *55 db max at 3000 Hz*
5. VESTIBULAR NEURONITIS
6. VERTIGO or PAROXYSMAL POSITIONAL VERTIGO

21

AKAL001157

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.469   Page 52 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 23 of 23

## H.  HEMATOLOGY SYSTEM STANDARD

The applicant/incumbent must have a hematopoietic (blood and blood-producing) system that is sufficient for the individual to safely and efficiently perform the aggressive law enforcement functions of the job. All hematological conditions will be reviewed on a case-by-case basis.

### CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1.  ANEMIA

2.  BLEEDING DISORDERS  such as genetic bleeding disorders (Hemophilia, von Willebrand's disease), acquired bleeding disorders (caused by liver disease or infection) and medications (Coumadin, Heparin) which are likely to cause bleeding with physical confrontation or defensive tactics training.

3.  HEMOGLOBINOPATHIES such as Sickle Cell Disease or Thalassemia which are likely to cause infarction at high altitude, reduce exercise capacity, and prevent working in certain environments.

4.  MULTIPLE MYELOMA

5.  SYSTEMIC LUPUS ERYTHEMATOSUS

6.  THROMBOCYTOPENIA

AKAL001158

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.470    Page 53 of 126

Case 4:05-cv-00096-HL    Document 78-10    Filed 07/03/06    Page 8 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2006    Page 1 of 35

## I. MEDICATION STANDARD

All medication requirements, including psychotropic medication, will be evaluated to ensure that safe and efficient job performance will not be adversely affected by their use. Medical conditions that require medications will be reviewed on a case-by-case basis. Each of the following considerations will be reviewed in order to make a medical determination.

1.    Drug-food interactions

2.    Drug-environmental interactions

3.    Drug toxicity

4.    History of patient compliance

5.    Medical complications associated with long-term drug use

6.    Medication type and dosage requirements

7.    Potential drug side effects and adverse reactions

8.    Potential drug-drug interactions

Medications such as narcotics, sedative hypnotics, barbituates, amphetamines, or any drug with the potential for addiction, that is taken for extended periods of time (usually beyond 10 days) or is prescribed for a persistent or recurring underlying condition would generally be considered disqualifying.

23

AKAL001159

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.471   Page 54 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 9 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 2 of 35

## J.  MUSCULOSKELETAL SYSTEM STANDARD

The applicant/incumbent must have a musculoskeletal system that allows the individual sufficient movement, agility, flexibility, strength, dexterity, coordination, acceleration, deceleration and the ability to change directions in order to safely and efficiently carry out the requirements of the job.  This may be demonstrated by:

- A physical exam of the upper and lower extremities, neck, and back that is within the range of normal variation for strength, flexibility, range of motion, and joint stability;
- No evidence of physical examination and medical history of musculoskeletal conditions likely to present a safety risk or to worsen as a result of carrying out the essential functions of the job.
- All musculoskeletal conditions will be reviewed on a case-by-case basis.

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1.  AMPUTATIONS of an EXTREMITY.  Any loss of an upper or lower extremity, hand, foot.

2.  AMPUTATIONS of THUMB or INDEX FINGER that affect the ability to perform essential functions, such as involving lethal and non-lethal weapons, handcuffs, etc.

3.  ARTHRITIS of any type if there is limited joint motion, pain, and/or muscle atrophy that affects the ability to perform essential job functions.

4.  CERVICAL, THORACIC, LUMBAR, LUMOSACRAL DISK DISEASE, FRACTURES, OR DISLOCATIONS of any type if there is limited joint or gait motion, pain, motor or sensory manifestations, and/or muscle atrophy that affects the ability to perform essential functions, such as limitations of flexibility and strength causing an inability to stand, bend, stoop, carry heavy objects or sit for long periods of time.

5.  CHRONIC LOW BACK PAIN with recurrence of pain and/or restricted range of motion or gait that affects the ability to perform essential functions.  Each case will be reviewed in context to the original history of the injury (or whatever the etiology), the response to therapeutic regimes, frequency of recurrence, exacerbating factors, and lengths of disability associated with the recurrences combined with the current clinical presentation.

6.  CHRONIC SPRAIN OR STRAIN OF THE NECK limiting mobility or causing recurring cephalgia (headaches) may be disqualifying.

24

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.472   Page 55 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 10 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 3 of 35

7.  FRACTURES may require orthopedic evaluation to determine whether functional limitations currently exist. A recent fracture with current immobilization (such as casting, bracing, etc.) of a limb that prevents the performance of the full range of essential law enforcement functions will require documentation from the treating physician that immobilization is no longer required and that no physical limitations are present. Fractures that continue to cause pain, swelling, muscle atrophy, limitation of motion, abnormal gait may be disqualifying.

8.  KNEE CONDITIONS with current symptoms such as swelling, pain, reduced range of motion, gait, or strength, or instability that prevents the full range of essential law enforcement functions.

9.  Any PROSTHETIC DEVICE will be reviewed on a case-by-case basis.

10. SCIATICA, CERVICAL NEUROPATHY, OR OTHER NEUROPATHIES with evidence of numbness, tingling, loss of motor strength, or limited gait.

12. SCOLIOSIS with curve greater than or equal to 45 degrees, pain, significant curve progression, or with limitations for physical activity that affects the ability to perform essential job functions.

12. SHOULDER CONDITIONS such as history of multiple dislocations (three or more) without surgical repair or any history of dislocation with current pain, or reduced strength or range of motion, acromioclavicular (AC) separation with current pain, or reduced strength or range of motion.

13. SPINAL DISORDERS such as Spina Bifida, Spondylolysis, Spondylolisthesis, or Ankylosing Spondylitis which limit mobility, gait, or skeletal strength, or cause pain.

25

AKAL001161

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.473   Page 56 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 11 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 4 of 35

## K. NEUROLOGICAL SYSTEMS STANDARD

The applicant/incumbent must have a nervous system that is free of central or peripheral nervous system interference that will allow the individual to safely and efficiently carry out the requirements of the job. This may be demonstrated by:

- A physical exam of the cranial and peripheral nerves and the vestibular and cerebellar system that is within the range of normal variation, including intact cranial nerves I-XII;
- Normal vibratory sense in the hands and feet;
- Normal proprioception (sense of movement and position of the body) of the major joints;
- Normal sensation of hot and cold in the hands and feet;
- Normal reflexes of the upper and lower extremities;
- Normal balance (e.g., heel-toe walk, Romberg, balance on one foot);
- Normal basic mental status evaluation (e.g., person, place, time, current events);
- No evidence by physical examination and medical history of nervous, cerebellar, or vestibular system conditions likely to present a safety risk or to worsen as a result of carrying out the essential functions of the job;
- Any condition with loss of motor skills, muscle strength, cognitive function, coordination, or gait; sensory loss (limb, hearing, or vision); tremor, pain, or effect on speech may result in further evaluation or disqualification.
- All neurological conditions will be reviewed on a case-by-case basis.

## CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ALZHEIMER'S or other degenerative dementia disorders

2. AMYOTROPHIC LATERAL SCLEROSIS

3. CEREBRAL PALSY

4. CRANIAL NEUROPATHIES such as Tic Douloureux, Trigeminal Neuralgia

5. DEGENERATIVE SPINAL CORD DISORDERS

6. EPILEPSY with a history of past or current seizures requires additional medical documentation that this condition is unlikely to adversely effect the safe and efficient performance of essential job functions.

7. HAND TREMOR

8. HEAD TRAUMA

26

AKAL001162

Case 2:17-cv-10109-JMH-REW ECF No. 25-6 filed 03/15/18 PageID.474 Page 57 of 126

Case 4:05-cv-00096-HL Document 78-10 Filed 07/03/06 Page 12 of 15
Case 2:03-cv-04344-HB Document 168 Filed 12/21/2005 Page 5 of 35

9.    HUNTINGTON'S CHOREA

10.    HYDROCEPHALUS

11.    MENINGITIS which is current or a history of meningitis with residual neurological damage or changes.

12.    MIGRAINE and other headaches that interfere with performance of essential job functions (such as sensory changes) or that require medication that is either frequent, sedating, or that is likely to interfere with essential job functions.

13.    MULTIPLE SCLEROSIS

14.    MYASTHENIA GRAVIS

15.    NARCOLEPSY

16.    PARKINSON'S DISEASE

17.    PERIPHERAL NEUROPATHIES such as Carpal Tunnel Syndrome (Median nerve), Foot Drop (Peroneal nerve), Diabetic and Alcoholic Neuropathy

18.    SYNCOPE

19.    TRANSIENT ISCHEMIC ATTACKS or CEREBROVASCULAR ACCIDENT (STROKE)

27

AKAL001163

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.475   Page 58 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 13 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 6 of 35

## L.  ORGAN TRANSPLANTATION AND PROSTHETIC DEVICES

COCHLEAR IMPLANTATION is acceptable provided that the applicant meets the hearing standards.

OCULAR LENS IMPLANTATION may be acceptable considering an adequate post surgical recovery period and if the visual acuity meets the medical standards.  (See vision standards)

PACEMAKERS or PROSTHETIC VALVES are generally disqualifying.  Any other condition or post-surgical management that requires the use of coumadin or other anti-coagulants may be disqualifying.  (See cardiovascular standards)

RENAL TRANSPLANTATION may be considered disqualifying unless the applicant is not taking immunosuppressive drugs and is medically cleared by the surgeon who performed the operation to participate in strenuous activities. The applicant must be considered by the surgeon to be capable of withstanding blunt trauma to his/her flanks without a significant probability of untoward personal damage.

Other transplantations or prosthetic devises will be considered on a case-by-case basis.

28

AKAL001164

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.476   Page 59 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 14 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 7 of 35

## M. PSYCHIATRIC DISORDERS STANDARD

The applicant/incumbent must have judgement, cognitive functioning, and social interaction/behavior that will provide for the safe and efficient conduct of job requirements. Medical conditions may require the medical review by a psychologist, neuropsychologist, neurologist, and/or a psychiatrist for final medical determination of qualification. There should exist no evidence by physical examination and medical history of psychiatric conditions (including alcohol and substance abuse) likely to present a safety risk or to worsen as a result of carrying out the functions of the job. All psychiatric conditions will be reviewed on a case-by-case basis.

All psychiatric diagnoses must be consistent with the diagnostic criteria as established by the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) published by the American Psychiatric Association, and should include the results of a multi-axial assessment. All psychotropic medications will be evaluated to determine their impact on job performance. All psychiatric conditions will be reviewed on a case-by-case basis.

### SPECIFIC PSYCHIATRIC DISORDERS THAT MAY BE DISQUALIFYING INCLUDE BUT ARE NOT LIMITED TO THE FOLLOWING EXAMPLES.

1. DELIRIUM, DEMENTIA, AMNESTIC AND OTHER COGNITIVE DISORDERS

2. MAJOR DEPRESSION

3. MANIC-DEPRESSIVE DISORDER or Bi-Polar Disorder

4. PANIC DISORDER AND OTHER ANXIETY DISORDERS

5. SCHIZOPHRENIA AND OTHER PSYCHOTIC DISORDERS

29

AKAL001165

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.477   Page 60 of 126

Case 4:05-cv-00096-HL   Document 78-10   Filed 07/03/06   Page 15 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 8 of 35

## N. RESPIRATORY SYSTEM STANDARD

The applicant/incumbent must have a respiratory system that is sufficient for the individual to safely and efficiently carry out the requirements of the job. This is demonstrated by:

- A physical exam of the respiratory system that is within the range of normal variation;
- A normal pulmonary function test, if required;
- A normal chest x-ray, if required;
- A normal symptom-limited exercise stress EKG, if required;
- All medications taken for respiratory conditions will be carefully reviewed to insure that they do not compromise job performance and therefore interfere with safe and efficient job performance.
- All respiratory conditions will be reviewed on a case-by-case basis.

CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

1. ASTHMA currently controlled on any medication will be evaluated on a case-by-case basis. Exercise-induced asthma requiring medication either before or after exercise is generally disqualifying.

2. BRONCHITIS, chronic

3. EMPHYSEMA

4. FEV1/FVC RATIO SHOULD NOT REFLECT EVIDENCE OF A SIGNIFICANT OBSTRUCTIVE OR RESTRICTIVE DISORDER. Values of less than 70% will be further evaluated and a medical decision may be made on a case-by-case basis.

5. FORCED VITAL CAPACITY (FVC) AND/OR FORCED EXPIRATORY VOLUME AT ONE SECOND (FEV1) THAT IS LESS THAN 70% OF THE EXPECTED VALUE. Values of less than 70% will be further evaluated and a medical decision may be made on a case-by-case basis.

6. LUNG ABSCESS

7. PNEUMONECTOMY

8. PULMONARY EMBOLISM

9. PULMONARY INFARCTION

30

AKAL001166

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.478   Page 61 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 1 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 9 of 35

10.  **SARCOIDOSIS**

11.  **SPONTANEOUS RECURRENT PNEUMOTHORAX**

12.  **TUBERCULOSIS (TB)** A recent positive (conversion) TB test that has been treated for at least three weeks is acceptable providing the patient remains under continuing treatment and supervision. A chest x-ray will be required to document the stability of this condition. Evidence of active TB with or without symptoms, chest x-ray findings, or presence of sputum production, or presence of significant lung destruction on chest x-ray in fully treated cases will be evaluated on a case-by-case basis.

13.  **TUMORS OF THE LUNG** such as Malignant Mesothelioma, Bronchogenic Carcinoma

31

AKAL001167

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.479   Page 62 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 2 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 10 of 35

## O.   VISION STANDARD

The applicant/incumbent must be able to see well enough to safely and efficiently carry out the requirements of the job.

HISTORY:  All applicants/incumbents should be questioned regarding a history of eye injury, retinal detachment, serious eye disease (specific questions for glaucoma, diabetic or hypertensive retinopathy, and retinitis pigmentosa), or visual field defect.  Copies of previous assessments for the above abnormalities shall be obtained whenever possible. The individual should also be questioned regarding the use of orthokeratology lenses. Orthokeratology lenses should not be worn for two weeks prior to the examination.

1.   CORRECTED DISTANT VISUAL ACUITY must be 20/30 or better, as measured with both eyes viewing (binocular).

2.   CORRECTED DISTANT VISUAL ACUITY must be 20/125 or better in the worst eye.

3.   COMPLETE LOSS OF VISION IN ONE EYE is disqualifying.

4.   ABNORMAL COLOR VISION with severe color deficiency in any color is generally disqualifying.  The use of X-Chrom contact lenses or tinted spectacle lenses/contact lenses are not permitted in the testing of color vision. Basic color vision (the ability to distinguish yellow, green, red, and blue) is required.  This may be demonstrated by passing the standard Farnsworth D-15 color vision test.

5.   VISUAL FIELDS should be normal with full peripheral vision.  In full, normal binocular vision (full, normal peripheral vision) the horizontal field is about 180 degrees and the vertical field is 120-130 degrees.  Any permanent and significant deviation from full visual fields, either to the central or peripheral visual field, is generally disqualifying.  Any history of eye disease or any medical condition likely to cause eye disease, such as retinopathy, glaucoma, retinitis pigmentosa, or retinal detachment will require visual field evaluation by optometrist or ophthalmologist.

32

AKAL001168

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.480   Page 63 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 3 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 11 of 35

## OPHTHALMOLOGIC CONDITIONS WHICH MAY RESULT IN DISQUALIFICATION INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING EXAMPLES:

Ophthalmologic conditions which are particularly susceptible to environmental exposures such as sunlight, dusts, fumes, or various volatile compounds may cause an applicant to be disqualified. Any eye condition likely to impact on color vision will require further assessment of color vision.

1. **CONJUNCTIVITIS, chronic**

2. **CORNEAL ABRASIONS**

3. **CORNEAL DYSTROPHY**

4. **CORNEAL SCARS**

5. **CORNEAL ULCERS**

6. **DIPLOPIA (or double vision)**

7. **GLAUCOMA**

8. **KERATITIS**

9. **KERATOCONUS**

10. **LENS OPACITIES**

11. **NIGHT BLINDNESS**

12. **ORTHOKERATOLOGY**

13. **PHOTOPHOBIA**

14. **PTERYGIUM**

15. **REFRACTIVE SURGICAL PROCEDURES -- Radial Keratotomy, Photorefractive laser surgery (PRK or LASIK), ALK Keratoplasty.** These procedures will require an assessment of visual function prior to qualification.

16. **RETINAL DETACHMENT**

17. **RETINITIS PIGMENTOSA**

33

AKAL001169

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.481   Page 64 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 4 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 12 of 35

# Appendix A

## Federal Law Enforcement Work Functions Inventory and Directions for Use, US Marshals Service—Judicial Security Division 7/28/99

34

AKAL001170

Case 4:05-cv-00096-HL    Document 78-11    Filed 07/03/06    Page 5 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 13 of 35

**FEDERAL OCCUPATIONAL HEALTH**
**Federal Law Enforcement Medical Programs**

**Law Enforcement Functional Job Analysis**

**7/28/99**
**U.S. Marshals Service—Judicial Security Division**

### Why are we going through this process?

The process this agency is presently going through is structured in order to end up with defensible, objective medical standards for Court Security Officer (CSO) weapons-carrying positions. Each weapons-carrying position has certain job functions that are critical to the performance of that position, termed here essential job functions. An essential job function not only defines the job requirements, but also defines the expected working environments and conditions in which the job requirements are to be performed.

Prior to recommending and instituting medical standards for weapons-carrying positions the essential job functions for those positions must be identified. A connection (nexus) must be established between the performance and environment of essential job functions and the proposed medical standards. In addition, the physician providing medical qualification recommendations to management must have sufficient knowledge of the essential job functions in order to make competent and defensible medical employability decisions. The process in which you will participate today will ask you to define your essential job functions.

### Participant Selection Process and the Focus Group

The agency has selected key location(s) throughout the country in order to develop a representative sample of the CSO workforce and their expected job functions and work environments. In each of the location(s), five CSO's with varying experience have been selected. In each location(s) the group of five CSO will be asked to work as participants in a group process, the focus group, to provide valuable information concerning their essential job functions. Responses from each focus group will be merged in order to develop the essential job functions and occupational risk profile for the CSO position. The essential job functions and risk profile will give rise to the recommended medical standards for the CSO position.

AKAL001171

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.483   Page 66 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 6 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 14 of 35

## Directions for Today

The focus group today will consist of the following three exercises:

1. Scoring each function in the "Federal Law Enforcement Work Functions Inventory" as to Frequency and Importance using the scoring scales provided (tear-off sheet),
2. Determining cutoff points for group Importance scores and review of group Frequency scores to reflect the group's first cut in defining their essential functions, and
3. Participating in a group exercise that reviews the first cut of essential functions to insure that focus group members have selected only those job functions that are essential.

## Exercise One—Scoring the "Federal Law Enforcement Work Functions Inventory" for Frequency and Importance

- Each participant will give a separate verbal score for 1) the Frequency and 2) the Importance of each written function or working condition listed in the Inventory.
- Scoring will be done using the Frequency and Importance scale (tear-off page — use this as a reference during the scoring).
- In responding to the Frequency of performance, use as your reference the previous 12 months of work in your job. If you have been working on a task force or in an administrative capacity during the past 12 months, use as a reference a typical 12-month period during your career with the agency within the same position.
- As a supervisor or manager, when responding to the 12-month Frequency use as a reference your career with the agency and/or your experience with the individuals that you supervise.
- Some functions will call for a Frequency that reflects your entire career within this agency position and will be identified by your facilitator. When asked to respond in this manner you will provide the number of actual times that this has occurred during your entire career in this position only with the current agency.
- Not every Frequency has been listed in the Frequency scoring scale so use the Frequency response that most closely matches your actual response.
- The participant who begins the scoring will be varied for each function in order to allow each participant equal input (and equal uncertainty when answering first).
- Discussion is encouraged during the process, especially when scores are significantly different. Feel free to change your score during or after any discussion, but only do so if you are truly convinced that the new score is a better reflection of your opinion about that job function. Do not just "go with the herd."

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.484   Page 67 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 15 of 35

- If any of the questions or functions are not clear, please ask the facilitator for clarification. The facilitator will be able to provide examples that involve the function or medical conditions that may impact on the function.
- After each participant has responded and discussion has ended a group score will be produced by averaging the individual scores. The group score will be reported to the agency and will be used for later exercises. Individual scores will not be reported to the agency.
- Mark your response to the left side of each item in the Inventory or in the blanks provided.
- Note that some functions will ask for percentages rather than Frequency or Importance and will be identified by your facilitator.
- This focus group is a group interactive exercise that requires the presence of all participants for the entire process. The focus group will last all day. There will be a morning and afternoon break of 15 minutes and one hour for lunch. If you have to leave the room for urgent business, alert the facilitator and a short break will be called.

## Exercise Two—Determining Cutoff Points

- After the group has completed the response to all of the functions and the group scores have been tallied, the focus group will be asked to provide a numerical cutoff point for group Importance scores.
- Upon selection of a cutoff point, those functions below the cutoff point will be dropped off and will not be considered in exercise 3, thereby eliminating them as essential functions. Those functions at or above the cutoff point will be saved for exercise 3.
- In determining an Importance cutoff point the group will be asked to review their group Importance scores and derive a cutoff point that saves those essential functions (see tear-off page, "Guide to the Definition of Essential Job Functions") of the job but eliminates those marginal or non-essential job functions.
- The group will review any frequently performed (group score of 4 or greater) functions that did not meet the numerical cutoff point determined for Importance. The group will be asked to decide whether to save those frequently performed functions for exercise 3.

AKAL001173

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.485   Page 68 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 8 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 16 of 35

### Exercise Three—Veteran Officer Scenario

In order to be certain that those functions you have identified and saved in exercises I and 2 truly are essential, you will be asked to review those essential functions again as a group by considering the following hypothetical situation. A Court Security Officer who has worked for 5 years has just developed a medical condition that causes his/her permanent inability to perform one of the essential functions that you have identified.

You will now be asked to reconsider whether that specific function is:

a) Essential to the performance of the CSO job, or
b) Non-essential to the performance of the CSO job.

You will determine this by your "Yes" or "No" response to each function previously identified as essential:

a) YES—An essential job function.  The function is essential to the performance of this job and is fundamental to this occupation.  An employee who is unable to perform this particular function changes the nature of the job, the flow of work, and /or may directly threaten the health and safety of themselves, other law enforcement personnel, or the general public.  The employee should not continue in this occupation.

b) NO—Not an essential function.  The function, though important, is not essential to this job.  An employee, though unable to perform this particular function, can still perform the job without significantly altering the nature of the position, disrupting the flow of work, or causing a safety hazard to themselves or others.  The employee should still be allowed to continue working in this occupation.

- Each group member will be asked to give their vote, with the lead responder changing after each function.
- It is important not to answer out of turn in this exercise.
- Group discussion is highly encouraged, after all responses have been given.
- You may choose to change your response, if desired, at anytime in this exercise. Do not just "go with the herd."
- Group decision regarding whether a specific function is truly essential or not is by majority vote.

AKAL001174

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.486   Page 69 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 9 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 17 of 35

## I. General

### I.A. Work Schedule

1. Work extended hours. Work an 8 hour day and then work additional hours due to unexpected activity or request
2. Travel that requires significant time or distance and follow with law enforcement related function (long air flights, drives by car at least 2 hours each way)
3. Shift work—perform LE function evening or night shift for at least 3 consecutive days
4. Miss meals or have irregularly scheduled meals while performing law enforcement functions (outside of the office, including use of GOV car)

### I.B. Work Environment

1. Work in tight, confined spaces having to crawl or squat while performing law enforcement functions. Do not include training.
2. Use respirator or gas mask (other than dust mask, HEPTA filter). Do not include training.
3. Skin or airborne chemical exposure (dust, illegal drugs, asbestos). Frequency response only.
4. Use body armor while performing law enforcement functions. Type of armor.
5. Drive vehicles on duty (used on Government time, official travel)
6. Perform high pursuit, emergency, or evasive driving. Describe # occasions.
7. Drive vehicles on the job in the dark
8. Work in environment in adverse weather conditions (e.g., rain/fog/snow). Could be in vehicle.
9. For the following provide % of total work time (not frequency/importance)
   a. Time that you spent out of the office, excluding commute to work. %_____
   b. Time spent outside (in elements/weather)         %_____
   c. Describe your three (3) most frequently performed law enforcement work activities other than routine paper work. For each activity describe the percent (%) of your total work time spent in each activity (do not include travel time, prep time, or paperwork)
   Activity 1 _____  % total work time _____ %
   Activity 2 _____  % total work time _____ %
   Activity 3 _____  % total work time _____ %

10. Work alone while armed out of the office. Anytime that you carry your weapon = work. Alone = not in visual contact with other LE.
11. Work under extreme psychological tension or pressure
12. Work at heights greater than or equal to 15 feet (ladders, climbing, not enclosed in building)
13. Walk or run on uneven surfaces (such as slanted, embankments, cracked pavement, grass, hills, muddy, wet). Describe types of surface.
14. Conduct vehicular stops
15. Stop or question or detain individuals (unplanned interviews)
16. Encounter individuals who display a violent or irrational temperament
17. Provide protection or armed escort to public officials, other VIPs, and/or witnesses whose presence requires tight security measures (Do not include prisoner transport).

AKAL001175

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.487    Page 70 of 126

Case 4:05-cv-00096-HL    Document 78-11    Filed 07/03/06    Page 10 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 18 of 35

## I.C. Weapons/Defensive Tactics

Describe standard issue handgun(s) _____
Frequency of Firearms Qualification _____
    Handgun _____
    Shoulder weapons/Long guns _____
Frequency of Defensive Tactics Training _____

1. Use standard-issue handgun with weak (non-dominant hand). Use = deployed. Frequency = number in LE career with agency where weapon pulled and during course of LE activity transferred weapon from strong to weak hand. Do not include training.
2. Use shoulder weapons (shotgun, rifle). Use = deployed. Frequency = number in LE career with agency. Do not include training. Describe types used.
3. Use the following non-lethal defensive tactics/equipment. Do not include training. Usage = pulling equipment out of holder.
   a. Baton
   b. Pepper spray
4. Use handcuffs. Do not include training.
5. In using handcuffs provide percent (%) of total handcuffing incidents. Do not include training. Arrest situations. Reflects your entire agency career.
   a. That are resistive (non-compliant) during handcuffing
   b. Where LE support not immediately present (in same room or close by) when handcuffing suspect _____ %
   c. Where physical LE assistance requested for restraint or handcuffing _____ %
   d. That are performed in positions other than standing, hands behind back _____ %
6. Use weapon (standard issue handgun).
7. For the following provide a Frequency response only. Do not include training. Describe situations.

                                              Importance only _____

                                                             Frequency
   a. Draw weapon while performing law enforcement functions.
   b. Draw weapon and make shoot/no-shoot decision, with weapon on target _____
   c. Fire weapon in the line of duty _____ *

*Frequency = number of times in LE career with agency.

8. Load weapon under emergency conditions. Frequency = number of times in LE career with agency. Do not include training. Describe situations.
9. Confiscate weapon from person found during pat down

AKAL001176

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.488   Page 71 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 11 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 19 of 35

## II. Senses

**II.A.** Use sense of Smell to alert to danger (smoke, explosive, gas leaks) or to identify odors at crime scene. Describe situations.

## II.B. Vision

### Distance Vision

1. Use vision to detect individuals or objects at a distance without binoculars. (Examples: visually inspect crime scene, house under search warrant, observe crowds for suspicious behavior or violators of the law or for specific individuals matching a given description, observe people or locations for periods of time looking for suspicious behavior or violators of the law, license plates, vehicles, search suspects)

Describe the 3 most frequently performed law enforcement tasks that require distant vision and determine their Importance. (Do not include training)

a) Task _____     Importance _____
b) Task _____     Importance _____
c) Task _____     Importance _____

Describe how frequently the above 3 tasks are performed under different conditions:

| Lighting conditions | Task a | Task b | Task c |
|---|---|---|---|
| a) Bright light (sunlight or florescence) | ____ | ____ | ____ |
| b) Dim, low light, or dark (dusk, dawn, nighttime) | ____ | ____ | ____ |

| Distances | | | |
|---|---|---|---|
| a) 2-20 feet | ____ | ____ | ____ |
| b) 20-99 feet | ____ | ____ | ____ |
| c) 100-200 feet | ____ | ____ | ____ |
| d) 200-400 feet | ____ | ____ | ____ |
| e) Greater than 400 feet | ____ | ____ | ____ |

AKAL001177

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.489   Page 72 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 12 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 20 of 35

2. Positive detection if an individual has a weapon which poses a threat to you.
   Importance _____

   Describe how frequently the above task is performed under different conditions:

   Lighting conditions

   a) Bright light (sunlight or florescence)
   b) Dim, low light, or dark (dusk, dawn, nighttime)      _____

   Distances
   a) Within 5 feet
   b) 5-20 feet                                            _____
   c) 20-50 feet                                           _____
   d) 50-100 feet                                          _____
   e) Greater than 100 feet                                _____
                                                           _____

   Near Vision

3. Identify and visually examine documents, reports, etc.          Importance _____
   Please describe specific documents.
   What size detail is involved (fine—normal newspaper print, medium—this document,
   coarse—headers in newspaper)?

   Describe how frequently the above task is performed under different conditions:

                      a) Fine detail
                      b) Medium detail      _____
                      c) Coarse detail      _____

   Depth Perception

4. Perform 3-D work at close range. Visualizing objects at different depths (manipulating
   dials during closing down of clandestine drug lab operations)  Identify tasks
   _____

AKAL001178

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.490   Page 73 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 13 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 21 of 35

**Color Vision**

Use Frequency and Importance scoring

5. Recognize fine differences in color (shades, pastels) to perform your job. **Describe specific tasks. What are the consequences of error?**
6. Recognize basic colors (green vs. red, blue vs. yellow) in the performance of job duties. **Describe specific tasks. What are the consequences of error?**

**Peripheral Vision**

7. Perform tasks which require detection of movement or identification of threat at extreme left or right. (During search warrant or surveillance, or while sitting or driving vehicle). **Use Importance & Frequency scoring**
8. Perform tasks where confronted by 2 or more individuals, suspects, or assailants.

|  | Frequency Performed | Frequency Performed alone |
|---|---|---|
|  | (Use scoring sheet) |  |
| a) Identify tasks _____ | _____ | _____ |
| b) Identify tasks _____ | _____ | _____ |

**Uncorrected Distant Vision**

9. Have you or someone in your presence had to function without the use of your normal spectacles or contact lenses due to dislodgment or fogging of lenses. **Describe situations.**
10. Has the loss or dislodgment of your glasses or contact lenses interfered with the job performance. **Describe situations.**

AKAL001179

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.491   Page 74 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 14 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 22 of 35

## II.C. Hearing

**Directions for scoring this section.** For each of the following functions provide a single Importance score for each function AND a frequency of performance of that function in Silence (a), Moderate Noise (b), Loud Noise (c), and Very Loud Noise (d) backgrounds. Mark your responses below each function.

a) **Silence:** Quiet, virtually no background noise
b) **Moderate Noise:** Muffled street sounds, running car engine, normal conversation
c) **Loud Noise:** Honking horns, nearby street/building construction, motorcycle engine, noisy restaurant, nearby crowd of people
d) **Very Loud Noise:** Sirens, nearby helicopter, screaming mob, gunfire

### Speech Comprehension

1. Participate in face-to-face conversations (interviewing, mediating, receiving instructions from other LE)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

2. Talk on telephone (communicate non-face-to-face with other LE, public)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

3. Monitor and/or respond to radio transmissions (on foot or in car)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

4. Communicate with other LE when you can't see or look at them (other LE in same car while driving, during search/arrest warrants or surveillance, or in low light or dark conditions)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

### Sound Detection

5. While on foot or in car hear sounds that require investigation (breaking glass, whispering, breathing, footsteps, vehicle, rustling noise)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

### Sound Discrimination

6. Distinguish type of sound being heard either on foot or in car (breathing, breaking glass, cocking gun or shotgun rack, footsteps, vehicle type, voices, type of alarm)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

7. Hear differences in sounds resulting from tapping on tires, metal tanks, container walls, doors, or walls to determine if they contain objects or are full or empty
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

### Sound Localization

8. Determine location of sound while on foot or in car (breathing, breaking glass, cocking gun or shotgun rack, footsteps, vehicle type, voices, type of alarm)
   Importance ___  Frequency a) ___  Frequency b) ___  Frequency c) ___  Frequency d) ___

AKAL001180

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.492   Page 75 of 126

Case 4:05-cv-00096-HL   Document 78-11   Filed 07/03/06   Page 15 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 23 of 35

9.  Describe any special types of telephones or listening devices used.

## III.  Cardiopulmonary/Musculoskeletal

1.  Attempt to subdue physically attacking or resisting persons or engage in physical confrontation with other individual.  Frequency = number in LE career with agency. **Duration?  Size/Weight?  Assistance?**
2.  Physically control violent or unruly crowds or bystanders (may perform as part of a group of LE)
3.  Pursue fleeing suspects on foot
4.  Attempt to subdue combative person after running in pursuit
5.  Respond to life threatening or emergency situation with unplanned strenuous physical activity
6.  Lift/carry/drag/pull/push heavy objects (e.g., heavy equipment, boxes/files, ammunition, protective equipment).   Describe type and weight.  Minimum 50#.
7.  Pull oneself over obstacle or climb over obstacle (e.g. fences, walls, vehicles)
8.  Climb stairs in pursuit or in emergency situation.   Describe situations.
9.  Use bodily force to gain entrance (e.g. through a barrier such as a door).  Can use tools/ram.
10. Sit or stand in one position for long periods of time.   Minimum of 2 hours. (not including classroom, office, airplane, car where have the ability to move around or stop and walk around).   Describe time of continuous siting/standing and reasons for activity

**THANK YOU**

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.493    Page 76 of 126

Case 4:05-cv-00096-HL    Document 78-12    Filed 07/03/06    Page 1 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 24 of 35

### Federal Law Enforcement Work Functions Inventory
### Scoring Scales

This inventory is intended to prioritize the essential functions of the Court Security Officer job by determining how often these functions are used (Frequency Scale) and by the value placed on these functions by the Court Security Officer (Importance Scale). Respond to the following work-related functions by using the two scales and scoring key below, selecting the response closest to your answer. Score each function by rating the frequency over importance (e.g., 3/5 would mean that you used this 1-3 times per month and you rated this function very important). Mark your rating on the Left side of each function. Vision and hearing functions use a different scoring format which is shown in those sections.

**Frequency Scale**

Determine how often you have performed each function. Consider the frequency of performing each function in an average year under normal working conditions.

| | | |
|---|---|---|
| 0 | Not performed in the last year | LEAST |
| 1 | 1-2 times per year | |
| 2 | 3-6 times per year | |
| 3 | 1-3 times per month | |
| 4 | 1-3 times per week | |
| 5 | 1-3 times per day | |
| 6 | 1-3 times per hour | |
| 7 | 5+ times per hour | MOST |

**Importance Scale**

Determine the importance of each function to the overall success of your individual mission and job performance. Except where noted you should determine the importance of each function by how important is it that you have the ability to perform each function. Remember that not every task can be extremely important.

| | | |
|---|---|---|
| 0 | Function is NOT related to mission/job performance | LEAST |
| 1 | Function is related but not important | |
| 2 | Function is related but of low importance | |
| 3 | Function is related but only moderate importance | |
| 4 | Function is important | |
| 5 | Function is very important | |
| 6 | Function is of great importance | |
| 7 | Function is fundamentally important | MOST |

AKAL001182

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.494   Page 77 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 2 of 15
Case 2:03-cv-04344-HB·   Document 168   Filed 12/21/2005   Page 25 of 35

**Guide to the Definition of Essential Job Functions**

The determination of whether an individual is qualified for a position is based on his/her ability to perform the essential functions of the job. An essential function is a specific job function that is critical to the safe and/or effective performance of the job. Without the ability to perform that critical or essential function, an individual should not be allowed to perform the job. This is especially true in law enforcement where the inability to perform that essential function is likely to cause a safety risk to the individual and/or others. Below are some thoughts to guide you in determining whether a job function is essential.

- The job function must be real—it must actually be performed on the job.
- The job function must be universal—it is required of all employees in that job classification, regardless of location.
- The job function, if removed, would fundamentally alter the job.
- A job function is essential if the principle flow of work would stop with the elimination of that function—the function is fundamental to the job.
- The reason that the position exists is to perform an essential function. An example is that of a security guard who checks ID cards. The ability to read ID cards is an essential job function, since the only reason the position exists is to have the ID cards checked.
- In law enforcement, during peak demand periods (emergency situations) the performance of essential job functions becomes more critical as all individuals are called for support.
- A job function is essential if severe consequences can occur with non-performance or poor performance of that job function. The consequences of poor or inadequate performance can be far more important than the frequency of function performance in determining if a task is essential. Especially in law enforcement which consists of highly critical but infrequently performed job functions, such as using weapons, subduing combative subjects.

AKAL001183

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.495    Page 78 of 126

Case 4:05-cv-00096-HL    Document 78-12    Filed 07/03/06    Page 3 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 26 of 35

Please complete the following information and return to facilitator along with your completed inventory.

Name _____

Today's Date _____

Current Position/Grade _____

Years as Court Security Officer _____

Previous Agency Law Enforcement Experience

| Dates (Years) | Position | Location |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.496   Page 79 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 4 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 27 of 35

# Appendix B

## Focus Group Determination of Job Task Frequency, by Site

Northern Georgia District (Atlanta),
Delaware District (Wilmington),
Colorado District (Denver),
Maryland District (Baltimore),
Oregon District (Portland)

AKAL001185

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.497   Page 80 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 5 of 15
Case 2:03-cv-04344-HB   Document 166   Filed 12/21/2005   Page 28 of 35   Page 1

| | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **Work Schedule** | | | | | | | |
| Extended Hrs | 2.80 | 1.60 | 1.20 | 0.80 | 1.00 | 1.48 | 0.8 |
| Travel | 0.00 | 0.00 | 0.20 | 0.00 | 0.20 | 0.08 | 0.1 |
| Shift work | 0.00 | 0.00 | 0.00 | 0.00 | 1.40 | 0.28 | 0.6 |
| Miss meals | 2.20 | 3.60 | 1.40 | 3.00 | 1.80 | 2.40 | 0.9 |
| **Work Environment** | | | | | | | |
| Tight spaces | 1.80 | 0.00 | 1.80 | 0.00 | 1.80 | 1.08 | 1.0 |
| Respirator | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Chemical exposure | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Body armor | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Drive on duty | 0.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.3 |
| Evasive driving | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Drive in dark | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Adverse weather | 0.00 | 2.40 | 0.00 | 4.60 | 2.80 | 1.96 | 2.0 |
| Work alone & armed | 5.40 | 6.40 | 5.00 | 5.80 | 5.40 | 5.60 | 0.5 |
| Work under stress | 5.60 | 0.00 | 1.40 | 1.00 | 2.40 | 2.08 | 2.1 |
| Work heights | 0.20 | 0.60 | 0.20 | 0.00 | 0.00 | 0.20 | 0.2 |
| Uneven surfaces | 4.60 | 4.60 | 0.00 | 4.60 | 0.60 | 2.88 | 2.4 |
| Vehicular stops | 1.00 | 0.00 | 0.00 | 1.20 | 2.80 | 1.00 | 1.1 |
| Unplanned interview | 4.00 | 4.40 | 5.60 | 4.80 | 2.80 | 4.32 | 1.0 |
| Handle violent people | 2.80 | 1.20 | 3.20 | 2.20 | 2.60 | 2.40 | 0.8 |
| Armed escort | 3.60 | 5.40 | 3.80 | 3.00 | 1.80 | 3.52 | 1.3 |
| **Defensive Tactics** | | | | | | | |
| Weapon in weak hand | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Shoulder weapon | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Use baton | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Use pepper spray | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Handcuffs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Draw weapon | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Shoot/no-shoot decide | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Fire weapon | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Load weapon | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Confiscate weapons | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.08 | 0.2 |

| Cardiopulmonary / Musculoskeletal | | | | | | | |
|---|---|---|---|---|---|---|---|
| Subdue attacker | 1.00 | 0.20 | 3.00 | 0.00 | 0.20 | 0.88 | 1.2 |
| Control crowds | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.2 |
| Pursue on foot | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Subdue after pursuit | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Unplanned vig activity | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.08 | 0.2 |
| Move heavy objects | 1.40 | 0.00 | 0.80 | 0.00 | 0.00 | 0.44 | 0.6 |
| Climb obstacles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |

AKAL001186

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.498    Page 81 of 126

Case 4:05-cv-00096-HL    Document 78-12    Filed 07/03/06    Page 6 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 29 of 35

| | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **SMELL** | | | | | | | |
| Use smell | 0.80 | 0.60 | 1.20 | 0.20 | 1.20 | 0.80 | 0.4 |
| **VISION** | | | | | | | |
| Distance | | | | | | | |
| *Light Conditions* | | | | | | | |
| Monitor frnt checkpoint | | | | | | | |
| Bright | 5.40 | 5.60 | 6.80 | 6.60 | 6.00 | 6.08 | 0.6 |
| Dim/Dark | 1.40 | 4.40 | 5.80 | 2.00 | 2.40 | 3.20 | 1.8 |
| Monitor courtroom | | | | | | | |
| Bright | 4.40 | 5.80 | 7.00 | 6.60 | 5.20 | 5.80 | 1.0 |
| Dim/Dark | 0.60 | 3.40 | 0.00 | 2.00 | 2.20 | 1.64 | 1.4 |
| Monitor garage/vehicles | | | | | | | |
| Bright | 2.40 | 3.80 | | 6.60 | 4.40 | 4.30 | 1.7 |
| Dim/Dark | 1.80 | 3.60 | | 4.40 | 2.00 | 2.95 | 1.3 |
| *Distances* | | | | | | | |
| Monitor frnt checkpoint | | | | | | | |
| 2-20' | 6.60 | 6.20 | 6.80 | 5.20 | 6.60 | 6.28 | 0.6 |
| 20-99' | 3.00 | 4.80 | 6.40 | 5.80 | 4.40 | 4.88 | 1.3 |
| 100-200' | 0.00 | 4.00 | 4.20 | 5.00 | 3.00 | 3.24 | 1.9 |
| 200-400' | 0.00 | 0.00 | 0.40 | 0.00 | 1.40 | 0.36 | 0.6 |
| > 400' | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.04 | 0.1 |
| Monitor courtroom | | | | | | | |
| 2-20' | 5.00 | 5.40 | 6.20 | 5.80 | 4.00 | 5.28 | 0.8 |
| 20-99' | 1.60 | 5.00 | 6.20 | 5.00 | 3.00 | 4.16 | 1.8 |
| 100-200' | 0.00 | 1.00 | 0.00 | 0.80 | 0.40 | 0.44 | 0.5 |
| 200-400' | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| > 400' | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Monitor garage/vehicles | | | | | | | |
| 2-20' | 5.00 | 4.40 | | 5.20 | 5.40 | 5.00 | 0.4 |
| 20-99' | 3.60 | 4.20 | | 4.80 | 2.00 | 3.65 | 1.2 |
| 100-200' | 0.00 | 4.00 | | 3.20 | 0.00 | 1.80 | 2.1 |
| 200-400' | 0.00 | 0.00 | | 0.00 | 0.00 | 0.00 | 0.0 |
| > 400' | 0.00 | 0.00 | | 0.00 | 0.00 | 0.00 | 0.0 |
| Suspect armed? | | | | | | | |
| *Light Conditions* | | | | | | | |
| Bright | 0.00 | 0.00 | 0.00 | 0.00 | 1.60 | 0.32 | 0.7 |
| Dim/Dark | 0.00 | 0.20 | 0.00 | 0.00 | 0.60 | 0.16 | 0.3 |
| *Distances* | | | | | | | |

AKAL001187

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.499   Page 82 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 30 of 35

Page 3

| 50-100' | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| > 100' | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 | |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 | |

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.500   Page 83 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 8 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 31 of 35

| VISION | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **Near** | | | | | | 5.88 | 0.7 |
| Fine detail | 5.60 | 5.00 | 6.80 | 6.40 | 5.60 | 5.72 | 0.7 |
| Medium detail | 5.60 | 4.60 | 6.20 | 6.00 | 6.20 | 5.28 | 0.3 |
| Coarse detail | 5.60 | 5.00 | 5.20 | 5.60 | 5.00 | | |
| **Depth** | | | | | | 0.00 | 0.0 |
| Near 3-D work | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| **Color** | | | | | | 5.64 | 1.3 |
| Shades | 4.60 | 6.80 | 6.80 | 4.00 | 6.00 | 6.28 | 1.3 |
| Basic | 7.00 | 7.00 | 7.00 | 4.00 | 6.40 | | |
| **Peripheral Vision** | | | | | | 6.20 | 0.8 |
| Detect peripheral mov't | 7.00 | 5.80 | 7.00 | 5.20 | 6.00 | 1.68 | 2.1 |
| Confronted alone ckpt | 0.00 | 4.20 | 3.80 | 0.00 | 0.40 | 3.35 | 1.1 |
| Confronted alone ctroom | 2.60 | 4.00 | | 2.20 | 4.60 | | |

AKAL001189

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.501   Page 84 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 9 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 32 of 35

| | | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|---|
| **HEARING** | | | | | | | | |
| **Speech** | | | | | | | | |
| Face-to-face | Silence | 5.40 | 4.80 | 4.60 | 3.80 | 3.80 | 4.48 | 0.7 |
| | Moderate | 6.60 | 6.00 | 6.40 | 5.40 | 5.20 | 5.92 | 0.6 |
| | Loud | 0.80 | 5.20 | 3.60 | 3.80 | 3.40 | 3.36 | 1.6 |
| | Very Loud | 0.00 | 4.20 | 1.20 | 1.40 | 2.00 | 1.76 | 1.5 |
| Telephone | Silence | 5.20 | 4.80 | 5.00 | 4.00 | 5.00 | 4.80 | 0.5 |
| | Moderate | 5.20 | 5.40 | 4.80 | 4.80 | 4.00 | 4.84 | 0.5 |
| | Loud | 1.00 | 3.80 | 3.80 | 2.60 | 2.00 | 2.64 | 1.2 |
| | Very Loud | 0.00 | 2.60 | 1.20 | 0.60 | 1.40 | 1.16 | 1.0 |
| Radio | Silence | 3.80 | 4.80 | 4.60 | 4.80 | 4.20 | 4.44 | 0.4 |
| | Moderate | 5.20 | 5.40 | 4.00 | 5.40 | 4.60 | 4.92 | 0.6 |
| | Loud | 1.00 | 5.00 | 2.60 | 3.00 | 2.60 | 2.84 | 1.4 |
| | Very Loud | 0.00 | 4.00 | 1.20 | 1.00 | 1.20 | 1.48 | 1.5 |
| Nearby | Silence | 1.40 | 4.60 | 4.80 | 3.60 | 4.40 | 3.76 | 1.4 |
| | Moderate | 2.00 | 4.80 | 4.60 | 3.60 | 5.40 | 4.08 | 1.3 |
| | Loud | 0.20 | 3.60 | 3.60 | 1.40 | 4.40 | 2.64 | 1.8 |
| | Very Loud | 0.00 | 1.80 | 0.80 | 0.00 | 3.00 | 1.12 | 1.3 |
| **Sound Detection** | | | | | | | | |
| | Silence | 2.00 | 2.60 | 3.40 | 4.00 | 1.60 | 2.72 | 1.0 |
| | Moderate | 2.60 | 2.40 | 3.80 | 3.40 | 1.40 | 2.72 | 0.9 |
| | Loud | 0.80 | 0.80 | 3.00 | 2.00 | 1.20 | 1.56 | 0.9 |
| | Very Loud | 0.00 | 0.60 | 0.60 | 0.20 | 1.00 | 0.48 | 0.4 |
| **Sound Discrimination** | | | | | | | | |
| Distinguish | Silence | 2.80 | 2.00 | 3.00 | 1.80 | 3.40 | 2.60 | 0.7 |
| | Moderate | 3.00 | 2.00 | 2.80 | 3.40 | 2.40 | 2.72 | 0.5 |
| | Loud | 0.00 | 2.00 | 2.40 | 1.80 | 1.40 | 1.52 | 0.9 |
| | Very Loud | 0.00 | 1.60 | 0.60 | 0.40 | 0.80 | 0.68 | 0.6 |
| Tap tires | Silence | 0.40 | 1.00 | 0.00 | 0.80 | 0.40 | 0.52 | 0.4 |
| | Moderate | 0.40 | 1.00 | 0.00 | 0.80 | 0.00 | 0.44 | 0.5 |
| | Loud | 0.00 | 1.00 | 0.00 | 0.40 | 0.00 | 0.28 | 0.4 |
| | Very Loud | 0.00 | 0.80 | 0.00 | 0.00 | 0.00 | 0.16 | 0.4 |
| **Sound Localization** | | | | | | | | |
| | Silence | 1.80 | 2.60 | 4.80 | 2.00 | 1.60 | 2.56 | 1.3 |
| | Moderate | 1.80 | 2.40 | 5.20 | 3.20 | 1.20 | 2.76 | 1.6 |
| | Loud | 0.20 | 1.40 | 3.60 | 0.60 | 0.80 | 1.32 | 1.3 |
| | Very Loud | 0.00 | 1.20 | 0.60 | 0.00 | 0.60 | 0.48 | 0.5 |

AKAL001190

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.502   Page 85 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 10 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 33 of 35



Appendix C

Focus Group Determination of
Job Task Importance, by Site

AKAL001191

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.503    Page 86 of 126

Case 4:05-cv-00096-HL    Document 78-12    Filed 07/03/06    Page 11 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 34 of 35

|  | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **Work Schedule** |  |  |  |  |  |  |  |
| Extended Hrs | 4.40 | 3.20 | 4.80 | 4.80 | 3.80 | 4.20 | 0.7 |
| Travel | 0.00 | 0.60 | 0.60 | 3.80 | 3.80 | 1.64 | 2.0 |
| Shift work | 0.80 | 0.60 | 0.40 | 3.80 | 4.20 | 1.96 | 1.9 |
| Miss meals | 2.80 | 2.20 | 2.00 | 3.40 | 3.40 | 2.76 | 0.7 |
| **Work Environment** |  |  |  |  |  |  |  |
| Tight spaces | 4.80 | 1.00 | 3.60 | 3.00 | 4.60 | 3.40 | 1.5 |
| Respirator | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Body armor | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Drive on duty | 4.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.80 | 1.8 |
| Evasive driving | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Drive in dark | 4.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.80 | 1.8 |
| Adverse weather | 1.60 | 3.40 | 0.00 | 5.00 | 4.60 | 2.92 | 2.1 |
| Work alone & armed | 6.00 | 7.00 | 5.60 | 5.80 | 5.80 | 6.04 | 0.6 |
| Work under stress | 5.40 | 3.20 | 5.40 | 5.20 | 5.00 | 4.84 | 0.9 |
| Work heights | 0.80 | 0.40 | 1.40 | 0.00 | 0.00 | 0.52 | 0.6 |
| Uneven surfaces | 4.40 | 3.80 | 0.00 | 5.00 | 1.00 | 2.84 | 2.2 |
| Vehicular stops | 4.00 | 0.00 | 0.00 | 1.60 | 4.80 | 2.08 | 2.2 |
| Unplanned interview | 5.00 | 5.40 | 6.80 | 5.00 | 5.40 | 5.52 | 0.7 |
| Handle violent people | 0.80 | 1.00 | 1.00 | 1.00 | 1.20 | 1.00 | 0.1 |
| Armed escort | 1.00 | 1.40 | 1.40 | 1.20 | 1.00 | 1.20 | 0.2 |
| **Defensive Tactics** |  |  |  |  |  |  |  |
| Weapon in weak hand | 5.40 | 5.60 | 6.80 | 6.00 | 5.00 | 5.76 | 0.7 |
| Shoulder weapon | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Use baton | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Use pepper spray | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| Handcuffs | 4.40 | 7.00 | 6.40 | 5.80 | 5.00 | 5.72 | 1.0 |
| Use weapon | 7.00 | 7.00 | 7.00 | 7.00 | 6.20 | 6.84 | 0.4 |
| Load weapon | 7.00 | 0.00 | 0.00 | 0.00 | 5.60 | 2.52 | 3.5 |
| Confiscate weapons | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 | 0.0 |

| Cardiopulmonary / Musculoskeletal |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Subdue attacker | 6.80 | 7.00 | 6.60 | 6.80 | 6.00 | 6.64 | 0.4 |
| Control crowds | 6.80 | 7.00 | 6.60 | 7.00 | 6.00 | 6.68 | 0.4 |
| Pursue on foot | 3.20 | 7.00 | 6.20 | 4.60 | 4.00 | 5.00 | 1.6 |
| Subdue after pursuit | 4.80 | 7.00 | 6.20 | 4.40 | 5.80 | 5.64 | 1.1 |
| Unplanned vig activity | 5.80 | 7.00 | 6.40 | 5.20 | 6.20 | 6.12 | 0.7 |
| Move heavy objects | 5.40 | 6.00 | 4.80 | 5.20 | 4.40 | 5.16 | 0.6 |
| Climb obstacles | 5.00 | 2.80 | 5.40 | 4.40 | 5.20 | 4.56 | 1.1 |
| Climb stairs | 6.80 | 7.00 | 5.80 | 4.20 | 5.60 | 5.88 | 1.1 |
| Force entry | 5.80 | 6.20 | 5.40 | 5.20 | 4.20 | 5.36 | 0.8 |

AKAL001192

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.504   Page 87 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 12 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 35 of 35

| | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **SMELL** | | | | | | | |
| Use smell | 4.60 | 6.40 | 6.80 | 5.80 | 5.40 | 5.80 | 0.9 |

| | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **VISION** | | | | | | | |
| **Distant** | | | | | | | |
| Monitor front checkpoint | 6.80 | 7.00 | 5.60 | 7.00 | 7.00 | 6.68 | 0.6 |
| Monitor courtroom | 6.40 | 7.00 | 6.40 | 7.00 | 7.00 | 6.76 | 0.3 |
| Monitor garage/vehicles | 6.40 | 7.00 | | 7.00 | 7.00 | 6.85 | 0.3 |
| | | | | | | | |
| **Assess threats** | | | | | | | |
| Person armed? | 7.00 | 7.00 | 7.00 | 7.00 | 6.80 | 6.96 | 0.1 |
| **Near** | | | | | | | |
| Reading | 7.00 | 7.00 | 7.00 | 7.00 | 6.40 | 6.88 | 0.3 |
| **Depth** | | | | | | | |
| Near 3D work | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.0 |
| **Color** | | | | | | | |
| Shades | 7.00 | 7.00 | 6.40 | 6.20 | 5.20 | 6.36 | 0.7 |
| Basic | 7.00 | 7.00 | 6.40 | 6.20 | 6.00 | 6.52 | 0.5 |
| **Peripheral Vision** | | | | | | | |
| Detect peripheral mov't | 7.00 | 7.00 | 6.40 | 7.00 | 6.60 | 6.80 | 0.3 |

| | ATL | WILM | DEN | BALT | PORT | AVG | S.D. |
|---|---|---|---|---|---|---|---|
| **HEARING** | | | | | | | |
| **Speech** | | | | | | | |
| Face-to-face | 7.00 | 6.60 | 6.40 | 7.00 | 5.80 | 6.56 | 0.5 |
| Telephone | 7.00 | 6.60 | 6.00 | 7.00 | 5.80 | 6.48 | 0.6 |
| Radio transmissions | 7.00 | 7.00 | 6.40 | 7.00 | 6.40 | 6.76 | 0.3 |
| Nearby – not visual | 6.20 | 6.80 | 6.20 | 6.20 | 6.40 | 6.36 | 0.3 |
| **Sound Detection** | | | | | | | |
| Hear sounds | 6.60 | 7.00 | 5.80 | 7.00 | 6.00 | 6.48 | 0.6 |
| **Sound Discrimination** | | | | | | | |
| Distinguish sounds | 6.20 | 6.40 | 6.40 | 7.00 | 6.20 | 6.44 | 0.3 |
| Tapping tires, tanks | 4.40 | 6.20 | 4.80 | 4.80 | 4.20 | 4.88 | 0.8 |
| **Sound Localization** | | | | | | | |
| Localize sounds | 6.20 | 7.00 | 6.40 | 7.00 | 6.80 | 6.68 | 0.4 |

AKAL001193

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.505   Page 88 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 13 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 1 of 34

# Appendix D

## Focus Group Narrative Comments and Critical Incidents, by Site

37

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.506   Page 89 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 14 of 15
Case 2:03-cv-04344-HB      Document 168      Filed 12/21/2005      Page 2 of 34

NARRATIVE COMMENTS          *Focus Groups*

| Work Schedule | |
|---|---|
| | More important for those in admin or if working courts. Judge may stay late, or in mailroom must stay to x-ray all mail so that mail does not stay in building overnight without being x-rayed. |
| Extended Hrs. | |
| Travel | |
| Shift work | Dayshift only in courts and mailroom. |
| | Have to respond if judge makes request. In mailroom, at the mercy of when mail is delivered & how much is delivered, so may not have regular set lunchtime. Have to x-ray immediately on receipt for Fedex, Airborne, UPS or other delivery people because they won't stick around while CSO finishes lunch. Could have snacks, breakroom is right next to mailroom. |
| Miss meals | |

| Work Environment | |
|---|---|
| | When get alarm may have to crawl, _____ to search area in _____, etc. May have to reset alarm, disconnect alarms, crawling to get to them. Someone else could always take over to do it if CSO can't. Alarms 1/month have to be checked & reset. |
| Work in tight spaces | |
| Use a respirator | N/A |
| Skin or airborne chemical exposures | Large envelopes have grey, dusty packing material. Mail is dirty or wet, sat at warehouse. Started to wear rubber gloves. |
| Use body armor | No body armor. |
| Drive vehicles while on duty | No GOV, no known air travel. Use POV if have to drive within district. |
| Pursuit, emergency or evasive driving | N/A |
| Drive in the dark | |
| Work in adverse weather conditions | 20 minute exposure in garage. |
| | Work garage in morning, cold in winter & hot in summer, 1.5 hours in AM & in PM (not the entire time). Escort all judges in & out of garage. In Court of Appeals do perimeter checks. Other activities-Radio communication, Response to alarms, Courtroom security. In courtroom stand 40% of time, sit when trial is in session, can step out for break. Security check ID, check property. Detect sensitivity of mag. |
| Time spent out in elements | , mailroom, |
| Work alone while armed | |
| Work under great tension or pressure | In mailroom stress by knowing that if you pickup the wrong package. |
| Work at heights at or over 15' | In courtroom you always have to be observant. |
| Walk or run on uneven surfaces | At appeals had to go out on roof to check. |
| | Exits in garage. Appeals Court are sloped. |
| | May need to check suspicious vehicles in garage. |
| | _____ if found |
| Conduct vehicular stops | call & give description to GSA/FPS or local PD who does actual car stop. |
| | Stop people in garage. Patrol areas, |
| | In courtroom if someone acts up. At Appeals Court areas open to public, people sitting on court property & have to ask them to leave. |
| Conduct unplanned interviews | |
| Encounter those with violent tempers | People going to bankruptcy court are stressed out. |
| Protect or escort VIPs or witnesses | Escort judges |

AKAL001195

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.507   Page 90 of 126

Case 4:05-cv-00096-HL   Document 78-12   Filed 07/03/06   Page 15 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 3 of 34

| Weapons/Defensive Tactics | |
| --- | --- |
| Types of handguns/Qualifications | |
| Use handgun with weak hand | Career frequency as CSO. Have to unload & load weapon daily to secure weapon at night & get it ready in AM. Hold weapon in non-dominant hand to remove bullets. Essential to secure weapon as part of job for storage and retrieval. |
| Use shoulder weapons | No shoulder weapons. |
| Use non-lethal equipment/tactics | No batons or pepper spray. |
| Use handcuffs | |
| Handcuffs | 1 CSO used handcuffs 2x in career. In court judges asked CSO to put defendant in cuffs & put into cell until DUSM arrived, for boisterous behavior. |
| Use weapon (standard issue handgun) | |
| Drawing & firing weapon | |
| Load weapon in emergency situation | |
| | Someone may not realize they have knife on keychain in pocket, during hand wand search picks up the metal. May have to physically touch person when they deny carrying metal object & wand picks up metal. |
| Visually or physically search suspect | |
| Confiscate weapon during pat'down | Question not used |

| Senses | |
| --- | --- |
| Use of smell | Have to patrol building, may need to smell smoke, odors from vents. With fumes from vent system had to evacuate building. Smoke from judges break room came from microwave. |
| Task 1 – SURVEILLANCE | |
| Task 2 – DRIVING | |
| Task 3 – USE WEAPONS | |
| Task 1 - various lighting conditions | Observe people at checkpoint. At Appeals Court diffuse light rather than direct or natural light. |
| Task 2 - various lighting conditions | Observe people in courtroom. Fred with no courtroom duty. |
| Task 3 - various lighting conditions | Look for suspicious people/vehicles in garage. |
| Task 1 - at various distances | Activity - > 400 ft. – Ave O |
| Task 2 - at various distances | Activity - > 400 ft. – Ave O |
| Task 3 - at various distances | Activity - > 400 ft. – Ave O |
| Detect if a suspect has a weapon | |
| Detect weapon - var lighting conditions | |
| Detect weapon - various distances | > 100 ft. – Ave O |
| Examine documents, reports | View x-ray monitors. Examine ID cards. Stamp personal items signifying that they have been examined & cleared, dated & need to examine the date. Examine material at checkpoint -pens, pagers, material in trays. |
| Depth perception | |
| Recognize fine differences in color | |
| Recognize basic colors | ID cards, ID people & vehicles by color. May need to provide description. |
| Detect threat at extreme right or left | |
| Confronted by 2 or more suspects | Freq performed task one ave.- 6.25. Freq performed task two ave.-3.25 |
| Have lenses dislodged or fogged? | None |
| Have loss of lenses affected job? | None |

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.508    Page 91 of 126

Case 4:05-cv-00096-HL    Document 78-13    Filed 07/03/06    Page 1 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 4 of 34

| Hearing | |
|---|---|
| Understand speech face-to-face | |
| Understand speech on phone | Spend time outside at Appeals Court, exposed to loud street noise. |
| Understand speech over radio transm. | |
| Understand speech not face-to-face | |
| Hear non-speech sounds | Hear sounds in court; judge asks CSO to investigate. |
| Sound discrimination | |
| Disting sounds from tapping tires/tanks | Want to have the ability. |
| Sound localization | Doors closing, need to check it out. |
| | |

| Cardiopulmonary / Musculoskeletal | |
|---|---|
| Subdue attacking or resisting person | Career frequency. Confrontation between deputy sheriffs & CSO's/USMS. Kept deputies out of area. Confrontations last about 30 seconds. 3 of deputies were > 220 #. |
| Physically control unruly crowds | |
| Pursue suspect on foot | |
| Subdue suspect after pursuit | If judge is attacked, need to run after suspect. |
| Respond to emergency situations | |
| Lift/carry/push heavy objects | |
| Pull oneself or climb over obstacle | Mailroom lifting heavy objects all day. |
| Climb stairs in pursuit of emergency | |
| Bodily force to gain entry (+/- ram) | In emergencies with fire alarms, bomb threats. |
| Sit or stand for long periods (2 hrs +) | Switch posts every 45 minutes. |
| | |

AKAL001197

## NARRATIVE COMMENTS

| Work Schedule | |
|---|---|
| | Judge goes over in court beyond 6 PM. |
| Extended Hrs. | |
| Travel | Only court in district, no travel |
| Shift work | Operation hours |
| Miss meals | Prisoner arrival, need to be present in court. Alarm response & everyone else held up in court. Can pickup slack with a diabetic & work around such a person. Team players. |

| Work Environment | |
|---|---|
| Work in tight spaces | |
| Use a respirator | N/A |
| Skin or airborne chemical exposures | N/A |
| Use body armor | N/A |
| Drive vehicles while on duty | N/A |
| Pursuit, emergency or evasive driving | N/A |
| Drive in the dark | N/A |
| Work in adverse weather conditions | #REF! |
| Time spent out in elements | Do not count guardhouse (controlled climate controlled) |
| Work alone while armed | ...times mailroom |
| Work under great tension or pressure | Man had gun at building checkpoint. After 3 requests did not remove all metal objects, mag kept going off. Man agitated, rapidly pulled gun out. CSO grabbed gun, restrained & handcuffed him with assistance. Arrested by USDM. Had no gun permit. 1.5 years ago. |
| Work at heights at or over 15' | Interior check, climb ladder to elevator cable room—10-15'. |
| Walk or run on uneven surfaces | Perimeter check, steps are uneven on the side of the building. |
| Conduct vehicular stops | N/A |
| Conduct unplanned interviews | Do not count checkpoint. Perimeter, hall patrol. |
| Encounter those with violent tempers | Mental patient comes in to visit senator's office. Irrate person coming to SSA filing a claim & told he was deceased. |
| Protect or escort VIPs or witnesses | Escort prisoners, witnesses. Escort jurors to parking lot & hotel. |

| Weapons/Defensive Tactics | |
|---|---|
| Types of handguns/Qualifications | |
| Use handgun with weak hand | Career frequency. |
| Use shoulder weapons | N/A |
| Use non-lethal equipment/tactics | N/A |
| Use handcuffs | |
| Handcuffs | ...with two career incidents 1 & 1.5 year ago. Handcuffed one with assistance, assisted another CSO. Does not include DUSM role players. |
| Use weapon (standard issue handgun) | |
| Drawing & firing weapon | No career pulling of gun. |
| Load weapon in emergency situation | Guardhouse, security for back of building, exterior perimeter checks. Cold & snow. |

AKAL001198

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.510    Page 93 of 126

Case 4:05-cv-00096-HL    Document 78-13    Filed 07/03/06    Page 3 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 6 of 34

| | |
|---|---|
| | Pat downs done when still beeping with wand.  2/week person beeps off and leaves the building to avoid the checkpoint.  Confiscated in jean jacket had razors which he gave up, object in zipper of jacket concealed.  Knife in pocket felt during patdown. |
| Visually or physically search suspect | |
| Confiscate weapon during pat down | Question not used. |
| | |
| Senses | |
| Use of smell | Smell natural gas leak on side of building.  Smoke in elevator. |
| Task 1 - SURVEILLANCE | #4—Hall monitoring, esp with movement of defendants, prisoners—also 7 |
| Task 2 - DRIVING | |
| Task 3 - USE WEAPONS | |
| Task 1 - various lighting conditions | Winter months, late in evening, early morning |
| Task 2 - various lighting conditions | Court held late at night, bankruptcy court has windows which will determine light.  District court when powerpoints working, dimly lit court. |
| Task 3 - various lighting conditions | Early morning, late evening |
| Task 1 at various distances | Activity - > 400 ft. – Ave 0.   Observe people walking up to the building. |
| Task 2 - at various distances | Activity - > 400 ft. – Ave 0. |
| Task 3 - at various distances | Activity - > 400 ft. – Ave 0. |
| Detect if a suspect has a weapon | 3 visual detections of guns.  1 at checkpoint described above, 1 gun in briefcase, 1 knife picked up on x-ray. |
| Detect weapon - var lighting conditions | Cloudy day. |
| Detect weapon - various distances | > 100 ft - 0.  Visually detected chrome of gun. |
| Examine documents, reports | |
| Depth perception | NO TASKS IDENTIFIED |
| | |
| | description.  Control room with color cameras description of people, wandering person to check out. |
| Recognize fine differences in color | |
| Recognize basic colors | |
| Detect threat at extreme right or left | Lobby post, escorting prisoners, monitoring courtroom. |
| | Frequency performed task one ave. – 6.6 .   Frequency performed task two ave. – 5.  Lobby post, get stacked up.  Employees do not get challenged, see them & visitors.  Courtroom–family comes up to CSO, tries to leave courtroom, wants to move around courtroom.  Roving patrol encounters people.  Direction-seekers at guardhouse. |
| Confronted by 2 or more suspects | |
| Have lenses dislodged or fogged? | None—use anti-fogging material. |
| Have less of lenses affected job? | None. |
| | |
| Hearing | |
| Understand speech face-to-face | |
| Understand speech on phone | Passing siren out in guardpost, sound bounces off building |
| | Basic means of communication |
| | situation & will depend on a response.  Control room.  You may get into a tight |
| Understand speed over radio transm | |
| Understand speech not face-to-face | |
| Hear non-speech sounds | |
| Sound discrimination | Hear someone gasping, asking for help.  Hear sound you will investigate. |
| Disting sounds from tapping tires/tanks | Vehicles, packages get checked |
| Sound localization | Sounds within building are echoed. |

AKAL001199

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.511   Page 94 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 4 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 7 of 34

| Cardiopulmonary / Musculoskeletal | |
|---|---|
| Subdue attacking or resisting person | Career frequency. Handcuffed man with gun. |
| Physically control unruly crowds | 40 lawyers in hallway, told to move, they did not move. Show of force moved the lawyers. |
| Pursue suspect on foot | |
| Subdue suspect after pursuit | |
| Respond to emergency situations | With duress alarm, CSO is located nearby so that physical response not needed. False alarms. |
| Lift/carry/push heavy objects | Mail package. Unlikely to exceed 50#. 35# at the most. |
| Pull oneself or climb over obstacle | |
| Climb stairs in pursuit or emergency | Rover position designated for _____ _____ If emergency rover could climb floor-to-floor. Checking stairwells everyday. Move prisoners with stairwells. Essential to climb _____ _____ flights of steps. |
| Bodily force to gain entry (+/- ram) | |
| Sit or stand for long periods (2 hrs.+) | |

AKAL001200

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.512   Page 95 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 5 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 8 of 34

## NARRATIVE COMMENTS

| Work Schedule | |
|---|---|
| | No overtime at Appeals, lots of overtime at OKC trials. Worked 12 hour days. Overtime is voluntary. Never had time where there were not volunteers. Judge still on bench at District by 6 PM, CSO's will |
| Extended Hrs. | volunteer to stay. |
| Travel | 1-3/week cover Colorado Springs (15 minutes extra from home), Grand Junction on occasion but travel night before. Escort judge to Pueblo 2/month for year. |
| Shift work | |
| Miss meals | Very set schedule, no one misses a meal. Lunch break cut short to be sworn in to serve as bailiff for jury. Miss lunch 1/week due to training CSO's as training officer. |

| Work Environment | |
|---|---|
| Work in tight spaces | Alarms are not hard to reach. Alarms to set ———— have to crawl to get to. |
| Use a respirator | N/A |
| Skin or airborne chemical exposures | N/A |
| Use body armor | N/A |
| Drive vehicles while on duty | N/A |
| Pursuit, emergency or evasive driving | N/A |
| Drive in the dark | N/A |
| Work in adverse weather conditions | Parking lots are enclosed and are not cold. Only supervisors walk from building to building. |
| Time spent out in elements | With potentially aggressive prisoner, may have 10-15 CSO's in court as show of force. Aggressive rancher brought many employees (9) in attempt to intimidate the judge. Drug-related case called for all the USDM's CSO's as a show of force. No designated mailroom. Courtroom duty is on rotation, as needed. Roving patrol done by courtroom duty CSO. Courtroom duty 4th most frequent. Escort prisoners to & from jail, sometimes—not always with DUSM at Bankruptcy. 40 DUSM with OKC. Roving patrol performed voluntary. |
| Work alone while armed | |
| Work under great tension or pressure | Had CSO who could not deal with searching the public, resigned. Hired for LE background, stress not an impact since used to the type of work. Pressure during OKC with large # of people, lasting all day long, needed to make quick decisions. People get upset when asked to show contents of bags, need to keep calm head. Get a lot of high profile trials in Denver due to the level of security available. |
| Work at heights at or over 15' | On roof periodically. |
| Walk or run on uneven surfaces | 7 % sloped driveway at Appeals |
| Conduct vehicular stops | N/A |
| Conduct unplanned interviews | Checkpoint |
| Encounter those with violent tempers | Irate people at checkpoint resistance to being checked. Mental patients walking in off the street. Homeless wanting to use the bathroom. Go off yelling & screaming. |

AKAL001201

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.513   Page 96 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 6 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 9 of 34

| | |
|---|---|
| Protect or escort VIPs or witnesses | Escort armored car services, Attorney General last week. Escort judge to Pueblo for a year, had death threats, functioned as bodyguards. USSS requested 8 CSO's to assist protection for President Ford. Bodyguard for _____. Judges & bankruptcy court had national convention, 6 CSO's exclusive bodyguards. |

| Weapons/Defensive Tactics | |
|---|---|
| Types of handguns/Qualifications | |
| Use handgun with weak hand | Career |
| Use shoulder weapons | N/A |
| Use non-lethal equipment/tactics | N/A |
| Use handcuffs | In last 12 months other CSO assisted in handcuffed individual coming into the building, had warrant. 5 years ago person who continually filed bankruptcy papers, became beligerant, judge told CSO's to remove person, 2 CSO's had to physically subdue person who was a large man. 3 years ago man going to bankruptcy court was wanted by several states, as he came out of courtroom, 2 CSO's handcuffed him assisted by FPO & DUSM, brought him to Marshals. 3 years ago similar situation. During OKC trial, arrested man wanted in Golden, removed him from courtroom, with one other CSO—called for assistance, but told no DUSM available. |
| Handcuffs | None |
| Use weapon (standard issue handgun) | |
| Drawing & firing weapon | |
| Load weapon in emergency situation | N/A |
| Visually or physically search suspect | |
| Confiscate weapon during pat down | Question not used. |

| Senses | |
|---|---|
| Use of smell | Gas leaks. Fuel leak in garage. Smoking, burning wires. Alcohol, intoxicated person. Had CSO who could not smell & he could perform his job. |
| Task 1 - SURVEILLANCE | After worked in a place for a period of time, without really seeing you can tell if something is wrong or right. |
| Task 2 - DRIVING | Primary responsibility is to protect judges in the courtroom. |
| Task 3 - USE WEAPONS | |
| Task 1 - various lighting conditions | Lighting conditions available at checkpoint itself. Hallway at Appeals leads to x-ray. |
| Task 2 - various lighting conditions | Courtroom in session. |
| Task 3 - various lighting conditions | |
| Task 1 - at various distances | Activity - > 400 ft. - Ave. 0. |
| Task 2 - at various distances | Activity - > 400 ft. - Ave 0 |
| Task 3 - at various distances | Activity - > 400 ft. - Ave 5 |
| Detect if a suspect has a weapon | |
| Detect weapon - var lighting conditions | |
| Detect weapon - various distances | > 100 ft. - Ave 0 |
| Examine documents, reports | |
| Depth perception | Visualization of depth on x-ray screen is important due to layering of objects. |
| Recognize fine differences in color | |
| Recognize basic colors | Have to look for people with clothing descriptions. |
| Detect threat at extreme right or left | |

AKAL001202

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.514   Page 97 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 10 of 34

| | |
|---|---|
| Confronted by 2 or more suspects | Frequency performed task one ave.- 7.   Frequency performed task two ave.- 5.4 |
| Have lenses dislodged or fogged? | None |
| Have loss of lenses affected job? | None |

| | |
|---|---|
| **Hearing** | |
| Understand speech face-to-face | |
| Understand speech on phone | Lobby area has echoes, cleaning people roll trash cans over rough floor surface, door is open to outdoor sounds.  Fire alarm can be painful. Fire truck comes by daily. |
| Understand speech over radio transm | |
| Understand speech not face-to-face | Checkpoint, walking down hall. |
| Hear non-speech sounds | Scream, acutal laughter.  People arguing in hall.  Defendants fighting in hall. |
| Sound discrimination | |
| Disting sounds from tapping tires/tanks | |
| Sound localization | |

| | |
|---|---|
| **Cardiopulmonary / Musculoskeletal** | |
| Subdue attacking or resisting person | Career frequency.  Dragging a man out of court, making arrest. Physically removed vagrants holing up in courts, no longer occurs since everything is secured. |
| Physically control unruly crowds | |
| Pursue suspect on foot | _____.  Career--one incident after OKC trial, kid throws bag into bushes, CSO chases kid, called in bomb threat, not a bomb. |
| Subdue suspect after pursuit | |
| Respond to emergency situations | |
| Lift/carry/push heavy objects | Desks, file cabinets to setup office.  When consider people, very important. |
| Pull oneself or climb over obstacle | Loading docks. |
| Climb stairs in pursuit or emergency | Duress alarms, but usually take elevators.  Judge wrote letter to Marshal to fire CSO because he didn't respond within 2 minutes of duress alarms. |
| Bodily force to gain entry (+/- ram) | USDM will be first to gain entry. |
| Sit or stand for long periods (2 hrs +) | Sit in back of courtroom, but can move around, have relief.  During OKC switched every 30 minutes. |

AKAL001203

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.515   Page 98 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 8 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 11 of 34

## NARRATIVE COMMENTS

| | |
|---|---|
| Work Schedule | All CSO's at Baltimore & Greenbelt rotate through all positions. |
| | ~~...~~ Bomb scare, Judge had prolonged court while picking jury. Satelite court in Hyattsville causes CSO to stay over 1-1.5 hours. |
| Extended Hrs. | |
| Travel | Travel from Baltimore/Greenbelt/Hyattsville but does not exceed 30 minutes. May have problem within district/DC will have to respond. Should be ready to go in a emergency. |
| Shift work | Baltimore a 24/7 operation. CSO's have permanent midnight shifts assignments. ~~...~~ all CSO's rotate through same assignments. |
| Miss meals | In court sometimes can't get lunch on time—1-2 hours later, especially if jury is still out. Sometimes have a rover to handle, sometimes have to handle the entire proceeding. May sit outside the jury room for 4-6 hours at a time—can't leave if jury is still deliberating. Motions hearing may last hours with defendant out on bail, 3-4 hours without relief, you are forgotten about. You can call for relief if needed. In Greenbelt you are relieved hourly. |

| | |
|---|---|
| Work Environment | |
| Work in tight spaces | |
| Use a respirator | N/A |
| Skin or airborne chemical exposures | N/A |
| Use body armor | N/A |
| Drive vehicles while on duty | N/A |
| Pursuit, emergency or evasive driving | N/A |
| Drive in the dark | N/A |
| Work in adverse weather conditions | Winter with snow. Walk to post to post, perimeter check. |
| Time spent out in elements | Greenbelt #2 activity control room. |
| Work alone while armed | |
| Work under great tension or pressure | Dealing with public making sure that they are not bringing in items, confrontations with public on screening. Certain length of knife allowed, negative responses. "You are a woman, the guys usually let me bring this in." ~~...~~ |
| Work at heights at or over 15' | |
| Walk or run on uneven surfaces | Grass on perimeter roving, sloped, muddy. |
| Conduct vehicular stops | Greenbelt—exposed parking areas, people are suspicious in vehicle, approach/stop vehicle, asking them what their business. |
| Conduct unplanned interviews | |
| Encounter those with violent tempers | ~~...~~, mental pt. broke front door, needed CSO escort. |
| Protect or escort VIPs or witnesses | Do not include courtroom security. Greenbelt—Escort agents with prisoners from jail to court to US Attorney, ~~...~~. CSO provides the armed escort, area is cleared. The case agent is responsible for producing defendants to magistrate. Baltimore—If prisoner in cellblock, use prisoner elevator to bring prisoner to courtroom, ~~...~~ only CSO armed in courtroom. Escort jurors. |

AKAL001204

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.516   Page 99 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 9 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 12 of 34

| Weapons/Defensive Tactics | |
|---|---|
| Types of handguns/Qualifications | |
| Use handgun with weak hand | Do not qualify require firing with weak hand. |
| Use shoulder weapons | N/A |
| Use non-lethal equipment/tactics | N/A |
| Use handcuffs | Step backs--person remanded to custody, contempt, violations of parole. Step him back into custody. CSO handcuffing the person, no DUSM present. Outstanding warrant on person in another jurisdiction, put into custody. CSO would escort DUSM or by only CSO a person from pre-trial or probation. Called to court, DUSM not available, CSO had to cuff prisoner & escort to jail. |
| Handcuffs | |
| Use weapon (standard issue handgun) | |
| Drawing & firing weapon | Career--one CSO drew weapon once. High profile drug case, working nights, car driving around. Approached car with gun drawn behind back. |
| Load weapon in emergency situation | |
| Visually or physically search suspect | |
| Confiscate weapon during pat down | Question not used. |

| Senses | |
|---|---|
| Use of smell | Smoke in elevator shaft, evacuated building. If you lose a sense you increase other senses. |
| Task 1 - SURVEILLANCE | Monitor vehicles that are suspicious and sitting, watching the movement of prisoners or circling the building. |
| Task 2 - DRIVING | Monitor people in courtroom to prevent family from moving close to defendants. |
| Task 3 - USE WEAPONS | |
| Task 1 - various lighting conditions | |
| Task 2 - various lighting conditions | |
| Task 3 - various lighting conditions | |
| Task 1 - at various distances | Activity - > 400 ft. - Ave  0 |
| Task 2 - at various distances | Activity - > 400 ft. - Ave  0 |
| Task 3 - at various distances | Activity - > 400 ft. - Ave  0 |
| Detect if a suspect has a weapon | |
| Detect weapon - var lighting conditions | |
| Detect weapon - various distances | > 100 ft. - Ave 0 |
| Examine documents, reports | |
| Depth perception | NO TASKS IDENTIFIED |
| Recognize fine differences in color | |
| Recognize basic colors | |
| Detect threat at extreme right or left | Working checkpoint, watching x-ray monitor, need to watch around you to cover your safety and partners safety. People standing around you after they have been checked. In courtroom watch defendant & spectators at the same time. |
| Confronted by 2 or more suspects | Frequency performed task one ave.- 5.2.  Frequency performed task two ave.- 2.6  n) Working front checkpoint, working mag or checking people, at Baltimore area is very tight people stop to ask questions of CSO.  B) In courtroom family members interact with CSO. CSO gives valuables to family members. |
| Have lenses dislodged or fogged? | No |
| Have loss of lenses affected job? | No |

| Hearing | |
|---|---|

AKAL001205

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.517   Page 100 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 10 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 13 of 34

| | |
|---|---|
| Understand speech face-to-face | Working outside have heavy traffic & sirens. |
| Understand speech on phone | |
| Understand speech over radio transm | |
| Understand speech not face-to-face | Incumbent on LE person to get communication to recipient, if cant hear, need to speak louder. |
| Hear non-speech sounds | |
| Sound discrimination | Alarms, car vs. fire.  Distress vs. fire alarm, distress alarm is a beep & is behind, fire is from ahead. |
| Disting sounds from tapping tires/tanks | Vehicle in parking lot, delivery package that is too big for x-ray. |
| Sound localization | Standing outside of courtroom, family members & attorney get into dispute.  Hear where the noise is coming from to assist in the courtroom. |
| | |
| Cardiopulmonary / Musculoskeletal | |
| Subdue attacking or resisting person | Career frequency. |
| Physically control unruly crowds | |
| Pursue suspect on foot | |
| Subdue suspect after pursuit | |
| Respond to emergency situations | Anytime you have a life threatening situation you need to perform. |
| Lift/carry/push heavy objects | Pull injured person. |
| Pull oneself or climb over obstacle | |
| Climb stairs in pursuit or emergency | Bomb threat, could not use elevators, check out 7,8,9 floors after climbing the stairs from the 1st floor. Make sure that all were off the floor. |
| Bodily force to gain entry (+/- ram) | If stuck in room on fire or barracaded in room need to be able to get into room. |
| Sit or stand for long periods (2 hrs +) | Courtroom, mag (standing for > 2 hours). |
| | |

AKAL001206

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.518   Page 101 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 11 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 14 of 34

# NARRATIVE COMMENTS

| Work Schedule | |
|---|---|
| Extended Hrs. | When necessary, very important. Need someone with unexpected activity. Work early, don't get stuck working over. Always work the same time shifts. |
| Travel | Rare travel to Pendleton, where have to open courtroom. Eugene goes to Bend. Alaska to fill in 1.5 years. |
| Shift work | Part-time CSO works as fill in. |
| Miss meals | Court assignment, fill in post if CSO missing. Special court, bankruptcy court (cant leave court area). |

| Work Environment | |
|---|---|
| Work in tight spaces | Alarms, checking & resetting |
| Use a respirator | N/A |
| Skin or airborne chemical exposures | N/A |
| Use body armor | N/A |
| Drive vehicles while on duty | N/A |
| Pursuit, emergency or evasive driving | N/A |
| Drive in the dark | N/A |
| Work in adverse weather conditions | Assigned to perimeter checks, lots of rain. Exposed to weather at loading dock, 2 blocks from river. Front entrance cold with doors open. Walking from District to Pioneer (Appeals), Bankruptcy court. Since April stationed at specific courthouse. May still get pulled from District to other courts if short staff. |
| Time spent out in elements | Monitor prisoners at parking/sally port |
| Work alone while armed | |
| Work under great tension or pressure | Sometimes a CSO may not be capable, increasing the pressure. Tax protesters who refuse to be screened on building entry. Mental pts around the courthouse. |
| Work at heights at or over 15' | |
| Walk or run on uneven surfaces | Wet, leaves, snow in front of courthouse with perimeter checks, loading dock. |
| Conduct vehicular stops | Stop cars in parking area, approach if no business in area. |
| Conduct unplanned interviews | People lost in building, street people find place in building, confront people who park around building, someone out of hand in one of the offices. |
| Encounter those with violent tempers | Motions hearing, gang-related, over 200 motions, USDM presence, did the screening. Abortion trial with demonstrators. People demand to see judges. |
| Protect or escort VIPs or witnesses | Escorting armored car services, come through screening to ATM, escort armed person to & from the ATM, to protect integrity of the courthouse due to armed person in courthouse. Escort judge to vehicle. Secured area for jurors |

| Weapons/Defensive Tactics | |
|---|---|
| Types of handguns/Qualifications | |
| Use handgun with weak hand | Career frequency. Never in 27/29 years as local/state PD had to use left hand. |
| Use shoulder weapons | N/A |
| Use non-lethal equipment/tactics | N/A |
| Use handcuffs | No career handcuffing. |
| Handcuffs | |
| Use weapon (standard issue handgun) | |
| Drawing & firing weapon | No career frequency |

AKAL001207

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.519   Page 102 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 12 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 15 of 34

| | |
|---|---|
| Load weapon in emergency situation | |
| Visually or physically search suspect | |
| Confiscate weapon during pat down | Question not used. |
| | |
| Senses | |
| Use of smell | Gas pipe leak, smoke from generators, small electrical motors. |
| | Other -- |
| | closed circuit TV monitors, observe communications with from judge & USDM |
| Task 1 - SURVEILLANCE | |
| Task 2 - DRIVING | |
| Task 3 - USE WEAPONS | |
| Task 1 - various lighting conditions | Evening time less light, dark earlier, no flourescent lighting in lobby |
| Task 2 - various lighting conditions | |
| Task 3 - various lighting conditions | |
| Task 1 - at various distances | Activity - > 400 ft. - 0.2 |
| Task 2 - at various distances | Activity - > 400 ft. - 0 |
| Task 3 - at various distances | Activity - > 400 ft. - |
| Detect if a suspect has a weapon | Knife, more frequently in summer when not wearing coats.  Have other means to detect weapons. |
| Detect weapon - var lighting conditions | People don't remember they are carrying a knife on belt. |
| Detect weapon - various distances | > 100 ft. - Ave 0 |
| Examine documents, reports | |
| Depth perception | NO TASKS IDENTIFIED |
| Recognize fine differences in color | More important to recognize |
| Recognize basic colors | |
| Detect threat at extreme right or left | |
| Confronted by 2 or more suspects | Frequency performed task one ave - 5.4.   Frequency performed task two ave - 3.8.  Main checkpoint, court security, employee entrance, loading dock |
| Have lenses dislodged or fogged? | No |
| Have loss of lenses affected job? | No |
| | |
| Hearing | |
| Understand speech face-to-face | |
| Understand speech on phone | |
| Understand speech over radio transm | |
| Understand speech not face-to-face | Alarm system is very loud noise, loading dock with trucks |
| Hear non-speech sounds | Windows broken, generator backfired, monitoring cellblock, door shutting when no one supposed to be there, tires screeching in garage. |
| Sound discrimination | As long as you can hear it & investigate the sound, you do not need to discriminate the sounds. |
| Disting sounds from tapping tires/tanks | |
| Sound localization | |
| | |
| Cardiopulmonary / Musculoskeletal | |
| Subdue attacking or resisting person | Career frequency.  Mental pt. Came into old courthouse & didn't want to leave, 4 CSO's forcefully packed him out on the sidewalk. |
| Physically control unruly crowds | Potential with protesters. |
| Pursue suspect on foot | Inside or outside of building.  Fleeing might mean getting to the judge. |

AKAL001208

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.520   Page 103 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 13 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 16 of 34

JSD-Portland-11399

| | |
|---|---|
| Subdue suspect after pursuit | |
| Respond to emergency situations | |
| Lift/carry/push heavy objects | Never had to lift/carry person from courtroom. A few seconds away from medical assistance. |
| Pull oneself or climb over obstacle | |
| Climb stairs in pursuit or emergency | Fire alarm, climb 6 flights of stairs. In the old building (> 12 months) always had to run up stairs, medical emergencies, person grabbed files & ran out of courthouse, fire alarms. 2 real fire alarms in new courthouse. Floor wardens (employees) responsible for clearing out floors, CSO's only provide assistance if needed. |
| Bodily force to gain entry (+/- ram) | Isn't a door in courthouse that could forcibly open. |
| Sit or stand for long periods (2 hrs +) | Bankruptcy, appeals sit/stand for 2 hours at a time. |

AKAL001209

# Appendix E

## Focus Group Determination of Essential Job Functions, by Site, with Consensus Essential Job Functions Determination

AKAL001210

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.522   Page 105 of 126

Case 4:05-cv-00096-HL   Document 78-13   Filed 07/03/06   Page 15 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 18 of 34

|  | ATL | WILM | DEN | BALT | PORT | CONSENSUS | CORR |
|---|---|---|---|---|---|---|---|
| **Work Schedule** |  |  |  |  |  |  |  |
| Extended Hrs | Y | Y | N | Y | Y | YES | 0.80 |
| Travel | N | N | N | Y | Y | NO | 0.60 |
| Shift work | N | N | N | Y | Y | NO | 0.60 |
| Miss meals | Y | N | N | N | Y | NO | 0.60 |
| **Work Environment** |  |  |  |  |  |  |  |
| Tight spaces | N | N | N | N | Y | NO | 0.80 |
| Respirator | N | N | N | N | N | NO | 1.00 |
| Body armor | N | N | N | N | N | NO | 1.00 |
| Drive on duty | N | N | N | N | N | NO | 1.00 |
| Evasive driving | N | N | N | N | N | NO | 1.00 |
| Drive in dark | N | N | N | N | N | NO | 1.00 |
| Adverse weather | Y | Y | N | Y | Y | YES | 0.80 |
| Work alone & armed | Y | Y | Y | Y | Y | YES | 1.00 |
| Work under stress | Y | Y | Y | Y | Y | YES | 1.00 |
| Work heights | N | N | N | N | N | NO | 1.00 |
| Uneven surfaces | Y | Y | N | Y | Y | YES | 0.60 |
| Vehicular stops | N | N | N | N | N | NO | 0.80 |
| Unplanned interview | Y | Y | Y | Y | Y | YES | 1.00 |
| Handle violent people | Y | Y | Y | Y | Y | YES | 1.00 |
| Armed escort | Y | Y | Y | Y | Y | YES | 1.00 |
| **Defensive Tactics** |  |  |  |  |  |  |  |
| Weapon in weak hand | Y | Y | Y | Y | Y | YES | 1.00 |
| Shoulder weapon | N | N | N | N | N | NO | 1.00 |
| Use baton | N | N | N | N | N | NO | 1.00 |
| Use pepper spray | N | N | N | N | N | NO | 1.00 |
| Handcuffs | Y | Y | Y | Y | Y | YES | 1.00 |
| Use weapon | Y | Y | Y | Y | Y | YES | 1.00 |
| Load weapon | Y | N | N | Y | Y | YES | 0.60 |
| Confiscate weapons | Y | Y | Y | Y | Y | YES | 1.00 |

| Cardiopulmonary / Musculoskeletal |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Subdue attacker | Y | Y | Y | Y | Y | YES | 1.00 |
| Control crowds | Y | Y | N | Y | Y | YES | 0.80 |
| Pursue on foot | Y | N | N | N | Y | NO | 0.60 |
| Subdue after pursuit | Y | N | Y | Y | Y | YES | 0.80 |
| Unplanned vig activity | Y | N | Y | Y | Y | YES | 0.80 |
| Move heavy objects | Y | N | Y | N | Y | YES | 0.60 |
| Climb obstacles | Y | N | N | N | Y | NO | 0.60 |
| Climb stairs | Y | Y | Y | Y | Y | YES | 1.00 |
| Force entry | N |  |  |  |  |  |  |

AKAL001211

|  | ATL | WILM | DEN | BALT | PORT | CONSENSUS | CORR |
|---|---|---|---|---|---|---|---|
| **SMELL** |  |  |  |  |  |  |  |
| Use smell | Y | N | Y | N | N | NO | 0.60 |

| **VISION** |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| **Distant** |  |  |  |  |  |  |  |
| Monitor front checkpoint | Y | Y | Y | Y | Y | YES | 1.00 |
| Monitor courtroom | Y | Y | Y | Y | Y | YES | 1.00 |
| Monitor garage/vehicles | Y | Y |  | Y | Y | YES | 0.80 |
| Monitor when roving |  |  | Y |  |  |  |  |
| **Assess threats** |  |  |  |  |  |  |  |
| Person armed? | Y | Y | Y | Y | Y | YES | 1.00 |
| **Near** |  |  |  |  |  |  |  |
| Read/monitor xray | Y | Y | Y | Y | Y | YES | 1.00 |
| **Depth** |  |  |  |  |  |  |  |
| Near 3D work | NA | NA | NA | NA | NA | NA |  |
| **Color** |  |  |  |  |  |  |  |
| Shades | Y | N | Y | N | N | NO | 0.60 |
| Basic | Y | Y | Y | Y | Y | YES | 1.00 |
| **Peripheral Vision** |  |  |  |  |  |  |  |
| Detect peripheral mov't | Y | Y | Y | N | Y | YES | 0.80 |

| **HEARING** |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| **Speech** |  |  |  |  |  |  |  |
| Face-to-face | Y | Y | Y | Y | Y | YES | 1.00 |
| Telephone | Y | N | Y | Y | Y | YES | 0.80 |
| Radio transmissions | Y | Y | Y | Y | Y | YES | 1.00 |
| Nearby - not visual | Y | Y | Y | Y | Y | YES | 1.00 |
| **Sound Detection** |  |  |  |  |  |  |  |
| Hear sounds | Y | Y | Y | Y | Y | YES | 1.00 |
| **Sound Discrimination** |  |  |  |  |  |  |  |
| Distinguish sounds | N | N | N | Y | N | NO | 0.80 |
| Tapping tires, tanks | N | N | N | N | N | NO | 1.00 |
| **Sound Localization** |  |  |  |  |  |  |  |
| Localize sounds | Y | Y | Y | Y | Y | YES | 1.00 |

AKAL001212

# Appendix F

## Interviews and Observations

39

AKAL001213

Court Security Officers—Atlanta—September 29-30, 1999

Interviewed

Observed
US Court of Appeals  Atlanta
US District Court     Atlanta, Richard Russell Building

13 US Court Circuits
94 US Court Districts
800 places of holding US Court
"A" sites, such as Atlanta
About 50 CSO's in district
District Court, Bankruptcy Court, Circuit Appellate Court (Appeals)

Generally lots of CSO's available to respond.  Atlanta police officers one block away.  Low risk at Appeals since mostly lawyers present appealing cases.
Local CSO office coordinated by US Marshal with Chief Judge making final determinations.
CSO can rotate within the Circuit, but generally only within the District.

Concerns include judicial security and physical/medical performance issues.
Perimeter security in Atlanta Russell Building provided by GSA/FPS contractor.

CSO's provide checkpoint for court floor security.
Provide bailiff services by working with judges, especially with threats.
Provide escort of individuals coming into building, such as an armed car to pickup/deliver.

11th Circuit Court is a 24/7 operation and emergencies are answered after-hours by CSO.
CSO is similar to Fulton County court deputy sheriff, but county deputies much younger than CSO.
Most CSO's are physically capable.  If physical confrontation CSO radios DUSM for response.
Judge can push alarm in courtroom.
Physical confrontations with outsiders usually start with the contract security outside the court area.  1-2/year confrontations that CSO's involved with.  Vagrants want to use the bathroom and have to be escorted outside 1/month.
Slower response with decreased hearing.
Always have CSO in court,
CSO's escort people out of court when asked by judge.
Local district decision to have CSO's in court.  Atlanta has them in court, DC does not.

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.526   Page 109 of 126

Case 4:05-cv-00096-HL   Document 78-14   Filed 07/03/06   Page 4 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 22 of 34

Gainesville District Court has CSO's. County courthouse across the street, police dept 1 block away. CSO's provide screening for all incoming personnel. Recent case of drug smuggling with 8 custody defendants & 6 witnesses in custody.

LE experience more important than physical. Need to weed out medical problems, but would be concerned about the decreased LE experience.
Have younger CSO's than in past.
CSO's response is better with the Marshal's presence.
Mailroom runs mail/packages through the x-ray by CSO & is less risky area.
CSO may escort a sequestered jury to the dining room, but escort to a hotel done by DUSM.
CSO's respond to alarms, but DUSM the primary responder.
Feels that CSO's with less experience are less responsive, are less familiar, have increased uncertainty.

Firearms qualification is annual, performed by contractor, under auspices of DUSM ranger officer who co-signs document.
CSO is deputized by US Marshals Service. Arrest authority on-site only.
Judge works late, CSO works late.

Observation of screening checkpoint—Russell Building District Court
Observe x-ray scanner. _____ may be a bomb. If in doubt call DUSM to verify threat & possible evacuate building.
8 hour shifts rotating on x-ray, magnetometer/hand wand, ID check. Rotate each hour.

Stand for 2-6 hours at a time.

Observation in mailroom—Russell Building District Court
CSO picks up pallet, easily weighing 25-30#, turns on E-scan, puts boxes on pallet. Boxes can weigh 40-45#. 2 or more CSO's in mailroom, & 2 CSO's may have to work together to lift boxes. Process mail for entire building, boxes of copier paper may exceed 50#. Mail comes in at 11AM, moved lunch to 2 PM. Screening takes about 3 hours. If eating will often be interrupted to screen mail. Must screen item then, since delivery person is waiting, can't ask another CSO to screen mail.

Observation in mailroom—Atlanta Circuit Court
CSO has to lift packages onto x-ray machine. Oversize packages must be hand inspected. UPS has 75# max weight. If FedEx shows up late, CSO stays late since no package can stay overnight. Mailroom is safety-sensitive & a CSO may not be able to bid on these positions based on seniority.

AKAL001215

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.527   Page 110 of 126

Case 4:05-cv-00096-HL   Document 78-14   Filed 07/03/06   Page 5 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 23 of 34

Observation of screening checkpoint—Atlanta Circuit Court



Video monitor room at Circuit Court.

------10/4/99------

Need sufficient fitness to respond to emergency. No lack of response in ——— court. Historically, no need for response. If person in court not responding to judge, CSO usually requests DUSM to remove person. Sometimes judge asks CSO to escort person out of court., but CSO will check with DUSM.

Once, family member collapsed in courtroom, DUSM not available, 2 CSO's arrived to pickup lady.

——— expects CSO to deal with any situation until DUSM arrives.

Need blend of young & experienced. DUSM are young & macho.

Some CSO's are obese, frail, don't look like they are capable. Some CSO's are not alert, response is slower. Security function—should look & act like LEO. Though closing of eyes in courtroom is not a function of age.

CSO's work in criminal court cases when no one is in custody & no DUSM. Not all court cases have CSO's. Half of criminal cases with no one under bond, no DUSM, only CSO. Held person in contempt, CSO placed person in custody. Generally, would request DUSM to remove person.

AKAL001216

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.528    Page 111 of 126

Case 4:05-cv-00096-HL    Document 78-14    Filed 07/03/06    Page 6 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 24 of 34

### Court Security Officers—Wilmington, DL—October 13-14, 1999

Interviewed



Observed
US Marshals Office    Wilmington (including cell block, control room)
US District Court     Wilmington (transfer of prisoner through corridor to US magistrate,
                      mailroom, outside security box on French Street)
US Bankruptcy Court   Wilmington (proceedings)
US Probation Office   Wilmington

- Delaware District has only court in Wilmington.
- 14 FTE CSO's, 17 positions, 3 co-shared.  No female CSO's.
- DUSM, 2 on maternity leave.
- Use CSO's in escorting prisoners within building.  Always accompanied by DUSM.
  Always have ———— DUSM as escorted prisoners.
- CSO's standby when moving prisoners in and out of building. ————————— .o keep
  crowds & people away from prisoners being escorted.  Clears hallway.  Hold elevator.
  CSO's walk prisoners by the jury holding room & keep them visually apart.
- Last week had a big case with 3 defendants.  Large family causing disruptions.  No problems
  due to strong CSO presence.
- Most CSO's retired Philly cops.
- No recollection of physical confrontation due to strong presence.
- CSO's stationed in spectator area in courtroom.  May have ste- a criminal trial.  DUSM
  stationed around prisoner/defendant.  (———— draws courtroom schematic of last week's
  courtroom.)
- CSO's positioned outside grand jury to keep media away from jury.
- CSO's keep spectators in courtroom until the jury & then the defendant leaves the courtroom.
- CSO's accompany jury movement, keep them apart from prisoner/defendant.
- CSO's provide security primarily for/from the spectators in the courtroom.
- CSO's may sit in civil case proceedings, depending on the contentiousness & as manpower
  allows.  Generally, CSO sits in on all trials.  Even with corporate proceedings judges like to
  see the CSO presence.
- CSO's generally sit in on bankruptcy cases.  CSO's are stationed at bankruptcy court,
  where they are more likely to have problems (relative to civil proceedings).

AKAL001217

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.529   Page 112 of 126

Case 4:05-cv-00096-HL   Document 78-14   Filed 07/03/06   Page 7 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 25 of 34

Criminal cases    DUSM primary attention to prisoner
Civil/Bankruptcy    CSO primary attention to watch family movement. If problem among spectators, CSO reacts to spectator problem & DUSM stays put, attention to the prisoner/defendant.

No local experience with a CSO having to run.
No local experience of CSO and physical confrontation.
2-3 years ago a CSO on meds was nodding off in courtroom, was discharged. Need attention to meds that may induce sleepiness because courtroom duty is sleep-inducing.
Obesity does not generally impair job ability, based on his personal LE experience.
CSO's are retired LE on a disability (does not impact on ability to perform job) or with 20 years LE experience.
Lifting weight in a controlled environment is not similar to restraining individuals. You always wait for assistance. Talk calmly & wait for assistance. There is safety in numbers, never lift heavy objects by yourself (e.g. persons).
There is a way to command, carry a presence that deters violent reaction. Family in state court caused a tremendous outburst, but in federal trial made not a peep. The family thanked the CSO's for their professional demeanor. The state court has young & brash officers, which causes a greater number of confrontations.

Current medical/physical performance abilities—only problem has been with drowsiness in courtroom. This brought up by judge. CSO nodded off in courtroom, dropped his radio, caused court disruption.

No real crisis seen, but potential is real.
Colleagues have witnessed situations where physical confrontation happened. In an emergency need to exert sudden & extended physical exertion. Such as run up stairs, chase a person, restraining person while waiting for assistance.
2 x this past summer CSO in outside guard booth fell asleep—2 different CSO's.
In appeals case, such as an ADA case, CSO needed for crowd control.

Bankruptcy Court
Like family court. Each CSO rotates between 2 courts.
Some cases may bring up to 200 lawyers to the court at one time.
Chapter 13 case more emotional, like if defendant loses his house.
CSO sits in back row of court.

CSO's perform roving patrol through unsecured parking area (judges) under Bankruptcy Court (opposite side of street from District Court, Probation Office.         CSO's respond.

AKAL001218

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.530   Page 113 of 126

Case 4:05-cv-00096-HL   Document 78-14   Filed 07/03/06   Page 8 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 26 of 34

Mailroom
No designated CSO mail screener. Whoever is on roving patrol screens mail when it comes.
Mail comes at various times.
UPS, Fed Exp is screened at front checkpoint.
2 CSO's will screen at a time.

French St. Security Box

1.5-2 hour rotation.
Cars will block driveway, delivery trucks come—CSO comes out of box.

AKAL001219

## Court Security Officers—Denver, CO—October 20-21, 1999

Interviewed
         

Observed
US Marshals Office   Denver
District Court        Main checkpoint, Control room
Appeals Court         Main checkpoint

37 CSO's in Denver, 2 are females.
▓DUSM stationed in Denver, ▬▬ other DUSM cover the district (state of Colorado).
Attracting young CSO's who are making CSO as a career.
Have to be prepared for things, even though they rarely occur.
Hearing is crucial. 1 CSO with hearing aid has left.

▬▬▬▬ Females failed the situps & pushups requirements and males failed the sit &
reach requirement (flexibility).

CSO's in Denver have had a successful time in LE, proven performance.
One CSO received a kidney transplant, was removed from the control room. He was
thankful, his performance improved for he lost weight with the reduced stress. He could not
walk the stairs. Allowed to work the main checkpoint.
Concern about CSO's with psychiatric problems under treatment or requiring treatment. One
CSO had unusual thought pattern, wrote judge worrisome letter. Another CSO displayed
bizarre behavior. ▓▓ removed credentials based on safety concern, CSO told ▬▬▬▓

No concerns voiced by judges about concern for CSO response. CSO's provide good
response to duress alarms. CSO's are good team players with a strong focus on court
security.

Lift/carry weight should not be the issue. CSO must pickup packages, but there are other
ways to measure, such as upper body strength. Self-defense, pushing away from
objects/people are the job requirements that require upper body strength. ▬▬▬ says that it
is not realistic to require a high capacity for weight lifting.

CSO's were involved in the OK City bombing trials. Provided 2 checkpoints, main & at the
2nd floor entrance to the courtrooms. Increased foot patrols. Worked longer hours (up to 12

hour days, six days per week). Chose CSO's with sharpness in vision to work the x-ray machines. Had to screen large numbers of people quickly.

CSO's are the potentially most safety-sensitive. If disgruntled, have access to cause much damage. Need high reliability & good judgement.

CSO's respond to emergencies in the courthouses (District Court 5 floors, Appeals Court 5 floors, Customs with Bankruptcy Court on 5th floor). In emergency can't use elevator, must use stairs. Duress alarms occur 2-3/week, usually false, but rapid response required. No reported physical confrontations. Numbers & presence of CSO's keep this low. Primary responders to duress alarms are CSO's.

Package deliverers (UPS) will put packages on x-ray belt & take them off belt. CSO's do not have to lift packages.

Security is required for the judiciary, defendants/litigants, jury, and the public. CSO activity now usually ends at the front door of the courthouse with GSA/FPS providing perimeter security. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Efforts are underway to give CSO's authority as roving security & increased perimeter security. CSO's are the 1st line of defense between the judicial proceedings of a Federal courthouse and any threat from the outside, from covert weapon detection to an overt show of force. 1 week ago had trial involving Colorado state prisoners with CSO's in courtroom, no DUSM. CSO's open and close the courthouses. For emergency responses, CSO's need to be able to rapidly climb/run down 2 flights of stairs, and run 40 yards. A single CSO may be called upon to respond to and neutralize an overt threat. In 1994, in the District of Kansas, a defendant was to be sentenced, became disgruntled, entered the courthouse, and started shooting. One CSO was killed, another wounded. Place a high premium on the LE experience of CSO's. Their experience and maturity gives the CSO that maturity and ability to better deal with threat situations. It is not realistic to require strength requirements for CSO's as this requirement does not correlate with their need/ability to respond. Ability to respond depends more on maturity and their use of defensive tactics measures.

AKAL001221

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.533   Page 116 of 126

Case 4:05-cv-00096-HL   Document 78-14   Filed 07/03/06   Page 11 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 29 of 34

### Court Security Officers—Baltimore, MD—October 27-28, 1999

Interviewed



Observed
US Marshals Office   Baltimore
Courthouse          Main checkpoint, Control room, garage, guardhouse to garage
Court trial         Criminal case heard by ――――― 6 defendants on charges of drugs,
                    racketeering, murder, ―――――― 2 DUSM, 1 CSO-to far
                    side of jury by exit door- in courtroom)

99% of time CSO's sit in the courtroom. Other 1% of time they respond to a crisis.
In the last 10 years there was a riot in the courtroom. The DUSM's were loading a jury on
the bus & were preoccupied. 1 CSO physically held off the family from mobbing the jury.
Judge pushed the duress alarm but DUSM not available.
CSO's need the appearance of being physically capable in order to reduce potential
problems. Need to have this deterrence value.
Anger & reckless behavior from people is always possible.
Occasionally, CSO's do nod off in court. No observation of slow response by CSO's.
Usually can tell when there is increased tension & things may get out of hand. At a verdict
or sentencing there is increased tension with the potential of trouble. Frequently use the CSO
as the only court security.
In the evening (5:30 PM) DUSM's are loading prisoners and are not available. CSO's are
the primary security at that time.
If medical assistance is needed for lifting people out of courtroom, usually call and wait for
medical assistance.
CSO's do not usually escort judges. Jury has been escorted by CSO's on rare occasions,
especially with criminal cases when jurors have to walk to their cars after dark.

CSO's escort the jury, family separately to prevent mixing.
Emergencies include fire evacuation, bomb threats. CSO's have done a good job with no
deficiencies.
CSO's screen packages in the basement mailroom on a rotating basis.
Out of custody criminal and civil cases usually have CSO's as only security.

AKAL001222

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.534    Page 117 of 126

Case 4:05-cv-00096-HL    Document 78-14    Filed 07/03/06    Page 12 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 30 of 34

CSO's used as backup for crowd control & for DUSM when there is increased threat in criminal trials. The greater the threat the more CSO's will be used for backup.
In an emergency evacuation CSO may need to drag a person with loss of consciousness to the elevator or stairwell. Must be able to climb stairs, must be able to regularly check the stairwells. In a fire can't use the elevator, must use the stairs. Must be able to walk around the building to perform perimeter security. CSO's need 100% mobility, be able to stand for long periods of time. Eyesight and hearing are essential. Good mental judgment.

CSO's generally have the ability despite their age.
LE experience is important, and the majority of CSO's have prior LE experience. Court security is different than LE and CSO's need further training in order to transition from LE to court security. Should look at other pools of applicants such as younger individuals who may want to make a career in court security & who may more dedication to the job.
Do not agree with the need for weight lifting requirements. This will cause the loss of experienced & capable CSO's. Recommend the use of defensive tactics training, and non-lethal defensive measures including baton usage.

One incident had mental patient breaking the front door of the courthouse, was arrested, and banned from the building. Allowed to enter the courthouse only with CSO escort. CSO's escort individuals who make frequent frivolous lawsuits.

Baltimore—99.99% of CSO activities are sedentary & generally does not take physical abilities. But there are times where it is needed. During jury selection the defendant panicked & had to be restrained by CSO. Another case had 8-9 defendants & potential threats are deterred when a large number of DUSM's & CSO's are present.
Greenbelt—Incident during a verdict where a family member approached the jury & CSO had to restrain the individual.
Baltimore—In civil case emotions ran high, an altercation was about to take place. CSO rose & defused the situation. Muscle is needed for prevention (show of force).

3 roving areas for CSO's at Baltimore courthouse.

If one rover can't cover a floor (court, suspicious person) other rovers must expand their responsible areas. In January an enhancement CSO will permanently be assigned outside perimeter security.
Alarms are audio. If alarm goes off, enunciated in CSO office where CSO will find the location. CSO in office will radio other CSO's the location of the alarm.
Baltimore courthouse is open 24/7 (one of only 20 in US). CSO's provide 24 hour coverage. Main checkpoint is manned 24/7.
Package delivery—delivery person loads packages onto x-ray belt & CSO unloads packages at the other end. With heavy packages the delivery person will

AKAL001223

Case 2:17-cv-10109-JMH-REW    ECF No. 25-6    filed 03/15/18    PageID.535    Page 118 of 126

Case 4:05-cv-00096-HL    Document 78-14    Filed 07/03/06    Page 13 of 15
Case 2:03-cv-04344-HB    Document 168    Filed 12/21/2005    Page 31 of 34

assist CSO with unloading packages or

Court Security Officers—Portland, OR—November 3-4, 1999

Interviewed

  

Observed

| | |
|---|---|
| US Marshals Office | Portland, OR |
| Courthouse | District Court—Main checkpoint, Control room, garage, guardhouse to garage |
| Courthouse | Court of Appeals checkpoint |
| Courthouse | Litigant collapsed in District Court with breathing problem. CSO responded to duress alarm. Used elevator from 1st floor to 14th floor. Person treated by EMT's, who removed person by gurney from courtroom. CSO's did not attempt to remove person. |

49 CSO's covering 6 buildings in Portland, Eugene, Medford. Two female CSO's. Main checkpoint at District Court open from 6AM-5:30 PM.
GSA private security guard provides security at main checkpoint from
2-3 CSO's wear hearing aids.
CSO's rotate posts within the District courthouse.
Only heavy lifting is associated with the mailroom and the loading dock.
More concerned about climbing stairs in an emergency. At the new courthouse, with the high ceilings, each floor has double the amount of stairs. So by having to cover at least 2 floors of stairs, CSO's here have to cover the equivalent of 4 flights of stairs.
Some close to 80 years of age.
CSO's work is in a protected environment & shelter. Cold air can come in with open doors or through the glass at the front checkpoint.
In Eugene, an observant CSO intercepted a person entering the bankruptcy court with a rifle, found to be part of evidence.
When entering the parking garage sometimes has to wait to notice the car waiting to enter.
Unannounced security test overall did well. Missed gun
Last week Planned Parenthood vs. Right to Life. 100+ spectators for 3 weeks. 1-2 CSO's in the courtroom with 1 at the north door. DUSM's provided escort, CSO cleared the pathways.
demonstrations (accused of killing Philly police officer) at the Pioneer Appeals Courthouse & District Courthouse. 150+ people for 2 days. 6 arrests. CSO's involved in perimeter security as show of force.

AKAL001225

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.537   Page 120 of 126

Case 4:05-cv-00096-HL   Document 78-14   Filed 07/03/06   Page 15 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 33 of 34

Never had a situation that "really popped." CSO's have done well. Protests have been handled well.

Primary concerns—

1. CSO's are retired LEO due to their age yet qualify as CSO. This courthouse is a high rise. A person in a wheelchair has to be evacuated by a CSO per the fire plan. Can CSO's handle this with the elevators out?
2. Mobility is needed. If confrontation occurred need physical strength. More concerned for the need to get about in a hurry, to run up flights of stairs.
3. Alertness is needed.

More of an appearance issue, where presence maintains control.

Pre-trial services will give a warning if a potential problem is thought. The CSO would be the loser if there is a confrontation between the CSO & a defendant.

No problems with CSO's falling asleep in the courtroom.

In Medford, CSO's more involved in the courtroom, act as bailiffs. Used to rotate CSO's among different courthouses, now they are assigned to specific buildings. The routine change, with walking to different buildings, increased alertness.

Confrontations have occurred but DUSM were there to handle.

No specific medical conditions noted to reduce effectiveness.

CSO has provided assistance to heart attack victim, CSO did not try to move from courtroom, EMT's handled.

No situations where CSO's carried out disabled person.

In one incident a CSO hovered over and separated the attorneys who were out of control. Prevented potential confrontation.

CSO's present poor image with smoking, large bellies, out of shape. Judges are in better shape than are the CSO's. Feel uncomfortable with current protection provided by CSO's.

Pioneer Courthouse—Circuit Court of Appeals. Built in 1875. Frequent tour groups without pre-announcement needing screening.

Never seen a situation where CSO has been neglectful, not paying attention, or asleep. Reasonably fit group. No physical confrontations in ———— courtroom.

AKAL001226

Case 2:17-cv-10109-JMH-REW   ECF No. 25-6   filed 03/15/18   PageID.538   Page 121 of 126

Case 4:05-cv-00096-HL   Document 78-15   Filed 07/03/06   Page 1 of 15
Case 2:03-cv-04344-HB   Document 168   Filed 12/21/2005   Page 34 of 34

<u>VISION</u>

- Monitor video screens
  - X-ray screen (near, color vision)
  - Video security cameras
- 
  - ~~████████████████████████████████~~
- Close inspection of items screened—pens, lighters, beepers

<u>HEARING</u>

- Hand wand beep when metal detected (background noise)
- With poor hearing slower response to threat
- Earpiece for radio communication in courtroom
- Beep of magnetometer
  - Heavier metal object with longer, stronger beep

<u>CARDIOPULMONARY</u>

- CSO's will eventually carry pepper spray & will be sprayed in training. Significant cardiopulmonary insult with being sprayed.
- Respond to emergencies by rapidly climbing/running down at least 2 flights of stairs

<u>THREAT</u>

- Threat to the Sanctity of the Federal Court
  - Safety risk includes safety of federal judge (national security)
  - Distraction in courtroom (misspoken work or sound) during trial can cause misconduct or mistrial
- CSO must be able to meet any potential threat
- Frail appearance may not provide deterrence to threat
- CSO not showing up at post at appointed time effects the mission of the Federal Court
  - Performance continuity—chain reaction of CSO's that can't leave post until relieved.

<u>QUESTIONS?</u>

- Weight of material in mailroom
  - Boxes of copier paper
- Defensive tactics qualification potential?
- Medical concerns about pepper spray?

AKAL001227

# ALLMOND v. ALBERTO GONZALES

## 4:05-CV-00096 (HL)

## EXHIBIT C

## To Declaration of Richard, J. Miller

AKAL001228

| | · CONTRACT ID CO | PAGE | OF PAGES |
|---|---|---|---|
| | | 1 | 4 |

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 2. AMENDMENT/MODIFICATION NO<br>M032 | 3. EFFECTIVE DATE<br>See Block 16C | 4. REQUISITION/PURCHASE REQ. NO<br>03AA1001 | 5. PROJECT NO. (IF APPLICABLE) |
|---|---|---|---|

| 6. ISSUED BY | CODE | 7. ADMINISTERED BY (IF OTHER THAN ITEM 6) | CODE |
|---|---|---|---|
| U.S. MARSHALS SERVICE<br>JSC/Suite 600, CS-3<br>Washington, D.C. 2050-1000 | | | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code) | | | 9a. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|
| AKAL Security Services, Inc.<br>P.O. Box 1197<br>Santa Cruz, New Mexico 87567 | | | |
| | | | 9B. DATED (SEE ITEM 11) |
| | | | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>X    MS-00-D-0025 |
| | | | 10B. DATED (SEE ITEM 13)<br>06/01/00 |

| CODE | | FACILITY CODE | |
|---|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If Required) |
|---|
| N/A |

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| | | |
|---|---|---|
| A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority)<br>TRACT ORDER NO. IN ITEM 10A. | | THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CON- |
| B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office,<br>appropriation, date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B) | | |
| C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | | |
| D. OTHER (Specify Type of modification and authority)<br>X  52.243-1 Changes - Fixd Price Alt I (April 1984) | | |

| E. IMPORTANT:    Contractor  ☐ is not,  ☒ is required to sign this document and return 1 copies to the issuing office |
|---|

| 14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.) |
|---|

**Eleventh Judicial Circuit:**

The above referenced contract is modified to incorporate a clarification of the hearing standards in the contract.

  1. Change Section C-8 to reflect incorporation of the following: Hearing Standard definition, Hearing Test Outcomes for CSOs' clarification, and the inclusion of a definition of the Purpose of Functional Hearing Tests into the contract.

  2. Remove Section C, page C-11 and replace with pages C-11a through C-11c, attached. Changes are annotated in the left margin.

  3. This a no cost change to the contract.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect

| 15A. NAME AND TITLE OF SIGNER (TYPE OR PRINT) | | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (TYPE OR PRINT)<br>Maxine W. Robinson | |
|---|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR | | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>By (Signature of Contracting Officer) | 16C. DATE SIGNED<br>12/18/02 |
| (Signature of person authorized to sign) | | | | |

| NSN: 7540-01-152-8070<br>PREVIOUS EDITION UNUSABLE | 53-105 | STANDARD FORM 30 (REV. 10-83)<br>Prescribed by GSA<br>FAR (48 CFR) 53.243 |
|---|---|---|

AKAL001229

| *SECTION C* | *11TH Judicial Circuit* | *MS-00-D-0025  Modification M032* |

continuation under the contract. If a CSO fails to meet the medical and/or physical standards upon reexamination, the CSO shall be relieved of duties until the problem is corrected or the employee is officially removed from the CSO Program. If relieved for medical reasons, the Government shall not be liable to pay for hours unworked during illness. Contractor employees found to have a correctable condition may be eligible for reappointment when the disqualifying condition is satisfactorily corrected or eliminated. The Contractor shall ensure that CSO employees comply with the USMS Medical Officer's request for follow-up or clarifying information regarding treatment measures. All requests from the USMS Medical Officer for additional information must be responded to within thirty days from the date of the request, unless a specific written extension is authorized by Judicial Protective Services. Failure to provide the requested information to the USMS Medical Officer could result in a determination of medical disqualification.

(1) Vision - Corrected distant visual acuity must be 20/30 or better, as measured with both eyes viewing (binocular). Corrected distant visual acuity must be 20/125 or better in the worst eye. Ability to distinguish basic colors, as well as, shades of color is required as is normal peripheral vision.

(2) Hearing - The Court Security Officer (CSO) must be able to hear well enough to safely and efficiently carry out the essential requirements of the job. This requires satisfactory binaural hearing (ability to hear in each ear), and ability to: *localize sounds, comprehend speech, and hear sounds that require investigation or that alert to danger*. In order to measure a CSO's ability to meet the hearing standards, the following test procedures are administered:

Initially all CSOs are tested UNAIDED using a pure tone, air conduction audiogram (audiometer) for measurement, testing each ear separately. The equipment and test standards are documented by the American National Standards Institute (see 29 CFR 1910.95) of hearing thresholds, as specified below.

(i) In the frequency range from 500 - 2000 hertz (Hz), the pure tone audiometric deficit must not exceed 30 decibels (dB) in either ear, without the use of hearing aids

(ii) At 3000 Hz, the pure tone audiometric deficit must not exceed 40 dB in either ear, without the use of hearing aids.

(iii) At 4000 Hz, the pure tone audiometric deficit must not exceed 50 dB in either ear, without the use of hearing aids.

C-11a

AKAL001230

**Hearing Test Outcomes for CSOs**

(i)    If the above UNAIDED pure tone audiogram is *passed* and the CSO *does not wear* hearing aids, no further testing is needed and the CSO is deemed medically qualified under this hearing standard.

(ii)    If the UNAIDED pure tone audiogram is failed, and the CSO *does not wear* a hearing aid, the CSO must undergo UNAIDED functional hearing assessments that will be provided after the initial examination result is reviewed by the USPHS.

(iii)    If the above UNAIDED pure tone audiogram is failed, and the CSO wears hearing aids, the CSO must undergo both

(iv)    UNAIDED and AIDED functional hearing assessments which will be provided after the initial examination is reviewed by the USPHS.

(v)    If the above UNAIDED pure tone audiogram is *passed* and the CSO wears hearing aids, the CSO must undergo *both UNAIDED and AIDED functional hearing assessments* which will be provided after the initial examination is reviewed by the USPHS. This is to ensure that the hearing aids do not impede the CSO's ability to meet the hearing standards.

**The Purpose of Functional Hearing Tests**

Functional hearing tests which measure sound and speech recognition will be used to determine the medical qualification of all individuals who either: a) pass the UNAIDED pure tone audiogram, but wear hearing aids on the job; or b) fail the UNAIDED pure tone audiogram. *The functional hearing tests will measure the following:*

(i)    Unaided hearing loss between the two ears must not differ by 25 dB or more at three of the four speech frequencies, i.e., 500, 1000, 2000, and 3000 Hz. (Measures the ability to localize sounds.)

(ii)    Unaided Speech Reception Threshold must be 30 dB or better in at least one ear. (Measures the ability to hear sounds that alert to danger.)

(iii)    Unaided Speech Recognition in quiet must be 90% or above in each ear.

C-11b

Sec. C

        (iv)     Unaided Speech Recognition in a noise sound field must be 50% or above.

If hearing aids are worn, the following <u>additional</u> assessments will be requested and will be completed <u>with the hearing aid</u>:

        (i)     A statement describing the type of hearing aids and ear(s) fitted must be provided by the audiologist.

        (ii)    Aided pure tone air conduction audiogram at the frequencies 250, 500, 1000, 2000, 3000, 4000, 6000 and 8000 Hz.

        (iii)   Aided Sound Field 5% FM warble tones at frequencies 250 - 6000 Hz, including 3000 Hz. Binaural signal must be phase-locked with simultaneous presentation from both speakers placed at 90 and 270 degrees azimuth (towards left and right ears, respectively).

        (iv)    Aided Speech Recognition in a noise sound field must not be less than 50%.

A determination of medical qualification for those individuals who wear hearing aids will be made pursuant to these additional assessments.

(3)    <u>Cardiovascular System</u> - Any condition which significantly interferes with heart function may be disqualifying. Examples of conditions which may be disqualifying are hypertension with repeated readings which exceed 150 systolic and 90 diastolic, symptomatic peripheral vascular disease and severe varicose veins.

(4)    <u>Respiratory System</u> - Any condition which significantly interferes with breathing capacity may be disqualifying.

(5)    <u>Gastrointestinal System</u> - Any disease or condition that requires rigid diets may be a disqualifying factor. An ulcer active within the past year may also be disqualifying.

(6)    <u>Genitourinary System Disorders</u> - Any functional disorder rendering the person incapable of sustained attention to work tasks, i.e., urinary frequency and secondary discomfort, may be disqualifying.

(7)    <u>Hernias</u> - Inguinal and femoral hernias, with or without the use of a truss, may be a disqualifying factor. Other hernias may be disqualifying if they interfere with the performance of the duties of the position

C-11c

AKAL001232