# Exhibit G

UNITED STATES DISTRICT COURT FOR THE
EASTER DISTRICT OF MICHIGAN


GARY BOIKE,

    Plaintiff,

                      Civil Action No.:

 vs.                  2:17-cv-10109

AKAL SECURITY, INC.,

    Defendant.



VIDEO DEPOSITION OF

HAVIVA GOLDHAGEN, M.D.

February 5, 2018

10 a.m.

3344 Peachtree Road, NE

Atlanta, GA




Diondre' Thomas, RPR, CCR-B-2433

1      A.   Sounds good.

2      Q.   All right.  Dr. Goldhagen, are you a medical

3 doctor by training?

4      A.   Yes.

5      Q.   What is your medical education briefly?

6      A.   Medical school.

7      Q.   Where did you go to medical school and when?

8 A little bit more full than that, please.

9      A.   Okay.  University of Toronto for two years

10 between 1974 and '76, transferred to the University

11 of Calgary; Alberta, Canada from '76 to '78.

12 Graduated medical school in 1978.  I did a year of

13 rotating internship in Toronto '78 to '79.  Went into

14 practice from 1980 through about 1992 and took a

15 brief hiatus for about four years.  Went back to do a

16 residency program in occupational medicine at Emory

17 University in Atlanta, graduated from that in 1998,

18 and then proceeded to work with Federal Occupational

19 Health from 1998 until I retired at the end of 2016.

20      Q.   Thank you, doctor.  You mentioned Federal

21 Occupational Health.  What is Federal Occupational

22 Health?

23      A.   Federal Occupational Health is a federal

24 agency tasked with providing health services to

25 federal employees.

1       Q.  And to federal agencies?

2       A.  And to federal agencies.

3       Q.  And what did you do in connection with

4  working for or at the behest of Federal Occupational

5  Health?

6       A.  I provided medical qualification

7  determinations for both applicants and employees from

8  federal agencies, as well as for the Marshals Service

9  and the CSOs in the Marshals Service.

10      Q.  You mentioned CSOs, what does CSO stand for?

11      A.  Court security officer.

12      Q.  Did you consider yourself --

13      MS. SWEARENGEN:  Kurt.

14      MR. PETERSON:  Yes.

15      MS. SWEARENGEN:  I'm having a little bit of

16      a hard time hearing Dr. Goldhagen.

17      MR. PETERSON:  Let me move the speak around

18      a little bit to see if that helps any.  Maybe

19      not.  Doctor, if you could just speak up just a

20      little louder for Kate, and I will try to do the

21      same.

22      Kate, we will try to raise our voices a

23      little bit, make it easier for you.  Let us know

24      if it doesn't work.

25      MS. SWEARENGEN:  Okay.

1    BY MR. PETERSON:

2        Q.   Doctor, do you consider yourself to be a

3    medical review officer in connection with Federal

4    Occupational Health?

5        A.   Yes.

6        Q.   That's just a term I've heard before,

7    medical review officer and I didn't know if that's

8    what you considered yourself to be doing or a title

9    that's applicable in connection with your work with

10   Federal Occupational Health?

11       A.   We normally refer to ourselves as reviewing

12   medical officer rather than to medical review

13   officers in order to distinguish from medical review

14   officers, MROs, that basically look at drug screens

15   so -- because we did more than that we called

16   ourselves reviewing medical officers, but basically

17   either one is fine.

18       Q.   Generally speaking, what did you do as a

19   reviewing medical officer?

20       A.   These employees or applicants had their

21   actual medical exams performed close to where they

22   lived.  So anywhere across the country.  In order to

23   make the actual qualification as consistent as

24   possible across an agency it was felt to be important

25   that one person or multiple people reviewed the

1    actual exams.  So all of the exams from the federal

2    agencies came through to our Atlanta office, as one

3    of the offices, but through let's say the Atlanta

4    office.  And we would review the medical history,

5    physical findings, the lab work, any additional tests

6    like electrocardiogram or pulmonary functioning tests

7    that were done.  And then we would make a

8    determination as to whether the individual was

9    medically qualified and/or if any additional

10   information was requested -- was needed in order to

11   make a medical determination prior to the actual

12   decision.

13        Q.  Thank you.  Let me ask a couple of follow-up

14   questions.  So ultimately was the end objective of

15   what you were doing is to make a recommendation as to

16   whether an applicant or the incumbent whose ever exam

17   you were reviewing, exam and related results, your

18   ultimate objective was to determine whether in your

19   opinion that person was recommended to be medically

20   qualified to serve or recommended not to be medically

21   qualified to serve?

22        A.  That's correct.

23        Q.  You mentioned that the Atlanta office -- did

24   you do you're work as a reviewing medical officer out

25   of Atlanta?

1      A.   Yes.

2      Q.   In determining ultimately whether in your

3  opinion someone was medically qualified to serve, I

4  think you mentioned you did review a host of medical

5  condition and criteria as to the applicant or

6  incumbent?

7      A.   Yes.

8      Q.   Was one of the criteria that you considered

9  in evaluating whether someone was medically qualified

10 to serve for at least a court security officer

11 working in conjunction with the United States

12 Marshals service was one of the criteria you examined

13 the color vision or color vision deficiency of that

14 person?

15     A.   Yes.

16     Q.   Was color vision deficiency considered only

17 in connection with court security officers working in

18 connection with the United States Marshals service or

19 were there other agencies where color vision was

20 considered as well?

21     A.   There were other agencies where color vision

22 was a requirement for the job.

23     Q.   You mentioned requirement was the ability to

24 distinguish basic colors a requirement to be

25 medically qualified to serve as a court security

1    officer working in conjunction with the United States

2    Marshals service?

3         A.   Yes.

4         Q.   Do you know who set that determination or

5    made that determination?

6         A.   Dr. Miller set that determination when he

7    performed a job task analysis for the U.S. Marshals

8    service specific for the court security officer

9    position back in -- I believe he began the study in

10   1999 completed it in 2000.

11        Q.   Can you tell us a little bit more about

12   Dr. Miller and the job function analysis you

13   referenced.  Can you walk us through what you

14   understood occurred in that job functional analysis

15   by Dr. Miller?

16        A.   Dr. Miller was tasked with performing an

17   assessment of the job requirements for court security

18   officers for the purpose of determining what the

19   medical standard should be for a court security

20   officer.  In performing that analysis he traveled to

21   I believe five sites across the country performing

22   focus groups, interviews and ride alongs, actually

23   seeing what job functions were being performed.  And

24   following that he made a determination as to what the

25   essential job functions were for a court security

1   officer.  And based on those essential job functions,

2   he determined what the medical requirements should be

3   or the medical standards should be for that job.

4        Q.  Let me ask you a couple of follow-up

5   questions, doctor.  You indicated that Dr. Miller

6   based upon a review of what the court security

7   officers were actually doing in the courthouse he

8   determined what their essential job functions were,

9   did I understand that correctly?

10       A.  That was part of it, yes.

11       Q.  And then you said based upon those job

12  functions he set medical requirements.  Help me, how

13  do the medical requirements tie to the ability to

14  perform the essential job functions?  What's the

15  connection between those two?

16       A.  For example, if color vision is required

17  in the performance of a job or is an important

18  essential function in performing a job as in the

19  electronic surveillance equipment that is used by the

20  court security officers in screening individuals when

21  they enter the building.

22           So screening individuals coming into the

23  building was considered an essential function of the

24  job of a court security officer.  In order to do that

25  function, they need to be able to utilize the

1    equipment that they have.  The electronic

2    surveillance equipment is color coded.

3         So the individuals need to be able to

4    determine certain colors coming through in order to

5    know whether somebody should pass through that

6    screening or not.  So in this way medical standards

7    were set for vision requirements for hearing

8    requirements.  Other medical conditions like

9    endocrinological issues like diabetes or orthopedic

10   issues like back conditions or knee conditions, the

11   physical functions of the job.

12        So based on determining what the essential

13   job functions were for the court security officers,

14   Dr. Miller through experience and through the use of

15   certain consultant experts in the field, through

16   literature searches and through various means made an

17   assessment of what the medical standards should be

18   for that job.

19        Q.  Are you familiar with the job functions of a

20   court security officer?

21        A.  Yes.

22        Q.  How are you familiar with them,

23   Dr. Goldhagen?

24        A.  Back in 1999 when Dr. Miller was performing

25   this study one of the sites that were used for

Page 14

1    assessment of the functions, one of the courtrooms

2    was in Atlanta.  And he invited all of the physicians

3    that were performing his reviews to come along to

4    actually see what these court security officers do.

5    And so I was one of those physicians that went to the

6    courthouse to see what the functions were.

7         Q.  Dr. Miller I'm going -- excuse me --

8    Dr. Goldhagen I'm going to hand to you what the court

9    reporter will mark as Defendant Exhibit 1 and ask if

10   you can identify that for us.

11        Kate, for your benefit this is the Final

12   Report Medical Requirements for Court Security

13   Officers, prepared for the United States Marshals

14   Service prepared by Federal Occupational Health Law

15   Enforcement Medical Programs.  It's AKAL Bates Nos.

16   1137 through 1127.  Kate, I'm handing that to the

17   court reporter to see if she'll mark that.

18        (Exhibit 1 was marked for identification.)

19   BY MR. PETERSON:

20        Q.  Dr. Goldhagen, you've been handed what's

21   been marked at Defendant No. 1.  Does that in fact

22   appear to be a copy of the so called Miller report

23   that you referred to a few moments ago and that has

24   been described for us?

25        A.  Yes, it does.

1       Q.  You indicated that you actually went to

2  federal courthouses and watched what CSOs did.  You

3  indicated that you're familiar with the Miller report

4  that has been presented to you.  Would you agree with

5  this, doctor, that the ultimate overall essential job

6  function of court security officers working in

7  conjunction with the United States Marshals Service

8  is to ensure the safety of the judges, courthouse

9  staff, the jurors and the public who come into

10  federal courthouses?

11       A.  Yes.

12       Q.  Within that overall responsibility, doctor,

13  would you agree that court security officers may

14  be called upon to detect and describe potentially

15  illegal or dangerous or suspicious items or

16  individuals?

17       A.  Yes.

18       Q.  Would you agree, doctor, that being able to

19  accurately and fully describe the color of clothes

20  worn by a suspicious or dangerous individual or the

21  color of a suspicious item or the color perhaps of a

22  fleeing vehicle, would you agree that the ability to

23  accurately and fully describe the color of those

24  things would also be an essential part of the court

25  security officer's position?

1      A.   Yes.

2      Q.   Are to your knowledge, doctor, are court

3  security officers called upon to describe the color

4  of those things every day?

5      A.   No.

6      Q.   Does the fact, doctor, that CSOs or court

7  security officers may not be called upon every single

8  day to describe -- to identify and describe the color

9  of clothing worn by a dangerous individual or the

10  color of a suspicious item, or the color of a fleeing

11  vehicle, does the mere fact that CSOs may not

12  be called upon -- may not be called every day to do

13  that, does that in any degree lessen the importance

14  of the CSO's ability to fully and accurately describe

15  the color of those things when called upon to do so?

16      A.   No.

17      Q.   Do you have any insight or opinion, doctor,

18  as to whether a tragic or potentially and even deadly

19  consequence could occur if a court security officer

20  failed to accurately and completely describe the

21  color of clothes worn by a suspicious individual or

22  an assailant in the courthouse or the color of a

23  dangerous item or the color of a fleeing vehicle.  Do

24  you have an opinion or insight into that, doctor,

25  whether something tragic or deadly may occur if a

1   court security officer was unable or failed to

2   accurately and fully describe the color of those

3   things?

4        A.   I believe that a critical incident leading

5   to significant injury or death or some other adverse

6   effect could result from a court security officer

7   being unable to provide accurate color descriptions

8   or be able to -- or someone who wouldn't see color.

9        Q.   Indeed, doctor, do you know what incident

10  prompted Dr. Miller to undertake his evaluation,

11  prepare his recommended medical standards?

12            MS. SWEARENGEN:  Objection to the form.

13            MR. PETERSON:  Kate, your objection is.

14            MS. SWEARENGEN:  To form.

15            MR. PETERSON:  I'm sorry.

16            MS. SWEARENGEN:  Lack of foundation.

17  BY MR. PETERSON:

18       Q.   Okay.  Do you know what prompted Dr. Miller

19  to undertake an evaluation of the court security

20  officer program which led him to produce his report

21  which we have identified as Defendant's Exhibit No.

22  1?

23       A.   I believe it was the Oklahoma City bombing

24  in 1995 that led the judicial committee to recommend

25  having medical standards for the court security

1  officers.

2      Q.  When you say a judicial committee, do you

3  know the name of that judicial committee?

4      A.  I do not.

5      Q.  But is it your understanding that a

6  committee of judges turned to Dr. Miller and said in

7  essence, evaluate the court security program and

8  determine -- fill in the rest of my sentence.  What

9  did the committee in essence say to your

10  understanding to Dr. Miller?

11      A.  I don't know the process at the time.  I

12  don't know whether they contacted Dr. Miller or

13  contacted the Marshals Service who then contacted

14  Dr. Miller to perform this service.  But I believe

15  they would have asked somebody at the time to go

16  ahead and assess the functions required of a court

17  security officer and to determine the medical

18  requirements for that.

19      Q.  You have mentioned medical requirements and

20  you mentioned color vision deficit.  What test was

21  set up by Dr. Miller and the United States Marshals

22  Service for incumbent officers and for applicants to

23  to determine whether they had color vision deficit?

24      A.  The initial screening test was the Ishihara.

25  And if an incumbent or an applicant failed the

1   Ishihara then they were requested to provide the

2   results of a Farnsworth D-15 color vision test.

3       Q.  Are you familiar with both the Ishihara and

4   the Farnsworth D color vision test, Dr. Goldhagen?

5       A.  Not in detail as to exactly how they work,

6   but I am familiar basically and with what is

7   considered a pass or a fail.

8       Q.  In your years of service as a reviewing

9   medical officer and following your residency in

10  occupational medicine, do you have an understanding

11  of whether the Ishihara is an accepted test in the

12  medical community for identifying whether someone may

13  have a color vision deficit?

14      A.  Yes, it is.

15      Q.  And similarly is the Farnsworth D-15 test

16  accepted as a test for determining perhaps the

17  severity or degree of a color vision deficit?

18      A.  Yes, it is.

19      Q.  What did you consider while you worked as a

20  reviewing medical officer as a "failing score" if you

21  will on the Ishihara test, that is a score that may

22  indicate someone has a color vision deficit?

23      A.  We would request the Farnsworth D-15 if an

24  individual achieved a score of less than 10 out of 14

25  on a 14 plate Ishihara.

1       Q.  And then what score on the Farnsworth D-15

2   test would you consider to be indicative of a severe

3   color vision deficit?

4       A.  On the Farnsworth D-15 one can have both

5   minor errors and major errors.  An individual was

6   allowed as many minor errors as whatever they did.

7   However, they were allowed only one major error.  So

8   anything beyond one major error was considered a fail

9   on the Farnsworth D-15.

10      Q.  Thank you, doctor.  Bear with me for just

11  one moment, please.  When you reviewed court security

12  officer and incumbent court security officer medical

13  exam for the year in which you were doing the review,

14  did you always look back at all of the prior medical

15  exams for that particular individual?

16      A.  No.

17      Q.  If and I understand it's an if question,

18  doctor, if an incumbent court security officer had

19  filed a color vision test in the past but for

20  whatever reason the reviewing medical officer who had

21  reviewed those exams in prior years for whatever

22  reason did not medically disqualify that person,

23  would that mean to you that when it became your turn

24  to review that person's annual medical exam you

25  should medically disqualify that person?  That's a

1   horrible question and I even lost the train --

2          MS. SWEARENGEN:  Kurt, I don't even

3          understand what you're asking.

4   BY MR. PETERSON:

5       Q.  I'm surprised everyone fell -- no one fell

6   asleep in the middle of that question.  Let me tee it

7   up one more time, please.

8          If a court security officer may have failed

9   a color vision test in the past but for whatever the

10   reviewing medical officer who reviewed those exams

11   did not medically disqualify that person would that

12   mean to you that you should not medically disqualify

13   that person when you did your review and learned that

14   they at that time had a color vision deficit?

15      A.  No, it would not.

16      Q.  Why?  Why do you have that opinion, doctor?

17      A.  Color vision is a requirement -- basic color

18   vision is a requirement for the job.  So if the

19   individual currently fails the Ishihara then that

20   individual needs to proceed on to the Farnsworth

21   D-15.  And if that individual then fails the

22   Farnsworth D-15 currently, it means that individual

23   does not meet the medical, the color vision

24   requirements for the job.  So I would not be able to

25   qualify, to medically qualify that individual if he

Page 22

1    fails the color vision requirement.

2         Q.   Were you ever aware of any United States

3    Marshals Service or Federal Occupational Health

4    policy that said that court security officers could

5    have a color vision deficit yet still serve as a

6    court security officer?

7         A.   Not to my knowledge.

8         Q.   And that certainly wasn't your policy and

9    practice?

10        A.   No, it was not.

11        Q.   Let's turn specifically to Mr. Boike and his

12   color vision deficit.  It's my understanding that in

13   2014, you had occasion to review Mr. Boike's color

14   vision test results in connection with his 2013

15   annual exam.  Do I understand that correct?

16        A.   Yes.

17             (Exhibit 2 was marked for identification.)

18             MR. PETERSON:  Let me hand the court

19        reporter what will be marked as Defendant

20        Exhibit No. 2.  And Kate, this has been marked

21        as AKAL Bates No. 590.

22   BY MR. PETERSON:

23        Q.   Dr. Goldhagen, you have been handed what has

24   been marked Defendant Exhibit 2.  I'm going to ask

25   you to identify that.  The title of this document is

1    Judicial Security Division Medical Review Form.  It

2    references an incumbent Mr. Gary Boike and then it

3    has got some recommendation of medical qualification

4    or not qualification in Mr. Boike case and it has a

5    signature.  Is that your signature at the bottom of

6    this page?

7         A.  Yes.

8         Q.  Is this the medical review form that you

9    caused to be generated in conjunction with your

10   review of Mr. Boike's color vision testing in 2014?

11        A.  Yes, it is.

12        Q.  Now in sort of the meat of this document

13   with the typed paragraph, it indicates that CSO Gary

14   Boike has a significant color vision deficit

15   according to the results the Ishihara color vision

16   test (4 correct 14 tested) and the Farnsworth D-15

17   color vision test (6 major errors).  Do you see that,

18   doctor?

19        A.  Yes.

20        Q.  Just so that we are -- I want to make sure

21   that we have the same test results.  I'm now going to

22   hand to you what I'm going to ask the court reporter

23   to mark as number 3 and 4.

24             (Exhibit 3 and 4 were marked for

25             identification.)

1          MR. PETERSON:  And Kate Defendant's 3 is

2          what you and I have been calling the short

3          version of Gary Boike 2013 annual review, AKAL

4          Bates Nos. 495 and 502.  And then Defendant

5          Exhibit No. 4 is the Farnsworth D-15 test

6          results from 2014.  Previously Bates marked,

7          Kate, as AKAL 563.  Okay.

8    BY MR. PETERSON:

9          Q.  Dr. Goldhagen, taking a look first at

10   Defendant Exhibit No. 3 I'm going to submit to you

11   what that is, is the cover sheet of Mr. Boike's

12   annual 2013 exam, and then the second page of this

13   exhibit is that page from that annual exam report

14   which in particular reflects the results of Mr. Boike

15   Ishihara color vision test.  As you know there are

16   multiple pages to the exam.  This exhibit just

17   includes a cover sheet, and then the page reflected

18   is the test results for that year.  Does that in fact

19   appear to be what Defendant Exhibit No. 3 is?

20         A.  Yes.

21         Q.  And you will see on the second page of

22   Defendant Exhibit 3 toward the bottom, you'll see the

23   reference to the Ishihara test, and somebody wrote

24   down the numbers 4 out of 14.  Do you see that?

25         A.  Yes.

1        Q.   Is  that the test results for the Ishihara

2   test you were referring to in your medical review

3   form that is Defendant Exhibit 2?

4        A.   Yes, it is.

5        Q.   Then similarly can you that I can a look at

6   Defendant Exhibit No. 4 and that document is entitled

7   something in French, but I understand this is the

8   test results for the Farnsworth D-15 test.  You can

9   see at the upper right-hand corner it references Gary

10  Boike and a date of 4/12/14.  Does this appear to be

11  Mr. Boike test results for the Farnsworth D-15 test

12  that he had conducted in April of 2014?

13       A.   Yes.

14       Q.   And is this the test result that you were

15  referring to in Exhibit 2 that is your medical review

16  form?

17       A.   Yes.

18       Q.   All right.  Just make sure that we had our

19  test correct.  Taking a look at Defendant Exhibit 4,

20  which is the results of the Farnsworth D-15 test, now

21  what do you understand this test says about Mr. Boike

22  color vision deficit?

23       A.   That he has a significant color vision

24  deficit.  And that it looks to be mainly along the

25  Deutane plane, which refers more to red, green

1  deficiency.

2      Q.  Take a look back at your medical review

3  determination that is Defendant Exhibit Number 2.

4  Reading through this document it reads that -- strike

5  that.  In Defendant Exhibit Number 2 the document

6  states that Mr. Boike has a significant color vision

7  deficit.  Do you see that?  The document states that

8  this condition impairs the ability to recognize basic

9  colors and does not meet the required color vision

10  standard for the job.  Do you see that, doctor?

11      A.  Yes.

12      Q.  Do you agree with that?

13      A.  Yes.

14      Q.  Your medical review form further states that

15  good color vision is important and sometimes a

16  crucial factor in the efficient performance of all

17  duties and responsibilities.  Do you see that,

18  doctor?

19      A.  Yes.

20      Q.  And do you agree with that?

21      A.  Yes.

22      Q.  Your medical review form further states that

23  the recognition and proper identification of persons,

24  vehicles, buildings, color-coded electronic screeners

25  and/or documents is important.  In officer-to-officer

1    communications the description of suspects, vehicles,

2    or buildings may be dependent on accurate color

3    descriptions.  In addition court testimony may depend

4    on proper color descriptions.  Do you see all of

5    that, doctor?

6         A.  Yes.

7         Q.  Do you agree with all of that, doctor?

8         A.  I do.

9         Q.  The last sentence in your medical review

10   form states, therefore the CSO Mr. Boike does not

11   meet the color vision requirement for the job of

12   court security officer.  Do you see that, doctor?

13        A.  Yes.

14        Q.  Do you agree with that, doctor?

15        A.  Yes.

16        Q.  Did you reach your recommendation that

17   Mr. Boike was not qualified to serve as a court

18   security officer given your best medical judgment and

19   the understanding of what is required or may

20   be required of a court security officer?

21        A.  Yes.

22        Q.  In concluding that Mr. Boike was not

23   qualified to serve as a court security officer did

24   you make any other additional determination as to

25   whether Mr. Boike could or could not work in any

1    other job, occupation or activity?

2         A.   No.

3              (Exhibit 5 was marked for identification.)

4              MR. PETERSON:   Doctor, take a look at --

5         well, I'm going to hand you what is going to be

6         marked hopefully as Defendant Exhibit No 5.

7              Kate, that is AKAL 553.

8    BY MR. PETERSON:

9         Q.   Doctor, what I have handed to you is another

10   Judicial Security Division Medical Review Form.   This

11   one also pertains to Mr. Gary Boike.   However, this

12   medical review form is dated a couple of months

13   before yours.   You'll see that yours was issued June

14   30th of 2014 whereas Defendant Exhibit 5 this medical

15   review form was issued a couple of months prior in

16   February of 2014.   Do you see that, doctor?

17        A.   Yes.

18        Q.   And if you take a look at this medical

19   review form it indicates that Mr. Boike has had a

20   color vision deficit identified on the initial

21   screening.   That initial screening to your

22   understanding was the Ishihara test?

23        A.   Yes.

24        Q.   And that this medical review form then

25   directed Mr. Boike to have additional testing done

1   with the Farnsworth D-15.  Do you see that, doctor?

2       A.   Yes.

3       Q.   Further on in this medical review form it

4   states next to the letter B -- excuse me -- next to

5   the letter C.  It says tinted lenses or glasses are

6   not to be used in order to pass this test.  Do you

7   see that, doctor?

8       A.   Yes.

9       Q.   Was it your understanding as of June of 2014

10  that CSOs were not allowed to wear a color or tinted

11  lens or glass when they were taking any color vision

12  test?

13      A.   That's correct.

14          (Exhibit 6 was marked for identification.)

15      Q.   Doctor, I'm going to hand to you another

16  exhibit.  This will be marked as Defendant Exhibit

17  No. 6.

18          Kate, this is AKAL Bates Nos. 1233 and 1235.

19          Doctor, take a look at what has been marked

20  as Defendant Exhibit 6 and if you would start from

21  the back and work forward.  If you turn to the second

22  page of this exhibit you'll see on the e-mail header

23  you'll see it's from apparently you sent on April 2,

24  2014 to someone named Gregory Good.  Then you have

25  got a several paragraph e-mail.  Do you recognize

1   that e-mail, doctor?

2       A.   Yes.

3       Q.   And is that in fact an e-mail that you sent

4   to Gregory Good in April of 2014?

5       A.   Yes, it would have been.  I don't

6   specifically recall requesting it at that specific

7   date, but yes, sir.

8       Q.   Then you'll see that then the rest of this

9   document is response from Dr. Good to you sent on

10  April 7, 2014?

11      A.   Yes.

12      Q.   Does that appear to be what this exhibit is

13  that is you wrote Dr. Good, and then Dr. Good wrote

14  you back?

15      A.   Yes.

16      Q.   Who is Gregory Good?

17      A.   Dr. Good is a vision specialist that we

18  consulted on a frequent bases when we had issues

19  related to vision.

20      Q.   And in this particular communication take a

21  look at the e-mail that you sent to him, you'll see

22  in the very second sentence after the greeting, you

23  indicate that you have a consultation request for him

24  from the judicial security division.  Do you see

25  that?

Page 31

1        A.   Yes.

2        Q.   And you see in the first paragraph that you

3   describe apparently the position of the court

4   security officer position, right?

5        A.   Yes.

6        Q.   And then you see in the second paragraph it

7   appears that you set forth what are the applicable

8   color vision standards for the court security officer

9   position?

10       A.   Yes.

11       Q.   You see at the end of that second paragraph,

12   doctor, you wrote, I have disqualified the

13   individual.  And then you wrote, one of these

14   individuals has requested that he be allowed to wear

15   contact lens that are available for color blindness.

16   Do you see that?

17       A.   Yes.

18       Q.   And then in the next paragraph you wrote the

19   JSD, the Judicial Security Division of the United

20   States Marshals Service is requesting an opinion

21   regarding whether it's appropriate to allow color

22   deficient individuals to wear glasses or contacts

23   that allow them to see color in order to meet the

24   standard.  Do you see that, doctor?

25       A.   Yes.

1      Q.  Do you know who the particular CSO was that

2   you were referencing that requested to be allowed

3   some sort of lens so that he or she may be able to

4   pass the color vision test?

5      A.  No, I don't.

6      Q.  But do I understand your communication to in

7   essence to be asking Dr. Good, this vision

8   specialist, to give you his opinion on whether it's

9   appropriate or advisable to preclude individuals who

10  wear color tinted lenses during color vision testing?

11     A.  Actually I didn't ask him whether it was

12  appropriate to preclude.  I was asking him whether

13  it's possible for them to wear those in order to meet

14  the color vision requirement.

15     Q.  Got it.  And then Dr. Good responded to your

16  question?

17     A.  Yes.

18     Q.  And you will see in the first paragraph

19  Dr. Good wrote at the end of that first sentence or

20  the end of that first paragraph, I along with the

21  vision science community in general do not believe

22  that using a tint spectacle or contact lens provides

23  for any significant improvement in general color

24  discrimination.  Do you see that, doctor?

25     A.  Yes.

1          Q.  Do you see then in the second paragraph

2     Dr. Good apparently talks a little bit about the

3     history and how these tinted lenses work.  Do you see

4     that?

5          A.  Yes.

6          Q.  Do you see in the middle of that second

7     paragraph sort of toward the end Dr. Good wrote, if

8     this, the lens, worked at all it only worked for very

9     bold green colors under very bright lights.  Do you

10    see that?

11         A.  Yes.

12         Q.  Dr. Good wrote also the "perception of

13    green" was not instantaneous (as it is in normal

14    color vision) and only came about after vigorous

15    inspection.  Do you see that, doctor?

16         A.  Yes.

17         Q.  Dr. Good further wrote that the lens is not

18    useful for less than bold colors (pastels) or dark

19    color.  And when working in less than ideal lighting

20    conditions.  Do you see that, doctor?

21         A.  Yes.

22         Q.  And Dr. Good also wrote, also the lens can

23    even introduce extra color confusions that weren't

24    present initially for the color deficient individual

25    when not wearing the tinted lens.  Do you see that,

1  doctor?

2      A.  Yes.

3      Q.  Do you see in the next paragraph that

4  Dr. Good then gave his opinion that often by wearing

5  the a severely color deficient individual may be able

6  to "pass" a color vision screening test but Dr. Good

7  continued to write that tinted lens does not, his

8  emphasis, provide for normal color discrimination but

9  instead interferes with the design of color vision

10  screening test.  Do you see that, doctor?

11      A.  Yes.

12      Q.  Continuing on in that paragraph Dr. Good

13  wrote by using the color tinted lens a color vision

14  defective can identify a figure on a test correctly

15  not by using color vision but by using brightness

16  discrimination.  Do you see that?

17      A.  Yes.

18      Q.  He goes on to explain that position in some

19  more detail.  And then in the final paragraph

20  Dr. Good concludes as follow, Dr. Good wrote, because

21  the court security officer deals with color coding on

22  scan equipment and as a weapon carrying law

23  enforcement officer that may need to comprehend

24  descriptions of individuals to include colors of

25  clothing and equipment, I, Dr. Good agree that

1   passage of the Farnsworth D-15 without the use of

2   tinted spectacle or contact lenses is the proper

3   standard color vision test for the CSO position.  Do

4   you see that, Dr. Goldhagen?

5        A.  Yes.

6        Q.  And then finally Dr. Good wrote,

7   additionally, I do not believe it is appropriate to

8   bypass the color vision standard for the position

9   with the use of a color contact lens or a tinted

10  spectacle lens.  Do you see that, doctor?

11       A.  Yes.

12       Q.  Do you have any reason to disagree with

13  anything that Dr. Good said in this response to you?

14       A.  No.

15       Q.  Do you consider Dr. Good to be an expert?

16       A.  Yes.

17       Q.  In the field of color vision deficit?

18       A.  Yes.

19       Q.  In your best medical judgment based upon

20  communication you have with Dr. Good and otherwise,

21  do you believe tinted lenses should be allowed to be

22  worn by a court security officer either during color

23  vision testing or on the job?

24       A.  Based on the recommendation by Dr. Good our

25  vision consultant, I do not believe that court

1  security officers should be allowed to use tinted

2  lenses during testing or on the job.

3      Q.  Did you in good faith and to the best of

4  your medical judgment believe that Mr. Boike's color

5  vision deficit could prevent him from fully and

6  accurately being able to identify and describe

7  colors?

8      A.  Yes.

9      Q.  Did you truly and in good faith and in the

10  best of your medical judgment believe that

11  Mr. Boike's inability to effectively and fully see

12  color and thus describe color did you believe in good

13  faith that may potentially lead to a dangerous and

14  perhaps even fatal security result?

15      A.  Yes.

16          MR. PETERSON:  Thank you, Doctor.  I have no

17          further questions.  Counsel for Mr. Boike may

18          have some questions for you.

19          (Plaintiff Exhibit 1-3 were marked for

20          identification.)

21                      EXAMINATION

22  BY MS. SWEARENGEN:

23      Q.  Hi, Dr. Goldhagen, again I'm Kate

24  Swearengen.  I have some questions for you.  I'd like

25  to get started and then maybe go off the record to

1  feel that an individual should not perform the

2  functions of the job pending further testing I would

3  usually state that in the review itself.  So the fact

4  that Dr. Gildiner did not specifically state that he

5  should be kept off the job pending further testing my

6  assumption is he continued performing the job.

7       Q.  Is that an option for a reviewing medical

8  officer to temporarily or permanently remove someone

9  from duty pending further documentation necessary to

10 make a medical determination?

11      A.  It would be a recommendation by the

12 reviewing medical officer.  The agency itself would

13 make the determination about whether that person

14 would go off the job itself or not.  But it would

15 strictly be a recommendation from the medical

16 reviewing officer.

17      Q.  But that's a recommendation the reviewing

18 medical officer would be empowered to make?

19      A.  Yes.

20      Q.  So as I understand it and please correct me

21 if I'm wrong, there are basically three options.

22 Number one, the reviewing medical officer determines

23 if the individual is not medically qualified.  Number

24 two, the reviewing medical officer determines that

25 the person is medically qualified.  Number three,

1    there is insufficient information to make a medical

2    determination and in that case the reviewing medical

3    officer can either recommend that the individual be

4    removed from duty or cease work; is that correct?

5         A.   Pending additional documentation, yes.

6         Q.   Do you know why Dr. Gildiner did not remove

7    Gary Boike from duty at this time?

8         A.   No.

9         Q.   Did you have any conversations with

10   Dr. Gildiner about Gary Boike medical qualifications?

11        A.   I don't recall.

12        Q.   This is an if question but if you had been

13   in Dr. Gildiner's place and you had reviewed the

14   initial Ishihara result from Gary Boike would you

15   have allowed him to keep working pending the

16   additional documentation or would you have removed

17   him from duty?

18        A.   I would have allowed him to keep working.

19        Q.   Why is that?

20        A.   It's my understanding that he had been on

21   the job for quite a number of years.  Therefore, I

22   felt -- I would have felt that it's best to give him

23   the benefit of the doubt pending the additional

24   documentation.

25        Q.   Do you know if there was a general practice

1        A.   It probably would have been mostly in maybe

2   2012, 2013, maybe 2014 that time frame.

3        Q.   Why that time frame in particular?

4        A.   I -- the Judicial Security Division had a

5   number of reviewing medical officers prior to my

6   taking on this agency.  I took on this agency as a

7   reviewing medical officer sometime maybe in 2012 or

8   2013.  At the time that I took over I noticed that

9   the employees with color vision deficit had not been

10  previously medically disqualified, however, that is a

11  medical standard for the job.  And a requirement for

12  the job is to have basic color vision.  So I felt it

13  was my duty to go ahead and uphold the medical

14  standards for the job when I came on as reviewing

15  medical officer.  So at that time all of the

16  employees who had been previously qualified had to go

17  forward with the Farnsworth D-15 test, and if they

18  failed that then they were found medical not

19  qualified.

20       Q.   Dr. Goldhagen, you mentioned that in 2012 or

21  2013 that you sort of took it upon yourself to ensure

22  that the Marshals Service color vision standards were

23  honored by looking at the individuals who came to you

24  who had color vision deficiencies but were not

25  previously medically disqualified.  Is that fair?

Page 44

1       **A.   Yes.**

2       **Q.   Did you get any -- what I'm trying to figure**

3  **out is did that just come from you or did you get any**

4  **guidance from someone at the Marshals Service or from**

5  **someone else?**

6            MR. PETERSON:  Object to the form of the

7       question please, Kate.

8            THE WITNESS:  I informed the Marshals

9       Service that a number of individuals appeared to

10      have been qualified with color vision deficit

11      and that I needed to uphold the medical

12      standard.  So I informed them that this was

13      occurring.

14  BY MS. SWEARENGEN:

15      **Q.   Who did you inform specifically?**

16      **A.   Most likely Barbara Hayes.  She was my point**

17  **of contact at the Marshals Service.**

18      **Q.   And what, if anything, did Ms. Hayes say to**

19  **you in response?**

20      **A.   I don't recall.**

21      **Q.   Do you recall if the Marshals Service**

22  **approved you upholding the medical standard and**

23  **disqualifying these individuals?**

24      **A.   Yes, they did.**

25      **Q.   How did they approve that?**

1      A.   Through not providing a waiver for these

2  individuals.   When my medical qualification or

3  disqualify came through, then they informed Akal I

4  imagine that these individuals were not medically

5  qualified.

6      Q.   What's the waiver that you just mentioned?

7      A.   An agency -- when the reviewing medical

8  officer provides a medical disqualification, that's

9  only a recommendation.   The agency itself makes the

10  final decision regarding medical qualification or

11  not.   An agency could provide a waiver for any

12  disqualification if they feel that that is

13  appropriate.

14      Q.   In your tenure as a reviewing medical

15  officer for the Marshals Service are you aware of the

16  Marshals Service ever having issued a waiver?

17      A.   Not to my knowledge.

18      Q.   Have you seen other agencies issue waivers?

19      A.   Yes.

20      Q.   What agencies were those?

21      A.   National Park Service.

22      Q.   Any other agency?

23      A.   Not that I'm aware of.

24      Q.   Dr. Goldhagen, when you reviewed for the

25  court security officer physicals and follow-ups, did

1    could keep things consistent between physicians who

2    were doing the reviews but yet at the same time they

3    could tailor it for that specific individual.

4        Q.   That's a good point.   I guess we should have

5    defined our terms.   Do you think the language in

6    Exhibit 2 which references the importance of good

7    color vision even though that might boilerplate, that

8    it's standard on the form, do you think that language

9    is important?

10       A.   Yes.

11       Q.   My opponent asked you some questions about

12    her Exhibit 2, which is another opinion letter from

13    Dr. Good whom you described as a color vision expert.

14    She didn't ask many questions about that document.

15    Let me ask you a couple.   On the second page of that

16    exhibit Dr. Good wrote that the mission of the court

17    security officer is to protect court officials and

18    safeguard the public for federal court pending.   The

19    position physician mission is described as "a

20    responsibility that permits no errors."   Dr. Good

21    wrote that color is an important descriptor used for

22    efficient officer to officer communications when

23    transmitting important "be on the lookout

24    information".   Dr. Good wrote the color of clothing,

25    vehicles and personal items are important descriptors

1    used to increase communication efficiency.  Dr. Good

2    further wrote that incorrect color interpretation

3    will impair efficiency of communication and can

4    result in a suspect escaping apprehension or a

5    "nonsuspect" being detained.

6             Do you have any reason to disagree with any

7    of the assertions that Dr. Good made?

8         A.   No.  And he was specifically referencing

9    court security officers in that document.

10        Q.   Do you think ensuring the safety of people

11   in a federal courthouse by court security officers is

12   a big deal, doctor?

13        A.   Yes.

14             MR. PETERSON:  I have no further questions.

15   Thank you.

16                      FURTHER EXAMINATION

17   BY MS. SWEARENGEN:

18        Q.   I have just a few and it won't be very long.

19   Dr. Goldhagen, when Mr. Peterson was referencing

20   earlier in his questioning the Oklahoma City bombing,

21   do you have any knowledge as to whether any of the

22   other court security officers on duty at that time

23   had color vision deficiency?

24        A.   No.  I don't know.

25        Q.   Turning to Defendant Exhibit 2?

## Judicial Security Division
## Medical Review Form

*7113*

| LE Incumbent Name: **Gary Bolke** | Date of Birth: | Age: **60** | Gender: **M** |

SSN: **[redacted]**     LE Incumbent  **Court Security Officer**

Examining Facility: , ,
Circuit 6  E M I

Report of Medical Examination:   Date: 12/18/2013      This review is based on     FY: 2014
Supplemental Medical Information: Date: 4/12/2014     ·Supplemental Medical Received   Date: 04/22/2014

---

**YOUR STATUS IS:  Not medically qualified to perform the essential functions of the job**

*The following medical condition(s) poses a significant risk to the health and safety of yourself and/or others in the performance of essential job functions.  Medical follow-up, if requested, and any restriction of duties are listed below.  Send medical information to your employer.*

**ALERT:  NOT MEDICALLY QUALIFIED**

CSO Gary Bolke has a significant color vision deficit according to the results of the Ishihara color vision test (4 correct/14 tested) and the Farnsworth D15 color vision test (6 major errors) provided by Thomas F. Koehler, OD on 4/12/14.  This condition impairs the ability to recognize basic colors and does not meet the required color vision standard for the job.  Good color vision is important and sometimes a crucial factor in the efficient performance of all duties and responsibilities.  The recognition and proper identification of persons, vehicles, buildings, color coded electronic screeners, and/or documents is important.  In officer to officer communication, the description of suspects, vehicles or buildings may be dependent upon accurate color descriptions. In addition, court testimony may depend on proper color descriptions. Therefore, the CSO does not meet the color vision requirement for the job of Court Security Officer.

Review Date:  06/30/2014
Judicial Security Division Reviewing Medical Officer:

H. Goldhagen, MD, MPH

---

Merits Record ID: 2612419



EXHIBIT
2

AKAL000590

U.S. Department of Justice
United States Marshals Service

**Acknowledgement of Conditions of
Court Security Officer Eligibility**

INSTRUCTIONS: Applicants to become U.S. Marshals Service Court Security Officers should complete Form CSO-004. Return completed acknowledgements to the contracting company.

I, _GARY Boike_ *(Insert name)*, understand that my (potential) employer
_AKAL Security Inc._ *(Insert the name of the company)*, is under contract with the United States Marshals Service (USMS) to provide security services.

I also understand _AKAL Security Inc._ *(Insert the name of the company)* has, or will hire me to work on their behalf, as a Court Security Officer (CSO), for the purposes of fulfilling its contract responsibilities with the USMS. I understand that I must not at any time, represent myself as an employee of the USMS.

I acknowledge and understand that my eligibility to perform services under the contract will be determined by the USMS based upon meeting all CSO contract qualifications standards. These qualifications include successful completion of an initial and yearly medical examination; weapon qualification test; a background investigation; and, other CSO qualification standards noted in the contract.

I acknowledge and understand my suitability and eligibility to perform as a CSO under the contract will be an annual requirement, or as deemed necessary by the Government. I acknowledge and agree that if I fail, at any time, to meet any of the CSO qualification standards, I will be prohibited from performing services under the USMS contract.

I fully understand and accept that if I am granted an "interim approval" to begin performing CSO services under the contract and subsequently fail to pass the medical standards, the weapons qualification standards or the background investigation, this approval will be revoked.

Name (Print): _GARY Boike_

Signature: _Gary Boike_

Date: _12-18-13_

**EXHIBIT**
_3_

Form CSO-004
Rev. 03/12

AKAL000495

## APPLICANT/INCUMBENT'S SIGNATURE AND CERTIFICATION STATEMENT

Read the following carefully before signing this certification. A false answer to any question in this statement may be grounds for disqualification and may be punishable by fine or imprisonment (U.S. Code Title 18, Section 1001).

*I have completed this statement with the knowledge and understanding that any or all items contained herein may be subject to investigation and I consent to the release of information concerning my capacity and fitness by employers, educational institutions, law enforcement agencies, and other individuals and agencies, to duly accredited investigators, and other authorized employees of the Federal Government for that purpose.*

**CERTIFICATION:** *I certify that all of the statements made by me are true, complete, and correct to the best of my knowledge and belief, and are made in good faith.*

Applicant/Incumbent Name (Print):

GARY M. Boike

Signature: Gary M. Boike

Date: 12-18-13

**PART V - PHYSICAL MEASUREMENTS** *(To be completed by Examining Physician or clinic staff.)*

### VITAL SIGNS

| Weight: | Height: | Blood Pressure: | Pulse: |
|---|---|---|---|
| | | REDACTED | |

### VISION/ACUITY

| | Both | Right | Left | | Both | Right | Left |
|---|---|---|---|---|---|---|---|
| Uncorrected Near: | 20/ 30 | 20/ 30 | 20/ 40 | Uncorrected Far: | 20/ 25 | 20/ 70 | 20/ 70 |
| Corrected Near: | 20/ 25 | 20/ 30 | 20/ 40 | Corrected Far: | 20/ 25 | 20/ 30 | 20/ 25 |

### VISION - COLOR

Testing MUST be done with Ishihara (or comparable) Pseudo=Isochromatic Plates. <u>A MINIMUM OF FOURTEEN PLATES</u> must be reported.

| Type of test: | # of plates correct: | # of plates tested: |
|---|---|---|
| ☒ Ishihara  ☐ Other: HHH | 4 | 14 |

| VISION - PERIPHERAL | | VISION - DEPTH PERCEPTION | | |
|---|---|---|---|---|
| Is the peripheral vision normal? | Type of test: | | Score: | Seconds of arc: |
| ☒ Yes  ☐ No | TiTMuS | | 85 | 30 |

### HEARING

Hearing testing must be done with an <u>AUDIOMETER IN A SOUND CONTROLLED ROOM OR BOOTH</u>. Each ear must be tested separately at 500, 1000, 2000, 3000, and 4000 Hz. **HEARING AIDS MAY NOT BE USED DURING TESTING.** Attach audiometer printout to this form.

| Results: | 500 | 1000 | 2000 | 3000 | 4000 |
|---|---|---|---|---|---|
| Right ear | | | REDACTED | | |
| Left ear | | | | | |

PATIENT NAME (LAST, FIRST, MI):

Boike, GARY, M.

L  REDACTED  I:

Form CSO-229
Rev. 11/12

AKAL000502

**TEST DICHOTOMIQUE de FARNSWORTH**
pour la Cécité des Couleurs - Série D-15
**FARNSWORTH DICHOTOMOUS TEST FOR COLOR BLINDNESS**
Series D-15

Nom / Name _Gary Boike_

Age _____ Date _4-12-14_ N° _____

Lieu d'examen / Place of Examination _Normandy Optical Shelby Twp_

Examinateur / Examiner _Thomas P. Koehler O.D._

**ANALYSE DICHOTOMIQUE**
**DICHOTOMOUS ANALYSIS**

| Type | Axe de Confusion / Axis of Confusion | |
|------|------|------|
| PROTANE | (ROUGE - bleu vert) (RED - blue green) | ☐ |
| DEUTANE | (VERT - rouge pourpre) (GREEN - red purple) | ☒ |
| TRITANE | (VIOLET - jaune vert) (VIOLET - yellow green) | ☐ |

RÉUSSITE / CORRECT ☐

ÉCHEC / ERROR ☒

**Test :** Ordre donné par le sujet / Order given by patient
1  2  3  15  14  4  5  13  6  12  11  7  10  9  8

**Retest :** Ordre donné par le sujet / Order given by patient
1  2  3  4  5  6  7  8  9  10  11  12  13  14  15
1  2  3  15  14  4  5  13  8  7  9  10  6  12  11

**TEST**



**RETEST**



SEE INTERPRETATION ON BACK

LUNEAU OPHTALMOLOGIE - B.P. 252, 28005 CHARTRES

EXHIBIT 4

AKAL000563

## Judicial Security Division
### Medical Review Form

| | | |
|---|---|---|
| LE Incumbent Name: **Gary Boike** | Date of Birth: Age: **60** | Gender: M |
| SSN: REDACTED | **LE Incumbent** **Court Security Officer** | |
| Examining Facility: , , | | |
| Circuit 6 | | |

*Akal Security Received FEB 2 0 2014*

| | | | |
|---|---|---|---|
| Report of Medical Examination: | **Date:** 12/18/2013 | This review is based on | FY: 2014 |
| Supplemental Medical Information: Date: | | Supplemental Medical Received | **Date:** |

---

**YOUR STATUS IS:  Medical determination deferred pending further documentation**

*Incumbent has medical findings which may hinder safe and efficient performance of essential job functions.  Please provide the following detailed or diagnostic medical information.  Per agency request, if further information is not provided, a determination will be made based on available medical information.  Send medical information to your employer.*

*The written request below should be provided to the treating physician, or other applicable health care provider(s), such as an audiologist.  Failure to provide the requested information or the failure to demonstrate that the medical condition(s) in question has been satisfactorily treated/resolved could result in medical disqualification.  Individuals who are medically disqualified are not allowed by the Marshals Service to serve as Court Security Officers.  In addition to the medical information requested below, the CSO applicant or incumbent and/or the treating physician should be encouraged to provide any additional written opinions or comments and any other copied records that may be useful in reaching a determination of medical qualification.*

1.   A color vision deficit has been identified on the initial screening test (4 of 14 plates correct).  Therefore, further testing using the Farnsworth D-15 color vision test is necessary.  Please be certain that the testing facility can administer the Farnsworth D-15 test.  Other testing formats and Farnsworth testing using more than 15 color objects are not acceptable  Please also NOTE the following:

a. This test MUST be explained, observed and results recorded and signed by the eye doctor.
b.  A copy of the test must be provided, to include graph with cap order, with the eye doctor's interpretation and signature.
c. Tinted lenses or glasses are NOT to be used in order to pass this test and this must be documented in the medical report.
d. A government issued photo ID (Drivers license, passport, military ID), must be checked and verified for the person tested and this verification acknowledged in the report.

It is important that all above verification be addressed in the report.

Review Date:  **02/01/2014**
Judicial Security Division Reviewing Medical Officer:

**K.C. Gildiner, MD, MPH**

KC GILDINER, MD
FOH ATLANTA

---

**EXHIBIT**
_5_

PENGAD 800-631-6989

AKAL000553



**From:** Good, Gregory [good.3@osu.edu]
**Sent:** Monday, April 07, 2014 3:35 PM
**To:** Goldhagen, Haviva (PSC/FOH/CHS) (CTR)
**Cc:** Howard, Jeff (PSC/FOH/CHS) (CTR); Ohlsson, Sara (PSC/FOH/CHS) (CTR)
**Subject:** RE: tinted lenses for correction of color vision deficit

Haviva:

I understand the concern of JSD concerning this issue. It does seem logical that using the tinted contact lens for color deficiency would be similar to allowing glasses for poor visual acuity due to nearsightedness or a hearing aid for poor hearing. I strongly state, however, that this is not the case. I, along with the vision science community in general, do not believe that using a tinted spectacle or contact lens provides for any significant improvement in general color discrimination.

Tinted contact lenses designed for use with significant color vision deficiencies were first introduced in the early 1970's. The X-Chrom lens was developed with a deep red tint to provide some help with colors for severe color vision defectives. The vast majority of color vision defectives confuse greens, browns, and reds, as well as confuse blues and purples. The idea of using the X-Chrom lens was that the deep red tint would essentially render all green objects BLACK as the red tint would absorb all green wavelengths of light. Then, by fitting the red lens to a single eye, green objects would appear normal brightness with one eye and appear very dark to the eye wearing the contact lens. The difference in brightness as seen by the two eyes would then create a shimmering (or luster) to the brain. Red objects would appear normal brightness to each eye, however. If this worked at all, it only worked for very bold green colors under very bright lights. Also, the "perception of green" was not instantaneous (as is normal color vision) and only came about after vigorous inspection. The lens is not useful for less than bold colors (pastels) or dark colors and when working in less than ideal lighting conditions. Also, the lens can even introduce extra color confusions that weren't present initially for the color deficient individual when not wearing the tinted lens.

Often, however, by wearing the lens a severely color deficient individual may be able to "pass" a color vision screening test. The tinted lens does NOT provide for normal color discrimination, but instead, interferes with the design of the color vision screening test in which the color and brightness of figures and background are very



EXHIBIT

6

AKAL001233

precisely produced to help identify those with normal color vision from those that lack normal color discrimination. By using the tinted lens, however, a color vision defective can identify a figure on the test correctly, not by using color vision, but by using brightness discrimination. Thus, it appears the individual may discriminate colors as well as a color vision normal (by passing the screening test), but this is not the case. When colored samples with various saturation, brightness, and hue are viewed, color confusions remain. If basic colors are confused by a color vision deficient when not wearing the lens, then basic colors (and certainly subtle shades of color) will be confused while wearing the tinted lens in the "real" world when shadows, lightings, and various backgrounds constantly change the visual environment.

Because the Court Security Officer deals with color coding on scanning equipment, and, as a weapon carrying "law-enforcement" officer that may need to comprehend descriptions of individuals to include colors of clothing and equipment, I agree that passage of the Farnsworth D-15 test (without the use of tinted spectacle or contact lenses) is the proper standardized color vision test for the CSO position. Additionally, I do not believe it is appropriate to bypass the color vision standard for the position with the use of a tinted contact lens or a tinted spectacle lens.

Sincerely,

Gregory W. Good, OD, PhD
Professor Emeritus, Clinical Optometry
The Ohio State University
Cell 614-204-7671

---

**From:** Goldhagen, Haviva (PSC/FOH) (CTR) [Haviva.Goldhagen@foh.hhs.gov]
**Sent:** Wednesday, April 02, 2014 1:31 PM
**To:** Good, Gregory
**Cc:** Howard, Jeff (PSC/FOH) (CTR); Ohlsson, Sara (PSC/FOH) (CTR)
**Subject:** tinted lenses for correction of color vision deficit

Greg,

Hi there. Hope all is well at your end.

I have a consultation request for you from the Judicial Security Division (JSD). This Agency is a division of the U.S. Marshals Service and oversees the Court Security Officers. They are contracted to the USMS/JSD to provide security in the Federal Courthouses. These are the fellows in the blue jackets who man the entrances to these buildings and may help the Deputy U.S. Marshals when needed in the Courtrooms. They carry guns. They check IDs and check people through the security scanners (magnetometers, X-Ray scanners, and walk-through/hand-held metal detectors) which are frequently color coded. They may need to physically control violent, irrational or unruly individuals or crowds, run up or down hallways or several flights of stairs, defend themselves against physical attack, remove a prone individual from danger, subdue an individual after running in pursuit, and arrest a resistant individual.

The vision standards require the ability to distinguish basic color, as well as shades of color. No uncorrected vision standard; corrected binocular distant vision of 20/30 or better, with worse eye of 20/125 or better; corrected binocular near vision of 20/40 or better; normal peripheral vision; no depth perception standard. When a CSO or applicant fails the Ishihara screening test (less than 10/14) and then fails the Farnsworth D15 (greater than one major error), I have disqualified the individual. One of these individuals has requested that he be allowed to wear contact lenses that are available for color blindness.

The JSD is requesting our opinion regarding allowing color deficient individuals to wear glasses or contacts that allow them to see color in order to meet the standard. We currently allow glasses/contacts in order to meet the visual acuity standard. We currently allow hearing aids on the job in order to meet

AKAL001234

the hearing standard.

Please provide your opinion regarding the use of lenses/contacts to meet the color vision standard. Charge your consultation time to JSD, Agreement #A105254. Please send your consultative hours to STG for payment and also to Jeff Howard and Sara Ohlsson (emails above) in order to ensure appropriate billing to JSD.

Thank you.

Haviva

AKAL001235