UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
**SOUTHERN DIVISION at DETROIT**

GARY BOIKE,                          )
                                     )
        Plaintiff,                   )              Case No.
                                     )              2:17-cv-10109
v.                                   )
                                     )       **MEMORANDUM OPINION**
AKAL SECURITY, INC.,                 )              **AND ORDER**
                                     )
        Defendant.                   )
                                     )
                                     )

***

Plaintiff Gary Boike was asked by his employer, Defendant
Akal Security, Inc., to take a color-vision examination that
confirmed what he, his physician, and the federal agency overseeing
his position already knew: Boike's ability to distinguish between
certain colors was impaired. The United States Marshals Service,
pursuant to its contract with Defendant Akal Security, Inc.,
required Boike to take a follow-up color-vision test, which again
confirmed his impairment. He was subsequently fired from his
position as a court security officer. After exhausting his
administrative remedies, Boike filed this action against his
former employer under the Americans with Disabilities Act ("ADA"),
42 U.S.C. § 12112(b)(2), and Michigan's Persons with Disabilities
Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1101, *et seq.*

1

Akal Security, Inc. ("Akal"), has filed a motion for summary judgment [DE 25] on Boike's claims, alleging that his color-vision deficit is not a "disability" as defined by the ADA. Even if Boike is disabled, Akal argues that the color-vision exams Boike took did not violate the ADA because those exams are a means to achieve the overarching goal of protecting the federal judiciary and the public. The parties disagree on several factual premises in this case, namely, whether the ability to recognize basic colors is an essential function of a court security officer. Boike has responded [DE 35] and Akal Security replied [DE 39], making this matter ripe for review.

For the reasons set forth below, Akal's motion for summary judgment is granted in part and denied in part.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The United States Marshals Service ("USMS") is statutorily responsible for security in federal courthouses. 28 U.S.C. § 566(a). The USMS fulfills this responsibility by contracting with private companies to provide court security officers ("CSOs"). 28 U.S.C. § 604(a)(22). Akal is one of the security contractors hired by USMS to provide CSOs at federal courthouses and facilities. [*See* DE 25-1 at 11].

Gary Boike began working as a CSO at the United States District Court for the Eastern District of Michigan in 1999. [*See* DE 35 at 10]. Prior to his employment as a CSO, Boike was a police

officer with the Hamtramck, Michigan police department for twenty-five years. [*Id.*]. Boike worked for Akal during most of his career as a CSO. [*Id.* at 11]. When Boike was terminated, he held the preeminent title of "Lead CSO." [DE 35 at 12].

The USMS requires CSOs to be able to perform certain functions and meet specific medical standards to ensure that they can adequately protect members of the judiciary and the public. [DE 34 at 4]. The contract between USMS and Akal stated that Akal was responsible for providing employees that met USMS's qualifications. [DE 34 at 25]. The CSO medical standards can be found in a report authored by Dr. Richard J. Miller, the former Director of Law Enforcement Medical Programs within the Federal Occupational Health agency("FOH"). These standards are included in USMS "Form 229" [*see* DE 25-6 at 4-10] and were created following the 1995 bombing of the federal building in Oklahoma City and pursuant to a specific request from the Judicial Conference Committee to analyze the CSO position. [DE 34 at 7-8]. Dr. Miller's report was adopted by the Judicial Conference after concluding that he satisfactorily determined the essential functions of the CSO. [*Id.* at 8].

To ensure that CSOs meet the medical standards, the USMS requires annual physical examinations, including color-vision testing. [*Id.* at 12]. Physicians approved by USMS and Akal examine CSOs and compile a complete medical history, documenting the exam's

results in USMS Form 229. [*See* DE 34-10]. Then, a medical review is performed by a physician with the Law Enforcement Medical Programs, a component of FOH, who makes a recommendation to USMS regarding the medical qualifications of the CSO examined. [DE 25-6 at 2, 8].

CSOs are required under the medical qualifications to be able to recognize and distinguish between basic colors. [*Id.* at 62; DE 34-10 at 4]. The Miller Report describes basic color vision as "the ability to distinguish yellow, green, red, and blue." [DE 25-6]. Dr. Gregory Good, whom Dr. Miller consulted about the vision standards in his report, stated that recognizing basic colors means "that you can use color names appropriately and you don't confuse colors, basic colors." [DE 25-9 at 44]. The vision standard in Dr. Miller's report explains that "severe color deficiency in any color is generally disqualifying," while loss of vision in one eye is completely disqualifying [DE 25-6 at 62; DE 35 at 13].

CSO color vision has been tested pursuant to this standard using two vision exams, the "Ishihara" and the "Farnsworth D-15." [DE 25-8 at 15-16; DE 25-2 at 20-21; *see* DE 25-9 at 15-18, 49-51]. Dr. Good described the Ishihara test as a "very precise test," but explained that the Ishihara does not screen individuals with blue-yellow color deficiency. [DE 25-9 at 48]. According to USMS "protocol," but not pursuant to a specific, documented policy, a CSO is required to correctly identify the number contained on at

least ten of the fourteen plates to pass the Ishihara screening. [DE 25-2 at 21; DE 25-8 at 16]. Akal states that USMS "protocol" is to require anyone who scores below a ten out of fourteen on the Ishihara to take another vision-deficient exam, the Farnsworth D-15 test. [DE 25-8 at 15-16; DE 25-2 at 20]. Dr. Miller's report says basic color vision may be demonstrated by passing the Farnsworth D-15, but it is not official procedural policy of USMS. [DE 25-6 at 62].

The Farnsworth D-15 test is designed to distinguish between individuals who have a slight color-vision deficiency from those who have a more severe impairment. [DE 25-1 at 18]. On the Farnsworth D-15, CSOs are allowed unlimited minor errors and one major error to obtain a passing score. [DE 25-8 at 17]. The FOH physician responsible for making qualification determinations stated in her deposition that a prospective or incumbent CSO needed to pass at least one of the color-vision exams to demonstrate that he or she met the color-vision requirement. [*Id.* at 18-19].

Prior to the December 2013 test at issue in this case, Boike's color vision was tested multiple times according to USMS "protocol." [*See* DE 24-10 at 1, 4]. Akal and USMS approved the medical clinic Boike frequently used for his annual physical exam [DE 25 at 14]. During these medical exams, Boike was always required to take a color-vision test. The record reflects that the clinic had discretion to choose which color-vision exam should be

administered, and on at least one occasion, Boike told Dr. Thomas Koehler that he needed to pass the Ishihara specifically for work. [DE 34-7 at 4]. Boike failed the Ishihara a number of times prior to 2013, but was rarely asked for a follow-up and was never medically disqualified. [*See* DE 35 at 15; DE 40 at 22-23].

When he underwent the same testing in late 2013 for his annual 2014 medical exam, Boike once again failed the Ishihara by scoring a four out of fourteen. [DE 25-1 at 13; DE 35 at 17]. This time, he was given a medical review form indicating that his medical determination was pending further testing and documentation. [DE 34-10 at 8]. Although it was possible to do so, Boike was not temporarily removed from the job pending the additional testing. [DE 35 at 18; DE 40 at 19-20]. The medical review required Boike to take the Farnsworth D-15 exam to further evaluate his color deficiency. [*Id.*]. Dr. Koehler performed the Farnsworth and concluded that Boike had a "deutan defect (mild)," but indicated that he had performed his job for the last fifteen years adequately and should still be able to. [*Id.*].

An FOH physician, after reviewing Boike's Farnsworth results, decided he should be medically disqualified from his position as a CSO. [*Id.*] More than half a year after Boike first took the Ishihara, FOH Judicial Security Division Reviewing Medical Officer Dr. Haviva Goldhagen submitted a medical review form stating the following:

> CSO Gary Boike has a significant color vision deficit
> according to the results of the Ishihara color vision
> test (4 correct/14 tested) and the Farnsworth D15 color
> vision test (6 major errors) provided by Thomas F.
> Koehler, OD on 4/12/14. This condition impairs the
> ability to recognize basic colors and does not meet the
> required color vision standard for the job. Good color
> vision is important and sometimes a crucial factor in
> the efficient performance of all duties and
> responsibilities. The recognition and proper
> identification of persons, vehicles, buildings, color
> coded electronic screeners, and/or documents is
> important. In officer to officer communication, the
> description of suspects, vehicles or buildings may be
> dependent upon accurate color descriptions. In addition,
> court testimony may depend on proper color descriptions.
> Therefore, the CSO does not meet the color vision
> requirement for the job of Court Security Officer.

[DE 34-1 at 9]. Dr. Goldhagen in a deposition stated that her review is not a final disqualification, but rather a recommendation to USMS. [DE 34-4 at 10]. Additionally, Dr. Goldhagen stated that "in order to make the reviews go quicker," the FOH used "boilerplate language" that physicians would modify or change according to each case. [*Id*. at 12]. Dr. Goldhagen was not personally familiar with the security equipment CSOs use and the need for color, but drafted this boilerplate language herself based in part on her "knowledge of how a medical condition could impact sage and effective job performance." [*Id*. at 13-14, 22-23]. Based on this recommendation, USMS directed that Boike be removed as CSO and Akal terminated his employment on July 9, 2019. [*Id*. at 16].

Akal argues that (1) the USMS color-vision examination and standard do not violate the ADA, (2) Akal did not discriminate

against Boike when it fired him pursuant to those standards, and (3) Boike is not entitled to punitive damages as a matter of law.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden to show that "there is an absence of evidence to support the nonmoving party's case," but that burden can be discharged when the moving party points to an absence of evidence to support the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment may only be granted if "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington—South Elkhorn Water Dist. v. City of Wilmore*, 93 F. 3d 230, 233 (6th Cir. 1996).

"A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (internal quotations omitted). The Court construes all facts, including inferences, in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Employers are prohibited from discriminating against "a qualified individual on the basis of disability in regard to … [the] discharge of employees." 42 U.S.C. § 12112.

To establish a prima facie case of disability discrimination under the ADA,[1] the plaintiff must show that he is (1) disabled, (2) otherwise qualified to perform the essential functions of the position, and that he (3) suffered an adverse employment action because of his disability. *See Ferrari v. Ford Motor Co.,* 826 F. 3d 885, 891 (6th Cir. 2016)(citing *Monette v. Elec. Data Sys. Corp.*, 90 F. 3d 1173, 1178 (6th Cir. 1996)). A plaintiff may make this showing by introducing direct evidence of discrimination, including that the employer considered and relied on the plaintiff's disability in making its employment decision. *Id.*

### A. Is Boike disabled under the ADA?

The threshold question to address on this motion is whether Boike is disabled, and thus, whether he is protected by the ADA. If Boike is not disabled, he is not entitled to relief from a discrimination claim under the ADA.

---

[1] Michigan's PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Cotter v. Ajilon Servs., Inc.*, 287 F. 3d 593, 597 (6th Cir. 2002)(abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F. 3d 312 (6th Cir. 2012). Absent a claim that the two statutes should be analyzed separately, courts analyze both claims under the ADA standards. *Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832 (E.D. Mich. 2017).

A disability can be established where (1) the plaintiff has a physical or mental impairment that substantially limits one or more major life activity; (2) a record of an impairment exists; or (3) the employer regards the person to have such an impairment. 42 U.S.C. § 12102(1)(A)-(B). The definition of disability under the ADA is to be construed broadly in favor of coverage. *Id.* at (4)(A).

The parties do not address in the motion or responses whether a record of the impairment exists that would establish a disability for the purposes of the ADA. Thus, the Court will address only whether Boike was (1) actually disabled under the ADA's definition, and if he was not, (2) whether Akal regarded him to be disabled when it terminated him. Boike carries the burden of showing he is or was perceived by Akal to be disabled, and for the purposes of the motion before the Court, Akal carries the burden of showing that there is an absence of evidence tending to demonstrate an actual or perceived disability.

**(1) Boike was not "actually disabled" under the ADA**

To meet the definition of an actual disability under the ADA, the plaintiff must have a physical or mental impairment that substantially limits one or more major life activity. Color-vision deficiency, commonly known as color-blindness, is certainly a physical impairment. The EEOC, in its regulations interpreting the amended ADA, defines a physical impairment as "[a]ny physiological disorder or condition … such as neurological, musculoskeletal,

special sense organs ..." 29 C.F.R. § 1630.2(h)(1)-(2). The parties do not dispute that Boike's ability to recognize basic colors is, at the very least, impaired.[2] The question here, however, is whether that physical impairment substantially limits a major life activity for Boike.

The ADA lists some conditions that may be considered "major life activities," including, notably, "seeing" and "working." *Id*. at (2)(A). The statute explains that the determination of whether an impairment substantially limits a major life activity should be made without considering ameliorative efforts, like equipment, appliances or "low-vision devices."[3] 42 U.S.C. § 12102 (4)(E)(i)(I).

To "substantially limit" a major life activity, the plaintiff must be be "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population

---

[2] Viewed in the light most favorable to the non-moving party, Boike's ability to recognize basic colors was impaired. Though Boike argues that there is a genuine dispute of material fact as to whether he could distinguish between basic colors, he repeatedly received low scores on annual color-vision tests and admitted in depositions that he has known for a while about his own vision deficiency. Thus, at the very least, Boike had difficulty identifying and distinguishing basic colors such as yellow, green, red, and blue.

[3] Low-vision devices are those that "magnify, enhance, or otherwise augment a visual image." 42 U.S.C. § 12102 (4)(E)(iii)(II).

can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Additionally, the nature and severity of the impairment, its expected duration, and its permanent or long-term impact should all be considered. *Id.* at (j)(2)(i)-(iii). The question must be answered on a case-by-case basis that takes into account the actual experience of an individual and the impact of the impairment on his or her daily life. *Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 566 (1999). Even though the ADA seeks to address more than utter inabilities, it is only meant to concentrate on limitations that are, at least, substantial. *Id.*; *see also Bragdon v. Abbott*, 524 U.S. 624, 642 (1998). To demonstrate a limitation on the major life activity of seeing, the plaintiff must point to more than a "difference" in vision between a person in the average population and the plaintiff. *Id.* at 565.

Boike has not presented evidence that he is substantially limited in daily life because of his color-vision deficiency. Instead, Boike simply states that there is a dispute of fact regarding whether he is substantially limited in the activity of seeing. [DE 35 at 24-26].

Next, Boike argues that he was substantially limited in the major life activity of working. When addressing whether a plaintiff's impairment limits his ability to work, regulations to the ADA explain that "substantially limits" means restricting the ability to perform a class or broad range of jobs compared to the

12

average person with similar training, skills, and abilities. 29 C.F.R. § 1630.2(j)(3)(i)(2012). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id*; *see also Booth v. Nissan N. Am., Inc.*, 927 F. 3d 387, 394 (6th Cir. 2019) *cert. docketed* No. 19-252. Several factors may be considered in determining if a person is limited, such as the geographic area where the person has reasonable access to work, the number of jobs with similar training, knowledge, skills or abilities in that area where the person would also be disqualified, and the job that the person was disqualified from. 29 C.F.R. § 1630.2 at (j)(3)(ii)(A)-(C); *see also Jasany v. U.S. Postal Serv.*, 755 F. 2d 1244, 1248 (6th Cir. 1985)(citing *E.E. Black, Ltd. v. Marshall*, 497 F. Supp. 1088, 1100-01 (D. Hawaii 1980)(evaluating the ADA's identical language to the Rehabilitation Act of 1973)).

In response to Akal's motion for summary judgment, Boike bore the burden of presenting some evidence that he was substantially limited from working due to his color-vision deficiency. Boike's response, however, only points out that Boike could not get a job as a printer for his father many years ago because he failed a color-vision test. Working as a printer is certainly not within the same skill set required for a court security officer. Boike has presented no evidence tending to show that other jobs requiring

his skillset in the geographical area he is located would not hire him because of his color-vision deficiency.

Thus, based on the undisputed facts of Boike's career history and the lack of evidence to suggest that he could not obtain jobs like that of a CSO, this Court agrees with Akal that Boike was not substantially limited in the major life activity of working. Because he is not substantially limited in a major life activity, he is not "actually disabled" under the ADA, and summary judgment should be granted for Akal on this issue.

### (2) Akal might have regarded Boike as disabled when it fired him

Boike is not precluded from the protections of the ADA on a finding that he was not "actually disabled." An ADA plaintiff can also meet the disability requirement by demonstrating that his employer perceived him to be disabled when it fired him. Congress intended that this route expand ADA coverage to people who felt the negative reactions to disabilities that were just as disabling as the actual impairment. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(l)(interpretive guidance on Title I of the ADA, discussing Congress's original intent in drafting the ADA). After a series of Supreme Court cases narrowed the scope of this protection, Congress chose to amend the ADA in 2008. *See Milholland v. Sumner Co. Bd. of Educ.*, 569 F. 3d 562, 566 (6th Cir. 2009).

Specifically, *Sutton v. United Airlines* held that the ADA "regarded as" prong required a plaintiff to show that the employer mistakenly believed the employee's actual or nonlimiting impairment substantially limited a major life activity. 527 U.S. 471, 489 (1999)(overturned by P.L. 110-325 (2009)). The amended ADA no longer requires plaintiffs to show that the impairment limited his or her life activity, or that the employer assumed the employee was limited in that way to demonstrate that he or she was regarded as disabled. In fact, the statute was amended to say the opposite:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*.

42 U.S.C. § 12102(3)(A)(emphasis added).[4]

Although the statutory language is clear that the plaintiff does not need to demonstrate that his or her impairment substantially limits or is perceived to substantially limit a major life activity, the Sixth Circuit Court of Appeals continues to apply the pre-amendment definition of "regarded as" disabled. In

---

[4] The EEOC regulations state that a "prohibited action" against an employee regarded as disabled includes a "refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment." 29 C.F.R. § 1630.2(l)(1)(2012).

*Ferrari v. Ford Motor Co.*, a 2016 case, the Sixth Circuit relied on cases applying the pre-amendment standard. 826 F. 3d 885, 892-93 (6th Cir. 2016)(quoting *Gruener v. Ohio Cas. Ins. Co.*, 510 F. 3d 661, 664 (6th Cir. 2008): "Individuals may be regarded as disabled when (1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities.").

The Sixth Circuit applied the *Ferrari* definition again in its most recent case on this issue, *Booth v. Nissan of North America, Inc.* 927 F. 3d 387 (6th Cir. 2019). In fact, in *Booth*, the Sixth Circuit expressly stated that "a plaintiff may seek relief under the ADA if his employer mistakenly believes that he is substantially limited from performing a major life activity, such as work." *Id*. at 395 (citing *Ferrari*, 826 F. 3d at 893). The line of cases relied on by the Sixth Circuit in *Booth* and *Ferrari* trace back to *Sutton v. United Air Lines, Inc.* — the very case Congress sought to supersede through its amendments to the ADA. 527 U.S. 471 (1999).

In comparing the language in the statute to the Sixth Circuit's standard, this Court notes the contradiction between the two definitions of "regarded as disabled." In fact, the Sixth Circuit noted the distinction immediately after the amendments in

*Milholland v. Sumner County Board of Education*. The Sixth Circuit noted there that the amended version of the ADA "no longer requires the plaintiff to bringing a claim under subpart (C) to show that the impairment limited her life activity, including working in a broad class of jobs." 569 F. 3d at 566.

The EEOC's regulations interpreting the ADA confirm a "regarded as" definition that contradicts recent Sixth Circuit decisions. Where a person has been subjected to an action prohibited by the ADA because of an actual or perceived impairment that is not transitory and minor, a person will be regarded as disabled. 29 C.F.R. § 1630.2(g)(1)(iii). Further, the code notes that the "regarded as" prong does not require a showing of an impairment that substantially limits a major life activity. *Id*. at (g)(3).

While this Court is certainly wary of critiquing the Sixth Circuit's application of the ADA, these cases stand in contradiction with the unambiguous words and Congressional purpose of the amendments. As the Western District of Michigan also noted on this discrepancy, "this Court interprets the amended statute as written and controlling … over case law that has been directly superseded by the Amendments Act and is no longer binding on the precise point at issue." *Equal Emp't Opportunity Comm'n v. M.G.H. Family Health Ctr.*, 230 F. Supp. 3d 796, 807 (W.D. Mich 2017)(citing *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 461-

62 (2002)). For the same reasons, this Court will apply the ADA as amended and not according to the legal standards set forth by the Sixth Circuit in *Ferrari*.

Akal agreed that Boike's color-vision was impaired when it chose to discharge him pursuant to USMS's medical determination. Because the post-amendment ADA does not require a showing that Akal regarded Boike to be substantially limited in the major life activity of working, and because the parties agree that he does have an impairment and was terminated on the basis of that impairment, there is no dispute of material fact and Boike has met the threshold requirement of being "regarded as" disabled.

### B. Was Boike otherwise qualified for the position?

Since a reasonable jury could find that Akal regarded Boike as disabled under the ADA, the next step in the analysis asks if Boike was "otherwise qualified" for the position despite his color-vision deficiency. If the plaintiff introduces direct evidence that he or she suffered an adverse employment action because of his or her disability, he or she must show they were otherwise qualified for the position despite it. *Ferrari*, 826 F. 3d at 891. The EEOC has defined "qualified" to mean that the person "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform

the essential functions of such position." 29 C.F.R. §
1630.2(m)(2012).

Where the employee alleging discrimination is doing so under
a "regarded as disabled" theory, the employer has no obligation to
provide a reasonable accommodation because the individual is not
"actually" disabled.[5] 42 U.S.C. § 12201(h)(an employer "need not
provide a reasonable accommodation or reasonable modification to
policies, practices, or procedures to an individual who meets the
definition of disability" under the "regarded as" prong of the
statute.).

Because it is unnecessary to analyze a reasonable
accommodation to determine if a plaintiff is otherwise qualified
for a position, the only remaining prong for Boike to meet is to
show that he could still perform the essential functions of the
job. The parties agree that the job function at issue is the
ability to distinguish between basic colors. Boike acknowledges
that this function is, at the very least, important to the CSO
position. However, Akal claims that a CSO cannot adequately protect
the public and the Court with a color-vision deficiency.

---

[5] Akal correctly notes that, if the Court finds that there is a
question of material fact as to whether Boike was regarded as
disabled, there is no need obligation for Akal to provide a
reasonable accommodation. Thus, as Akal notes, the effectiveness
of a tinted lens and how it might assist Boike in his position as
a CSO is not relevant.

The question of whether a job function is essential is a question of fact typically not suitable for resolution on a motion for summary judgment. *Keith v. Cty. of Oakland*, 703 F. 3d 918, 926 (6th Cir. 2013). Because these determinations are fact sensitive, the ADA requires the employer to conduct an individualized inquiry before finding that an employee's disability disqualifies him from a position. *Id.* at 923 (citing *Holiday v. City of Chattanooga*, 206 F. 3d 637, 643 (6th Cir. 2000)). In fact, courts in this Circuit have held that employers are estopped from arguing that a plaintiff is not "otherwise qualified" when it did not provide the plaintiff with a statutorily mandated individualized assessment of his ability to perform the job. *M.G.H. Family Health Ctr.*, 230 F. Supp. 3d at 813-14. The employer should consider the applicant's personal characteristics, his or her actual medical condition, and the effect it may have on his ability to perform the job. *Id.; see also Estate of Mauro v. Borgess Med. Ctr.*, 137 F. 3d 398 (6th Cir.)(explaining necessity of individualized inquiry into the plaintiff's specific situation to determine if he or she is otherwise qualified for the job)*cert. denied*, 525 U.S. 815 (1998).

In *Keith*, the examining doctor entered the employee's room and briefly reviewed his file, declaring that because the employee was deaf, he could not be a lifeguard. *Id.* at 923-24. Like the case at hand, the defendant employer in *Keith* was not the only

entity with say over the employee's potential discharge.[6] *Id.* at 924. The Sixth Circuit held that although neither his direct employer nor the agency advising his employer conducted an individualized inquiry into the plaintiff's ability to perform the job, it was quick to mechanically fire him the moment a doctor pointed out his disability. *Id.*

Another Sixth Circuit case illustrates the problem with relying on a single medical opinion with no individualized inquiry into the impact the disability will have on the employee's actual ability to work. In *Holiday v. City of Chattanooga*, an HIV-positive individual was disqualified from a job as a police officer based solely on a single doctor's medical report. That report simply cited his HIV-positive status as the reason he could not perform the essential functions of a police officer. 206 F. 3d at 644. The Sixth Circuit held that the district court erred in accepting the doctor's report as dispositive evidence of the plaintiff's inability to serve as a police officer. *Id.* at 643. The plaintiff also introduced a significant amount of evidence to show that he

---

[6] The plaintiff in *Keith* was hired by the County of Oakland, under advisement by an organization skilled in aquatic safety. 703 F. 3d at 920. He was fired by the County, but neither entity gave him any individualized evaluation of the impact his disability may have on his job as a lifeguard. *Id.* at 924. Though Akal does not mention its third-party status, this Court notes that employers do not escape their legal obligations unde the ADA because of that status. *See also Holiday v. City of Chattanooga*, 206 F. 3d 637, 645 (2000).

was still qualified to be a police officer — despite his status as an HIV-positive individual. *Id*. at 644.

A leading Sixth Circuit case cited by Akal is also instructive. In *Michael v. City of Troy*, a police officer was disqualified from his position after one physician examined the plaintiff for more than seven hours and wrote an eleven-page report on her findings. 808 F. 3d at 308. She also reviewed the City's job description for the position and applied her medical findings to find he was no longer qualified. *Id*. A second physician examined both the plaintiff and the first doctor's report to conclude that he was not qualified. *Id*. In comparing similar cases on the individualized inquiry issue, the Court noted that "[t]hese medical opinions are a galaxy apart from the ones we deemed inadequate in *Keith*—where the County's doctor dismissed out of hand [plaintiff's] ability to be a lifeguard because '[h]e's deaf[,]'—and in *Holiday*, where the doctor's opinion was only 'two scribbled lines at the bottom of a boilerplate evaluation form.'" *Id*. (internal citations omitted).

In Boike's case, the parties dispute whether an individualized inquiry was made to determine if he could perform the essential functions of the job. Dr. Koehler, Boike's USMS-approved physician, noted his failure of the color-vision test but concluded that he would still be able to work as a CSO. Based on that failure, and after more than a decade of failed results, the

FOH asked him to perform a second color-vision test. Despite Dr. Koehler's opinion that Boike's color-deficiency was "mild," he was disqualified based on his perceived failure of the exam. He was then provided boilerplate language Dr. Goldenhagen admitted she drafted based on Dr. Miller's report and her own opinion as a doctor with occupational health knowledge about color-vision deficiency. It does not strengthen Akal's argument that USMS did not have a written policy describing what a failing score on either the Ishihara or the Farnsworth would be, or even what test should be used during the physical exam. Dr. Goldenhagen's "report" contradicted previous medical determinations and did not explain why, nor did it assess, Boike's specific ability to perform the job. Akal accepted this report and recommendation without question based solely on its contract with USMS.

These facts create a material dispute surrounding not only whether Akal performed an individualized inquiry, but also whether the ability to distinguish basic colors is an essential function of the job, and one that Boike could not perform with his impairment.

### C. Did Boike suffer an adverse employment action?

The final prong of the prima facie case requires Boike to show that he was fired because he was disabled or because Akal regarded him as disabled. Termination is a materially adverse change in employment. *Sessin v. Thistledown Racetrack, LLC*, 187 F.

Supp. 869, 875 (6th Cir. 2016). The parties do not dispute that Boike was fired because of his color-vision deficiency. Thus, if Boike is disabled under the ADA, or if Akal perceived him to be, the final prong of the prima facie case of disability discrimination will be met.

For the reasons stated above, this Court denies Akal's motion for summary judgment on the issue of whether Boike can establish a prima facie case of disability discrimination. Boike's specific challenges to the color-vision examinations and standards, as well as his request for punitive damages, are addressed below.

### D. Boike's challenge of color-vision examinations

In his complaint, Boike contends that USMS's color-vision examinations and standards screen out individuals with disabilities and are unnecessary to determine if someone is qualified to work as a CSO. [DE 25-1 at 2]. There are two statutory sections of the ADA that apply to these claims. The first section, 42 U.S.C. 12112(d)(4)(A), prohibits employers from requiring medical exams or making disability inquiries unless they are job-related and consistent with business necessity. The second, 42 U.S.C. 12112(b)(6), focuses on the standards, employment tests, and other criteria that screen out individuals or groups with disabilities. *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 571-

72 (6th Cir. 2014). The Court addresses each of these statutory claims in turn.

**(1) 12112(d)(4)(A) claim**

The Sixth Circuit noted in *Bates* that it can be difficult to classify a test or examination under these two provisions because the ADA leaves 12112(d)(4)(A)'s terms — "medical examination" and "disability inquiry" — undefined. *Id*. at 573. One major difference is that (d)(4)(A) protects all employees from medical inquiries, even if they do not have a qualifying disability. *Id*. at 573-74 (citing *Kroll v. White Lake Ambulance Auth.*, 691 F. 3d 809, 813 n.6 (6th Cir. 2012)). Because this determination does not rest on Boike's status as a disabled individual, the Court addresses it first.

In its enforcement guidance, the EEOC defines a "medical examination" as "a procedure or test that seeks information about an individual's physical or mental impairments or health," and sets out a list of factors influencing this determination. EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* Part B.2 (July 27, 2000), *available at* http://www. eeoc.gov/policy/docs/guidance-inquiries.html. The EEOC explicitly includes vision tests as an example of a medical examination. *Id*. *see also Bates*, 767 F. 3d at 575.

As for the applicability of 12112(d)(4)(A), the Sixth Circuit explained:

> The statute clearly permits medical examinations, but only in limited circumstances. The focus is on the nature of the job relatedness and what constitutes a business necessity. The interpretative guidelines to the ADA explain that the statute was intended to prevent against "medical tests and inquiries that do not serve a legitimate business purpose."

*E.E.O.C. v. Prevo's Family Market, Inc.*, 135 F. 3d 1089, 1094 (6th Cir. 1998)(citing 29 C.F.R. § 1630.13(b)(1996)). When (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others, the medical examination will be found to be job-related and consistent with business necessity. *Denman v. Davey Tree Expert Co.*, 266 Fed. Appx. 377, 379 (6th Cir. 2007).

It is undisputed that Boike did not request an accommodation for his color-vision deficiency while employed as a CSO. [DE 34 at 38]. The medical examination is permissible, therefore, under the first prong of the job-related and business-necessity analysis. Instead, Akal argues that because CSOs are hired to protect the judiciary and the public, being able to distinguish between colors is an essential function of the CSO job. Thus, USMS began requiring color-vision testing as part of its mandatory annual physical exams.

Thus, a CSO's ability to distinguish between colors should be evaluated to determine if it is an essential function of the job. This inquiry is often made at the prima facie case stage of an ADA discrimination case, but, as noted above, Akal failed to conduct an individualized inquiry to determine if Boike could still perform the essential functions of the job. Although the failure to individually evaluate Boike estopped Akal from claiming he was not otherwise qualified, in the context of determining the alleged discriminatory nature of a medical exam, the Court must determine if there is a dispute of material fact as to whether the ability to distinguish color is an essential function of the job.

"A job function is essential if its removal would fundamentally alter the position." *Denman*, 266 Fed. Appx. at 380 (citing *Kiphart v. Saturn Corp.*, 251 F. 3d 573, 584 (6th Cir. 2001)). Marginal functions of a position are not considered "essential." 29 C.F.R. § 1630.2(n)(1)(2012). To determine if a job function is essential, courts in this Circuit look to the same standard used to determine if a plaintiff is "otherwise qualified" for a job despite his or her disability. *Id*. Federal regulations provide several factors to consider in determining if a job function is "essential": (1) if the position exits to perform that function, (2) a limited number of employees are available among whom the performance of the job function can be distributed; or (3) the function is highly specialized so that the position is

hired for the person's expertise or ability to perform. *Id*. at (n)(i)-(iii)(2012). Evidence of whether a function is essential includes:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

*Id*. at (n)(3)(i)-(vii). Finally, the Sixth Circuit has noted that the determination of whether a given function is essential is typically a question of fact. *Kiphart*, 251 F. 3d 573, 585 (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F. 3d 846, 849 (6th Cir. 1998)).

The parties agree that the ability to distinguish between basic colors is a qualification for service as a CSO, as established in the contract between USMS and Akal. [DE 34 at 25]. The parties disagree, however, on the potential risk of danger involved if Boike was called on to identify a fleeing person or a suspicious package. [*Id*. at 35]. According to her deposition, the FOH medical review officer believed this to be the case, despite

the fact that Boike made arrests based on descriptions that included clothing color.

Instead of evaluating whether the ability to distinguish basic color is an essential function, which, in turn would determine if that function is job-related and consistent with business necessity, Akal separately asked if (1) the exam and standard themselves are job-related and (2) whether they are consistent with business necessity. That is not the inquiry the ADA, its regulatory counterpart, or our courts have used to determine if a function is so essential to the position that employers should be able to test for it in medical exams that are usually prohibited. For that reason, Akal's reliance on cases like *Wice v. General Motors Corp.*, No. 07-10662, 2008 WL 5235996 (E.D. Mich. 2008), are inapposite because they simply declare that "ensuring a safe workplace is a business necessity" without going through the essential-functions analysis required under controlling authority.

Because Akal did not evaluate color-vision as an essential function under the relevant cases and regulations provided above, the Court must parse out the parties' arguments from related sections of their pleadings. Akal claims that the ability to distinguish between basic colors is essential for several reasons. First, Akal claims that because Dr. Miller found the recognition of color important enough to include the color-vision standard in

his report changing the job duties of CSOs, and because USMS wrote it into the contract with Akal, it is an essential function. Dr. Miller's report and the contracts explicitly list the ability to recognize basic colors as an essential function of the job. However, as this Court and others have noted, the employer's job description and judgment are not dispositive on the issue of whether a job function is essential.

Akal also claims that because the tests used are widely accepted in the medical community as the appropriate tests to screen for color deficit, the color vision examination is "plainly related to the essential job duty of recognizing basic color." [DE 25-1 at 31]. This argument does not address any of the statutory or regulatory definitions of an essential function. Akal's other arguments address issues not relevant to the evidentiary issue of whether the ability to distinguish colors is an essential function of the position.

In the brief section of Boike's response addressing the color-vision exams and standards, he concludes that because the standard has not been consistently applied and it fails to screen out some individuals, it is not job-related or consistent with business necessity. [DE 35 at 45]. However, again, these facts taken as true are not relevant to the determination of whether the ability to distinguish color is an essential function of the CSO position. Boike did at least address the essential functions argument under

the "otherwise qualified" inquiry. There, Boike stated that (1) there is no evidence that Boike's color-vision deficiency ever prevented him from performing his job as CSO, that (2) Akal's experts were not sure if the CSOs needed to see color to operate an x-ray machine, (3) that Boike passed an active shooter training in 2013 during which he was required to use a description of the person and their clothing, (4) that during his career, Boike made several arrests based on clothing descriptions, and (5) that following Boike's initial medical exam, the treating physician found that he should still be able to perform his job despite his color deficiency. [DE 35 at 35-36]. For these reasons, Akal has not met its burden of showing there is not genuine dispute of material fact regarding Boike's ability to perform the job's essential functions. Further, Boike has presented sufficient evidence for a jury to conclude that the ability to distinguish colors is not an essential function of the CSO position.

The final avenue for Akal to claim job-relatedness and business necessity is through a showing that Boike poses a direct threat to himself or others, thus making the vision exam job-related and necessary to its business. This portion of the analysis comes directly from the direct-threat defense in 42 U.S.C. § 12113. An employee will meet this standard when he or she creates a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. §

12111(3)(2009). This determination should be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. 29 C.F.R. § 1630.2(r)(2012). The employer should make the call after evaluating a reasonable medical judgment that relies on the most current medical knowledge or the best available evidence. *Id.*; *see also Michael v. City of Troy Police Dept.*, 808 F. 3d 304, 307 (6th Cir. 2015). Some factors to be considered include (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id.* at (r)(1)-(4).

As discussed above, no individualized assessment was completed to determine if Boike could still safely perform the essential functions of the job. The direct threat defense and prong of the medical examination analysis require an individualized assessment of the employee's current ability to perform the job and a study of reasonable medical knowledge or evidence. Because Boike has provided a sufficient factual basis for a reasonable jury to conclude that he was not provided this detailed of an inquiry, the Court cannot grant summary judgment in favor of Akal.

**(2) 12112(b)(6) claim**

To challenge medical standards under 42 U.S.C. 12112(b)(6), the plaintiff must be a qualified individual with a disability. Because the Court does not decide, but only denies summary judgment

on the issue of Akal's perception of Boike as disabled, this challenge should not be addressed on the motion. If a jury finds that Boike is a qualified individual who was perceived to be disabled by his employer, it may also evaluate the medical standards under which he was tested and eventually terminated.

### E. Is Boike entitled to punitive damages?

Akal has also moved for summary judgment on the issue of punitive damages. Punitive damages are only recoverable in ADA cases where a defendant has acted maliciously or with reckless indifference to the federally protected rights of the aggrieved person. 42 U.S.C. § 1981a; *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999). The Supreme Court in *Kolstad* explained:

> There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

527 U.S. at 536-37.

Akal argues that, as a matter of law, Boike is not entitled to punitive damages because it relied on the vision standards established by Dr. Miller after an occupational study of the CSO position and those standards were approved by a committee of

federal judges. [DE 25-1 at 50]. That is the only reason Akal gives indicating why punitive damages are inappropriate. Boike, on the other hand, points out that Dr. Miller's report lacks specificity about the vision standard and notes that it has been applied differently through the years and to other CSOs. [DE 35 at 47-48]. Akal has not met its burden of showing that there is an absence of evidence to support Boike's claim for punitive damages.

## IV. CONCLUSION

In light of the foregoing discussion, the undersigned requests that the parties attempt to resolve this case through mediation. Thus, the Court having reviewed the motion and responses, and being otherwise sufficiently advised,

**IT IS ORDERED** as follows:

(1) Defendant Akal Security, Inc.'s motion for summary judgment is **GRANTED** as to the issue of Plaintiff Gary Boike's actual disability;

(2) Defendant Akal Security, Inc's motion for summary judgment is **DENIED** on all other grounds;

(3) The Court requests that the parties meet to mediate the remaining claims in this case and will give the parties forty-five days to do so before further scheduling in this matter. The parties **SHALL** file a joint status report on this action no later than **Friday, November 15, 2019.**

This the 30th day of September, 2019.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge